# PX17

## PX17 Attachment A

## Documents obtained from office of Danielle Foss

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

███████████ and ███████████ individually and on behalf of all others similarly situated,

      Plaintiffs,

v.

BLIZZARDWHITE, LLC, an Arizona limited liability company,
BELLAATHOME, LLC, an Arizona limited liability company,
CONVERTIS, LLC, a Colorado limited liability company,
CONVERTIS MARKETING, LLC, a Colorado limited liability company, and
REVGUARD, LLC, a Colorado limited liability company,

      Defendants.

---

### CLASS ACTION COMPLAINT AND JURY DEMAND

---

Plaintiffs ███████ ("█████ and ███████ ("█████ (together, "Plaintiffs") bring this Class Action Complaint and Demand for Jury Trial ("Complaint") against Defendants BlizzardWhite, LLC, BellaAtHome, LLC, Convertis, LLC, Convertis Marketing, LLC, and RevGuard, LLC ("RevGuard") (together, "Defendants") to enjoin their practice of deceptively marketing to and billing consumers—without authorization—for certain of their products and to obtain redress for all persons injured by such conduct. Plaintiffs, for their Complaint, allege as follows upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conduct by their attorneys.

*[handwritten note: Send Jenny list: BW + BAH + all brands—they name later on. Screenshots]*

## NATURE OF THE ACTION

1.      Defendants[1] are only a few of the many companies vying for the attention and money of consumers seeking teeth-whitening products (*i.e.*, gels and liquids marketed as having the purported ability to whiten teeth).

2.      In an attempt to market and sell their products, Defendants heavily promote introductory "Risk Free Trials" through targeted online advertisements, where consumers can supposedly try a one month's supply of Defendants' teeth-whitening products for *only* $1.03 plus the cost of shipping and handling.

3.      Unfortunately, Defendants do not clearly or conspicuously disclose that once consumers provide Defendants with their payment information (to purportedly pay for $1.03 and shipping and handling), Defendants enroll them in a recurring monthly club known as the "BlizzardWhite Constant Dazzler Club" and then place substantial monthly charges on their credit or debit card accounts without disclosing—in *any* readily recognizable fashion—that these charges will be imposed.[2]

*[handwritten note: try diff browsers to make sure terms are above fold]*

4.      By and through these practices, Defendants have deceived thousands of

---

[1]      On information and belief, Defendants Convertis and Convertis Marketing are alter egos of RevGuard. In addition, on information and belief, Defendant RevGuard (and/or Convertis, and/or Convertis Marketing) is the ultimate parent company of Defendants BlizzardWhite and BellaAtHome, and several of other shell corporations controlled and created by RevGuard and used to fraudulently market and sell its products online. Accordingly, where referring to "Defendants" collectively, Plaintiffs allege the same facts against RevGuard, Convertis, Convertis Marketing, BlizzardWhite, and BellaAtHome, unless otherwise specified. As such, every reference to "Defendants" shall be construed to include all Defendants jointly and acting in concert, unless a particular Defendant is identified by name.

[2]      Any advertisements, fake reviews, sales pages, or other representations for BlizzardWhite shall be construed to include references to Bella At Home as well (*e.g.*, the "BlizzardWhite Constant Dazzler Club" shall be construed to include the "BellaAtHome Bella Dazzler Club.")

2

consumers throughout the United States. In order to redress these deceptive practices,

Plaintiffs ████████ and ████████ on behalf of themselves and a Class of

similarly situated individuals, bring this suit seeking injunctive and other relief.

**PARTIES**

5.    Plaintiff ████████ is a natural person and citizen of the State of

████

6.    Plaintiff ████████ is a natural person and citizen of the State of

████

7.    Defendant BlizzardWhite, LLC is a limited liability company incorporated

and existing under the laws of the State of Arizona, with its principal place of business

located at 6260 Lookout Road, Boulder, Colorado 80301. *Send address we use*

8.    Defendant BellaAtHome, LLC is a limited liability company incorporated

and existing under the laws of the State of Arizona, with its principal place of business

located at 6260 Lookout Road, Boulder, Colorado 80301.

9.    Defendant Convertis, LLC is a limited liability company incorporated and

existing under the laws of the State of Colorado, with its principal place of business

located at 6260 Lookout Road, Boulder, Colorado 80301.

10.   Defendant Convertis Marketing, LLC is a limited liability company

incorporated and existing under the laws of the State of Colorado, with its principal place

of business located at 6260 Lookout Road, Boulder, Colorado 80301.

11.   Defendant RevGuard, LLC is a limited liability company incorporated and

existing under the laws of the State of Colorado, with its principal place of business

located at 6260 Lookout Road, Boulder, Colorado 80301.

3

## JURISDICTION AND VENUE

12.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because (a) at least one member of the putative class is a citizen of a state different from Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of the exceptions under that subsection apply to this action. This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, as the action arises in part under the Electronic Funds Transfer Act, which is a federal statute.

13.     Venue is proper in this District under 28 U.S.C. § 1391(b) as the injuries of which Plaintiffs complain arose in part in this District. Venue is additionally proper because Defendants conduct significant business transactions in this District, including soliciting consumer business, and entering into consumer and business transactions, and Defendants reside in this District.

## FACTUAL BACKGROUND

**I.      An Overview of Defendants' Deceptive Conduct.**

14.     Defendants sell teeth-whitening products under the names of "BlizzardWhite Teeth Whitening," and "Bella At Home," amongst others ("Teeth Whitening Kits").

15.     Unfortunately, and as described more fully below, Defendants engaged (and continue to engage) in a far-reaching scheme to defraud consumers into purchasing their Teeth Whitening Kits. That is, Defendants deceptively enroll consumers in a monthly subscription so that Defendants can impose recurring and sometimes endless monthly charges onto their credit card or bank statements.

PX17 Attachment A-4

16.     Defendants primarily accomplish this fraud by using targeted online advertisements to promote "risk trial offers," so that consumers can supposedly *try* their products "risk free." Unfortunately, Defendants' trials are nothing more than traps designed to induce consumers to provide Defendants with their payment information (to pay for a nominal fee), so that Defendants can later load substantial charges on their accounts without permission. Given the complexity of their scheme, a description of Defendants' business practices follows.

      A.     *Defendants and their agents heavily promote Defendants' products through targeted online advertisements and affiliate websites.*

17.     Consumers are first exposed to Defendants' products through Defendants' use of targeted online advertisements and affiliate marketers' websites[3].

18.     While these advertisements and websites appear to be consumer reviews, blogs, and articles recommending Defendants' products, they are actually fabricated advertisements designed to direct consumers to Defendants' websites (*e.g.*, BlizzardWhite.com, ActionProWhite.com, and BellaAtHome.com) where consumers are strongly encouraged to sign up for an introductory "risk free trial" (*i.e.*, to receive a free month's supply of one of Defendants' products). For example, Figure 1, on the following page, shows a screenshot of a page on http://healthy-fitness.me, which is one of dozens—if not hundreds—of websites that contain "reviews" boasting the purported benefits of using Defendants' products, in this case, "BlizzardWhite" and "Action Pro White" (another of Defendants' products under this scheme). Throughout the websites similar to the one shown in Figure 1, the reader is strongly encouraged to visit one of Defendants'

---

[3]     In its simplest form, an "affiliate website" or "affiliate marketer" refers to a party that is paid to bring potential customers to another party's business or website.

webpages where they can sign up to try Defendants' Teeth Whitening Kits for a nominal

fee. (*See id.*)



(**Figure 1.**)

19.     As previewed above, the review shown in <u>Figure 1</u> is not an authentic

review of Defendants' products, rather it's an advertisement designed by one of

Defendants' affiliate marketers (or Defendants themselves). As such, the advertisement is

built on an entirely false and deceptive premise intended to induce consumers to purchase

Defendants' products believing the consumer review to be true.

20.     Notably, Defendants and their affiliate marketers benefit from

advertisements like these. That is, Defendants pay affiliate marketers fees for each

customer that they direct to Defendants' website and who, in turn, purchases their

products. The intent and effect of this is obvious: affiliate marketers are incentivized to

use any and all methods of deception to drive traffic to Defendants' website, and

Defendants are incentivized to assist their affiliate partners using these methods to

maximize conversions.

6

  B. *Consumers are misled into providing Defendants with their payment information and then are ~~unknowingly enrolled~~ in recurring monthly clubs.*

  21. Once a consumer is directed to any of Defendants' websites, they are greeted with statements, graphics and claims designed to convince them to sign up for a "risk free trial" of one of Defendants' products.

  22. For instance, one such website includes the following statements to induce customers into registering for a trial supply of BlizzardWhite: "Get Your RISK FREE TRIAL Today!," and highlighting the purported price of "$1.03," a price much lower than the competition. (*See* Figure 2, below.)



  (**Figure 2.**)

  23. Defendants' websites are also riddled with graphics supposedly showing actual "before and after" pictures of consumers who used their products. (*See* Figure 3, on the following page, showing screenshots of Defendants' websites supposedly exhibiting "before and after" photos.)

7

*[handwritten: Send Jenny pages]*

*[handwritten: Touch ups?]*



*[handwritten: Mark —]*
*[handwritten: Ryan —]*
*[handwritten: Gabe —]*

(**Figure 3.**)

24.   Defendants placed near each of these statements and images statements strongly encouraging the visitor to try Defendants' products, such as "Rush My Risk Free Trial!" Nowhere on this page is a price for the given product beyond $1.03, nor is there any request that a consumer agree to any terms and conditions. Also on this page, the consumer is instructed to provide their name, address, phone, and email address.

*[handwritten: Terms on pg 2 instead]*

25.   Following submission of the initial contact information, consumers are directed to a checkout page. The page includes representations such as "You Qualify for Discounted Shipping," "You are one of 1,000 customers to receive our Web Exclusive RISK FREE Trial Offer today!," and "Send My Order!" Clearly displayed in the center of the page is an itemized listing of the products being ordered and the corresponding prices. On this page, Defendants represent that the price of the product is $1.03. *[handwritten: + S&P]*

*[handwritten: Not on our pages]*

26.   On the right of the page, Defendants maintain a "Credit Card Information" form where it asks consumers to input their credit card type (*e.g.*, Visa or MasterCard), number, expiration date, and a security code. *(See id.)* Just below the "Name on Card" form is a large "Send My Order!" button. *(See id.)* Because of this, the entire transaction can be completed without needing to scroll or view any other part of the page.

*[handwritten: WTF]*

27.   Within the online marketing industry, the term "above the fold," refers to

PX17 Attachment A-8

the content that can be viewed on the webpage without the need to scroll down the page. By contrast, the term "below the fold" refers to any content on a website that requires the consumer to scroll down and seek out. Any content that is below the fold, especially when there is no indication above the fold that such content exists, is commonly understood to not be seen by a website viewer.

28.     Defendants intentionally designed their products' checkout pages to place any relevant disclosures below the fold in an area that a consumer would have no reason to view. Specifically, in a box entitled "Satisfaction Guaranteed Risk Free Trial," Defendants placed a condensed paragraph of text written in light gray font on a beige background in small print. In a final effort to discourage any consumer from seeing or reading a price disclosure, this paragraph actually starts by stating that "You must be 18 years old or older to participate in this Risk Free Trial," that "You must use your own credit or debit card," and "Start your Risk Free Trial now to receive a trial supply of BlizzardWhite. You simply invest $1.03, plus a S&P fee of up to $3.87, to evaluate this great teeth whitening product for yourself."

29.     Only after those sentences, and buried in the middle of the paragraph, is there a convoluted description of the actual terms of the "Risk Free Trial." The paragraph states:

> Risk Free Trial Terms and Conditions: 1.You must be 18 years old or older to participate in this Risk Free Trial. 2.You must use your own credit card or debit card. 3.Start your Risk Free Trial now to receive a trial supply of BlizzardWhite. You simply invest $1.03, plus a S&P fee of up to $3.87, to evaluate this great teeth whitening product for yourself. 4.Your credit card will be charged the selected S&P charge above. 5.If BlizzardWhite is not right for you, call 866-955-7595 within 8 days from your order date to cancel your trial and you owe nothing more. 6.By participating in the Risk Free Trial, you are getting the rate of $34.31 a discount of 40% off of the normal retail price and you will be responsible for taking affirmative action during the Risk Free Trial period to avoid further charges outlined in How the Offer Works. 7.By clicking on the button to the right, you are agreeing to the terms and conditions in How the Offer Works. 8.You may call 866-955-7595 anytime to contact customer service regarding your shipment.

**(Figure 4.)**

30.     It is this last text, "How the Offer Works" that leads to a webpage that explains the real terms of the supposed "trial." On that separate webpage, the relevant

9

text of the "How the Offer Works" page reads, in part:



**Terms and Conditions of How the Offer Works, Returns and Refund Policy, Privacy Policy and Contact Information:**

You must be 18 years or older to participate in this Web-only Offer. You are required to use your own credit card or debit card, you cannot use the credit card of another person. By buying the total listed above, you will receive a 8 day trial of Smile Pro Direct™ Teeth Whitening Pens.

We'll enter you into our Smile Pro Direct Constant Dazzler Club. With the Constant Dazzler Club you'll get a package of Smile Pro Direct Teeth Whitening Pens so you can maintain your whiter tooth. (8) days from the date of order processing, unless you decide to take an action to cancel (by calling our customer service center at 877-281-8823 or www.SmileProDirect.com), we'll conveniently bill your credit card $94.31 for the full 30 day Smile Pro Direct System. Plus, you'll also get a package of Smile Pro Direct Teeth Whitening Pens about every 30 days. All this at the same monthly in-home price you paid for the original Smile Pro Direct System plus $10.91 in shipping, conveniently billed to your credit card.

All charges associated with this transaction will appear on your bill under the name: "SM*PROTBT8772818823".

Of course, you can also cancel any time after you receive your special offer shipment or any subsequent shipments by calling customer service at 877-281-8823 or by visiting the Easy Cancel link on our website or via written correspondence to:

Smile Pro Direct
7585 Commercial Way, Unit E
Henderson, NV 83011

If you cancel during the Web-Only Offer Introduction offer, you will be given 15 days from the day you cancel to return the unused portion of the Smile Pro Direct System in order to ensure you will not be billed (please see our no-hassle product return policy below for details) for the complete treatment. Return Shipping fees on returned Web-Only Trial package will be reimbursed on request and with documentation of shipping price after the package has been received up to a maximum of $4.95.

**(Figure 5.)**

31.     As such, and by intentional design, consumers simply do not see the actual price disclosure for Defendants' products or that they will be enrolled in Defendants' "BlizzardWhite Constant Dazzler Club," one of many recurring monthly clubs operated by Defendants ("Teeth Whitening Clubs"). As a result, consumers submit credit or debit card information relying on the fact that, as represented to them, they will only be paying $1.03, plus a "S&P" fee of up to $3.87 (and will not be subsequently charged).

32.     By definition, and by design, Defendants' disclosures are not clear and conspicuous, and intentionally defy every best practices recommendation and FTC guideline.

33.     For example, each year the FTC releases its ".com Disclosures" that provide guidelines and best practices for online advertising and online transactions.[4] The .com Disclosures set forth several rules that are applicable to Defendants' conduct here, and demonstrate how intentionally deceptive its conduct actually is:

- "If a disclosure provides information that contradicts a material claim, the disclosure will not be sufficient to prevent the ad from being deceptive. In that

---

[4]     *See* Federal Trade Commission, *.com Disclosure: How to Make Effective Disclosure in Digital Advertising* (March 2013), *available at* http://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-staff-revises-online-advertising-disclosure-guidelines/130312dotcomdisclosures.pdf.

10

PX17 Attachment A-10

situation, the claim itself must be modified.";

- "If a disclosure is not seen or comprehended, it will not change the net impression consumers take from the ad and therefore cannot qualify the claim to avoid a misleading impression.";

- "In reviewing their ads, advertisers should adopt the perspective of a reasonable consumer. They also should assume that consumers don't read an entire website or online screen, just as they don't read every word on a printed page. Disclosures should be placed as close as possible to the claim they qualify. Advertisers should keep in mind that having to scroll increases the risk that consumers will miss a disclosure.";

- "In addition, it is important for advertisers to draw attention to the disclosure. Consumers may not be looking for—or expecting to find—disclosures . . . disclosures must be communicated effectively so that consumers are likely to notice and understand them in connection with the representations that the disclosures modify. Simply making the disclosure available somewhere in the ad, where some consumers might find it, does not meet the clear and conspicuous standard.";

- "When advertisers are putting disclosures in a place where consumers might have to scroll in order to view them, they should use text or visual cues to encourage consumers to scroll and avoid formats that discourage scrolling . . . An explicit instruction like 'see below for important information on restocking fees' will alert consumers to scroll and look for the information . . . General or vague statements, such as 'details below,' provide no indication about the subject matter or importance of the information that consumers will find and are not adequate cues.";

- "The design of some pages might indicate that there is no more information following and, therefore, no need to continue scrolling. If the text ends before the bottom of the screen or readers see an expanse of blank space, they may stop scrolling and miss the disclosure."

- "They will also likely stop scrolling when they see the information and types of links that normally signify the bottom of a webpage, e.g., 'contact us,' 'terms and conditions,' 'privacy policy,' and 'copyright.' In addition, if there is a lot of unrelated information—either words or graphics—separating a claim and a disclosure, even a consumer who is prompted to scroll might miss the disclosure or not relate it to a distant claim they've already read."; and

- "If scrolling is necessary to view a disclosure, then, ideally, the disclosure should be unavoidable—consumers should not be able to proceed further with a transaction, e.g., click forward, without scrolling through the disclosure. Making a disclosure unavoidable increases the likelihood that consumers will see it."

34.     As made clear when comparing Defendants' conduct with the guidelines set forth by the FTC, it is apparent that Defendants' marketing and sales tactics are intentionally deceptive and meant to prevent consumers from understanding the true terms of purchasing Defendants' product.

35.     Perhaps most tellingly, Defendants also sell their products through several non-affiliate driven websites that more appropriately follow the guidelines above and disclose the actual charges at issue and place the full charge amount (typically $94.31) next to the products. These websites do not receive affiliate traffic and can be difficult, if not impossible, to find through a search engine. As such, they are not Defendants' intended vehicles to actually sell their products because they know they will simply not sell as well as their other sites. Yet, even still, the very existence of these websites demonstrates Defendants' knowledge of how to properly market and sell their products and how to better disclose a negative option trial. (*See* Figure 6, below, and Figure 7, on the following page, showing one of the non-affiliate home and checkout pages controlled by Defendants.)



**(Figure 6.)**

*What page is this? Ivory Pro home?*

*Send Jenny order path w/ screen shots for home page*

12



*Ivry Pro Mobile* (handwritten)

**(Figure 7.)**

C.     *Defendants Craft a Complicated Scheme to Deceive Consumers.*

36.     For years, Defendant RevGuard has been operating a scheme to sell "vanity" products online. RevGuard's business model is to rapidly invent, develop, launch, market and optimize "teeth-whitening, anti-acne, anti-aging, hair restoration and weight loss" products.[5] At the heart of RevGuard's scheme is the "risk free trial" promotion described in this complaint.

*When did convertis name page [go] down?* (handwritten)

*Convertis name page* (handwritten)

37.     To market and sell the "risk free trial" products, RevGuard has created a copious number of shell companies. Likewise, RevGuard has created additional shell or alter-ego companies to distribute, manage, and provide "customer service." With all of the many parts moving together, Defendants' scheme has resulted in thousands of consumers being defrauded.

38.     In addition to the named Defendants in this action, on information and belief, Defendant RevGuard owns and controls many other shell companies that it uses to sell products using the same fraudulent "risk free trial" scheme. For instance, RevGuard operates Smile Pro Direct, LLC, Action Pro White, LLC, First Class Whitening, LLC, Spark Whitening, LLC, Dental Pro at Home, LLC, and Titan White, LLC to sell its Teeth Whitening Kits. Similarly, RevGuard created Circle of Youth Skincare, LLC, Body ›

---

[5]     *Convertis, LLC: Overview | LinkedIn*, https://www.linkedin.com/company/convertis-llc (last visited July 9, 2014).

13

Last date brands had a sale

Tropical, LLC, Sedona Beauty Secrets, LLC, SkinnyIQ, LLC, and DermaGlam, LLC to sell its skin-care products and weight-loss pills.



(**Figure 8**, showing RevGuard's discontinued "Ultimate Facial" website created by its senior designer and a comparison to RevGuard's current "Action Pro White" web page.)

39.    For each of the shell companies used to sell the "risk free trials,"

Defendants must create a unique brand (*i.e.*, a logo, color scheme, and consistent design)

14

and website. Thus, Defendant RevGuard employees a "senior web designer," who "creat[s] marketing materials & graphics" for the "risk free trial" websites.[6] On a publicly available online website, RevGuard's "senior" employee claims to have designed several web pages that are a part of Defendants' fraudulent scheme. (*See* Figure 8, on the previous page.) Defendant RevGuard also created "RevGo" to supply its many "risk free trial" companies with Teeth Whitening Kits and other products. RevGo is a "fulfillment center" that ships the "risk free trial" products (*e.g.*, Teeth Whitening Kits) as soon as a consumer places an order. RevGo "fulfill[s] your orders - and your returns - while you focus on growing your business."[7]

     40.   ~~In an effort to reduce the number of returns they receive,~~ Defendants use RevGuard's "optimization" technology for "Trial" offer programs.[8] On its website, RevGuard claims that its technology has been used "during 15 million consumer interactions," spanning "over 375 brands across dozens of product categories." Ostensibly referring to customers attempting to cancel Defendants' unauthorized recurring charges, RevGuard says its technology eliminates the "headache or loss of revenue" from "customer[s] trying to cancel." RevGuard goes on to state:

> "Imagine learning in just a few short weeks exactly what to say to your customers when they are calling or searching for a way to cancel their next

---

[6]    Christy Gould | LinkedIn, https://www.linkedin.com/pub/christy-gould/37/7b2/b66 (last visited July 8, 2014).

[7]    *RevGo Fulfillment - We Ship That Day or You Don't Pay*, http://revgo.net (last visited July 8, 2014).

[8]    *The Top 10 Reasons Why Trial/Continuity Business Models Should Use RevGuard[TM]*, *previously available at* http://www.revguard.net/wp-content/uploads/2014/05/Top-10-Reasons-Continuity.pdf, a true and accurate reproduction of which is attached hereto as Exhibit ("Ex.") A.

PX17 Attachment A-15

bill on your website—that actually calms them down makes them want to pay you more money. ... Immediate service for the majority of your canceling customers keeps them happier and less likely to post negative reviews, or use social media to complain."

41.     RevGuard also operates "RevLive" to deal with "customer[s] trying to cancel." RevLive is a "call center" and a self-described "leader in the live Customer Service industry."[9] Yet a closer look at RevLive's *modus operandi* reveals that it is simply an extension of RevGuard's fraudulent scheme. On a recently removed web page describing its "Free Trial" customer service offerings, RevLive stated:

> "[W]e also have agents well trained for clients offering a Free Trial program. The challenge that our agents are trained to overcome would be the billing the customer receives after the Free Trial has expired [i.e., unauthorized recurring charges]. This is the point where customers would request a refund and are looking to speak to a representative. With the help of our client, we can creatively write save sales scripts, create save sale tools, or simply offer to cancel the service and encourage the customer to keep the product and billing. All of this will result in saved revenue for our clients which affect the bottom line."[10]

*[handwritten margin note, left: How long has RevLive been live. Does Dave how old Verbiage from site?]*

*[handwritten margin note, right: No idea where this verbiage came from. Who designed Revlive?]*

42.     As RevLine's statement indicates, Defendants anticipated an influx of customer complaints resulting from their practice of surreptitiously "billing the customer[s] ... after the Free Trial has expired." Unfortunately, Defendants' tactics have indeed resulted in countless consumers across the country stuck with such fraudulent and unauthorized charges on their credit and debit card statements after the "Free Trial has expired."

## II.     Facts Relating to Plaintiff ███████

43.     In late ████████ Plaintiff ██████ encountered an advertisement for Defendants' BlizzardWhite Teeth Whitening Kit while browsing around the World Wide

---

[9]     *About Us | RevLIVE!*, http://revlive.net/about-us/ (last visited July 8, 2014).

[10]    A true and accurate reproduction of an archived copy of Defendants' RevLine webpage is attached hereto as Ex. B.

16

Web. Plaintiff clicked on the advertisement and viewed representations substantially similar to those described above concerning the efficacy, availability, and cost of the Teeth Whitening Kit. Specifically, ▓▓▓▓▓▓▓ Plaintiff saw representations on a website owned or controlled by Defendants that she would pay only $1.03 plus shipping and handling for a "risk free trial" of the Teeth Whitening Kit; nowhere did Defendants disclose that she would be automatically enrolled in Defendants' "BlizzardWhite Constant Dazzler Club," one of Defendants' Teeth Whitening Clubs. Based on those representations, Plaintiff then submitted her personal information through Defendants' initial landing page.

44.     Immediately after submitting her personal information, Defendants directed Plaintiff to their checkout page. Once there, Plaintiff viewed the representations substantially similar to those described above, including a "price" box which included $1.03 for the BlizzardWhite "risk free trial." Plaintiff did not view any other price terms or agree to any terms and conditions.

45.     Based on the representations made by Defendants on their website regarding the total price of $1.03 plus shipping and handling that would be charged to her credit card, Plaintiff submitted her credit card information and submitted her order.

46.     ▓▓▓▓▓▓ Defendants charged Plaintiff's credit card in the amount of $1.03, and on ▓▓▓▓ Defendants again charged Plaintiff's credit card in the amount of ▓▓▓ ▓▓▓▓▓▓▓▓ Defendants additionally charged Plaintiff's bank account in the amount of ▓▓▓▓

47.     Plaintiff did not consent or otherwise agree to the charge of ▓▓▓, and Defendants failed to disclose the existence of this charge to Plaintiff in a clear and

17

conspicuous manner.

48.     Had Plaintiff known she was going to be automatically charged ████ ,
she would not have submitted her credit card information to purchase a trial of
Defendants' product.

**III.     Facts Relating to Plaintiff ████████**

49.     In ████████  Plaintiff ████████ encountered an advertisement
for Defendants' Bella at Home Teeth Whitening Kit while browsing around the World
Wide Web. Plaintiff clicked on the advertisement and viewed representations
substantially similar to those described above concerning the efficacy, availability, and
cost of the Teeth Whitening Kit. Specifically, ████████ Plaintiff saw
representations on a website owned or controlled by Defendants that she would pay only
$1.03 plus shipping and handling for a "risk free trial" of the Teeth Whitening Kit;
nowhere did Defendants disclose that she would be automatically enrolled in Defendants'
"BellaAtHome Bella Dazzler Club," one of Defendants' Teeth Whitening Clubs. Based
on those representations, Plaintiff then submitted her personal information through
Defendants' initial landing page.

50.     Immediately after submitted her personal information, Defendants directed
Plaintiff to their checkout page. Once there, Plaintiff viewed the representations
substantially similar to those described above, include a "price" box which included
$1.03 for the Bella At Home "risk free trial." Plaintiff did not view any other price terms
or agree to any terms and conditions.

51.     Based on the representations made by Defendants on their website
regarding the total price of $1.03 that would be charged to her credit card, Plaintiff

18

submitted her debit card information and submitted her order.

52.    Several days after her order, Defendants charged Plaintiff ▮▮▮▮ debit card ▮▮▮▮ for the purchase of the "risk free trial." Several weeks after charging her debit card ▮▮▮▮ Defendants charged Plaintiff's debit card ▮▮▮▮ without her authorization. Then, after another few weeks, Defendants yet again charged Plaintiff's bank account in the amount of ▮▮▮▮ without her authorization.

53.    Plaintiff did not consent or otherwise agree to the charges of ▮▮▮▮ or ▮▮▮▮, and Defendants failed to disclose the existence of these charges to Plaintiff in a clear and conspicuous manner.

54.    Had Plaintiff known she was going to be automatically charged ▮▮▮▮ and ▮▮▮▮, she would not have submitted her debit card information to purchase a trial of Defendants' product.

## CLASS ALLEGATIONS

55.    **Class Definitions:** Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(b)(2) on behalf of themselves and a proposed class and subclass defined as follows:

> **Class**: All persons in the United States who (1) arrived at Defendants' websites through an advertisement or affiliate link; (2) submitted payment information for BlizzardWhite, BellaAtHome, Smile-Pro-Direct, or Action-Pro-White; and (3) who were charged monies beyond the listed shipping and handling fees.

> **EFTA Subclass**: All persons in the Class who had monies debited from their bank account beyond the listed shipping and handling fee.

The following persons are excluded from the Class and EFTA Subclass: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former

19

employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class and EFTA Subclass; (4) any person who has had their claims fully and finally adjudicated or otherwise released; (5) the legal representatives, successors or assigns of any such excluded persons; and (6) Plaintiffs' counsel and Defendants' counsel.

56.     **Numerosity:** The exact number of the members of the Class and EFTA Subclass is unknown and not available to Plaintiffs at this time, but it is clear that individual joinder is impracticable. Defendants have deceived and profited from thousands of consumers who fall into the definitions set forth above. Members of the Class and EFTA Subclass can be identified through Defendants' records.

57.     **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and the Class and EFTA Subclass, and those questions predominate over any questions that may affect individual members of the Class and EFTA Subclass. Common questions for the Class and EFTA Subclass include, but are not limited to the following:

(a) Whether Defendants' conduct alleged herein constitutes a violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. Ann. §§ 6-1-101, *et seq.*

(b) Whether Defendants' conduct alleged herein constitutes fraud in the inducement;

(c) Whether Defendants' conduct alleged herein constitutes fraud by omission;

(d) Whether Defendants' conduct alleged herein constitutes breach of

20

contract; and

(e) Whether Defendants' conduct alleged herein constitutes a violation of 15 U.S.C. § 1693e.

58.     **Typicality**: Plaintiffs' claims are typical of the claims of other members of the Class and EFTA Subclass, as Plaintiffs and other members sustained damages arising out of the wrongful conduct of Defendants, based upon the same transactions that were made uniformly with Plaintiffs and the public.

59.     **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class and EFTA Subclass, and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interest antagonistic to those of the Class and EFTA Subclass, and Defendants have no defenses unique to Plaintiffs.

60.     **Policies Generally Applicable to the Class and EFTA Subclass**: This class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class and EFTA Subclass as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and EFTA Subclass, and making final injunctive relief appropriate with respect to the Class and EFTA Subclass as a whole. Defendants' policies challenged herein apply and affect members of the Class and EFTA Subclass uniformly and Plaintiffs' challenge of these policies hinges on Defendants' conduct with respect to the Class and EFTA Subclass as a whole, not on facts or law applicable only to Plaintiffs.

61.     **Appropriateness of Injunctive Relief**: Defendants have acted on grounds

21

generally applicable to the Class and EFTA Subclass, thereby making final injunctive

relief appropriate with respect to the Class as a whole. Prosecution of separate actions by

individual members of the Class would create the risk of inconsistent or varying

adjudications with respect to individual members of the Class and EFTA Subclass that

would establish incompatible standards of conduct for Defendants.

62.     Plaintiffs reserve the right to revise the foregoing "Class Allegations" and

"Class Definitions" based on facts learned in discovery.

**FIRST CAUSE OF ACTION**
**Violation of the Colorado Consumer Protection Act,**
**Colo. Rev. Stat. Ann. §§ 6-1-101, *et seq.***
**(On Behalf of Plaintiffs and the Class)**

63.     Plaintiffs incorporate by reference the foregoing allegations as if fully set

forth herein.

64.     The Colorado Consumer Protection Act, Colo. Rev. Stat. Ann. §§6-1-101,

*et seq.* ("CCPA"), protects consumers from a wide range of fraudulent and deceptive

trade practices.

65.     The CPPA prohibits the act, use, or employment of fraud, false pretense,

misrepresentation, misleading statement, or deceptive practice in connection with the sale

of goods or merchandise.

66.     When Plaintiffs and the Class submitted their payment information to

Defendants, they expected that such information would only be used to pay the listed

price (typically $1.03) and shipping and handling for their "risk free trial" of Defendants'

products.

67.     Plaintiffs' and the Class's expectations were justified by the fact that

Defendants never clearly or conspicuously disclosed, and in fact, actively hid the fact that

22

their payment information would be used to automatically enroll Plaintiffs and the Class in a monthly club at an additional cost.

68.    By stating that Plaintiffs and the Class could receive a "risk free trial" of Defendants' products for only a trivial cost (typically $1.03) and the cost of shipping and handling, Defendants intentionally mislead Plaintiffs and the Class to believe that they would only be charged for shipping and handling of their "risk free trial."

69.    Defendants were responsible for disclosing the true price of their products—typically a monthly charge of $94.31 for enrollment in Defendants' Teeth Whitening Club. Instead, Defendants intentionally mislead consumers into believing the price of the "risk free trial" was only a trivial amount (typically $1.03) and the cost shipping and handling of their products.

70.    Plaintiffs and the Class justifiably relied on Defendants' false and misleading statements regarding the price of their product. As a result of their reliance, Plaintiffs and the Class suffered damages in the amount of monies paid to Defendants for enrollment in their monthly Teeth Whitening Club.

71.    Accordingly, under the CPPA, Plaintiffs and the Class seek an injunction against further violations.

### SECOND CAUSE OF ACTION
**Fraud in the Inducement**
**(On Behalf of Plaintiffs and the Class)**

72.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

73.    As described with particularity herein, Defendants have designed, overseen, and disseminated false and misleading advertising promoting their Teeth Whitening Kits. This conduct includes, but it is not limited to, promoting and advertising

23

the Teeth Whitening Kits without disclosing the actual characteristics and price of those products, which are material terms of any transaction. Defendants promoted and charged for their products with full knowledge that consumers were acting in reliance on their false statements.

74.     Through a series of advertisements, representations, omissions, and false statements regarding the Teeth Whitening Kits, Defendants misrepresented and obscured the actual cost and characteristics of their products.

75.     Defendants took concrete and intentional steps to misrepresent the actual price and characteristics of their Teeth Whitening Kits products to mislead consumers into submitting their credit or debit card information to Defendants.

76.     Defendants intentionally designed their products' landing and checkout pages so as to increase the rates of conversion (*i.e.*, sales) by misrepresenting the characteristics of their products and intentionally concealing the actual price to be charged for the Teeth Whitening Kits.

77.     By committing the acts alleged in this Complaint, Defendants have designed and disseminated untrue and misleading statements through fraudulent advertising in order to sell or induce members of the public to purchase Defendants' products.

78.     The price of a product is a material term of any transaction because it directly affects a consumer's choice of, or conduct regarding, whether to purchase a product. Any deception or fraud related to the price of a consumer product is materially misleading.

79.     The misrepresentation or omission of the contents of a product is likely to

24

mislead a reasonable consumer who is acting reasonably under the circumstances.

80. Defendants knew of the falsity of the representations they made regarding the products they marketed and charged for.

81. Defendants intended that the deceptive and fraudulent misrepresentations and omissions they made would induce a consumer to rely and act by submitting their confidential contact and payment information.

82. Defendants charged and collected from Plaintiffs and members of the Class monies without clearly and conspicuously stating the actual price and characteristics of their products. Accordingly, Plaintiffs and members of the Class have suffered injury in fact and lost money in justifiable reliance on Defendants' misrepresentations and omissions of material fact.

83. In deceiving Plaintiffs and the Class by creating, enhancing, and supporting advertising that fails to clearly and conspicuously disclose, and in fact actively misrepresents, the actual price and characteristics of their products, and inducing Plaintiffs and the Class to proffer payment based on those misrepresentations, Defendants have engaged in fraudulent practices designed to mislead and deceive consumers.

84. Plaintiffs and the Class have suffered harm as a proximate result of Defendants' violations of law and wrongful conduct.

85. Plaintiffs, on behalf of themselves and the Class, seek an order: (i) permanently enjoining Defendants from engaging in the fraudulent conduct described herein; (ii) compelling Defendants to inform consumers who ordered "risk free trial" offers that they may have been (or will be) charged additional fees, and (iii) requiring Defendants to pay reasonable costs and attorneys' fees.

25

### THIRD CAUSE OF ACTION
**Fraud By Omission**
**(On Behalf of Plaintiffs and the Class)**

86.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

87.     Based on Defendants' misrepresentations and omissions, Plaintiffs and the Class reasonably expected that Defendants' Teeth Whitening Kits would include certain characteristics and could be obtained through a "risk free trial" offer for only $1.03 and the price of shipping and handling.

88.     At all times, Defendants knew that the price of their products was not clearly and conspicuously disclosed.

89.     Defendants were under a duty to Plaintiffs and the Class to disclose the true characteristics and price of the Teeth Whitening Kits and the automatic enrollment in the Teeth Whitening Clubs because:

        (a)     Defendants were in a superior position to know the true state of facts about the actual price and characteristics of the Teeth Whitening Kits and the Teeth Whitening Clubs;

        (b)     Plaintiffs and the Class members could not reasonably have been expected to learn or discover that Defendants were concealing the actual price of the Teeth Whitening Kits and that they would be automatically enrolled in the Teeth Whitening Clubs; and

        (c)     Defendants knew that Plaintiffs and the Class Members could not reasonably have been expected to learn or discover the actual price of the Teeth Whitening Kits and that they would be automatically enrolled in the Teeth Whitening Clubs.

26

90.     The facts concealed or not disclosed by Defendants to Plaintiffs and the Class, and the facts that Defendants knew were concealed, are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase Defendants' products. Had Plaintiffs and the Class known the actual price and characteristics of Defendants' the Teeth Whitening Kits, they would not have submitted their credit or debit card information.

91.     Defendants concealed or failed to disclose the true price and characteristics of the Teeth Whitening Kits in order to induce Plaintiffs and the Class to act thereon and proffer payment. Plaintiffs and the Class justifiably relied on Defendants' omissions to their detriment by paying more money than the small trial price (typically $1.03 plus shipping and handling).

92.     As a direct and proximate result of Defendants' misconduct, Plaintiffs and the Class have suffered actual damages in the form of monies paid to purchase Defendants' products.

93.     Plaintiffs, on behalf of themselves and the Class, seek an order: (i) permanently enjoining Defendants from engaging in the fraudulent conduct described herein; (ii) compelling Defendants to inform consumers who ordered "risk free trial" offers that they may have been (or will be) charged additional fees, and (iii) requiring Defendants to pay reasonable costs and attorneys' fees.

### FOURTH CAUSE OF ACTION
**Breach of Contract**
**(On Behalf of Plaintiffs and the Class)**

94.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

95.     In reliance upon Defendants' misrepresentations and deceptive

advertising, Plaintiffs and Class members entered into contracts with Defendants to receive a "risk free trial" offer of their Teeth Whitening Kits. A material inducement and term of the contracts was Defendants' representation that Plaintiffs and the Class would only need to pay a small trial fee (typically $1.03 plus shipping and handling) in order to receive the "risk free trial" offer.

96.     As a result of Defendants' misrepresentations detailed in this Complaint, Plaintiffs and the Class were charged fees above and beyond the listed trial price (typically $1.03 plus shipping and handling) in breach of the consumer retail contract.

97.     Defendants failed to uphold their contractual obligations by charging those additional fees without permission, thereby breaching their contract with Plaintiffs and the other members of the Class.

98.     At all times relevant to this action, Defendants acted willfully and with intent to breach contracts entered into with Plaintiffs and the Class.

99.     Plaintiffs and the Class have fully performed their contractual obligations.

100.    Plaintiffs and the Class have suffered damages as a direct result of Defendants' unlawful and wrongful practices described herein in the form of monies paid and lost.

101.    As a result, Plaintiffs and the Class request that the Court enjoin Defendants from offering "risk free trial" offers without clearly and conspicuously disclosing fees above and beyond the price of shipping and handling. In addition, Plaintiffs and the Class seek an order requiring Defendants to inform consumers who ordered "risk free trial" offers that they may have been (or will be) charged additional fees.

## FIFTH CAUSE OF ACTION
### Violations of the Electronic Funds Transfer Act
### 15 U.S.C. § 1693e
#### (On behalf of Plaintiff ▮▮▮ and the EFTA Subclass)

102.    Plaintiff ▮▮▮ incorporates the foregoing allegations as if fully set forth herein.

103.    As described above, Defendants initiated the electronic transfers of funds for unauthorized charges from the debit accounts of Plaintiff ▮▮▮ and the EFTA Subclass without first obtaining written authorization from them or providing them with a copy of any such purported authorization. As such, Defendants have violated 15 U.S.C. § 1693e.

104.    Plaintiff ▮▮▮ and the members of the EFTA Subclass have suffered damages as a result of Defendants' violations of 15 U.S.C. § 1693e.

105.    Accordingly, under 15 U.S.C. § 1693m, Plaintiff and the members of the EFTA Subclass seek an injunction preventing further violations.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ▮▮▮ and ▮▮▮ individually and on behalf of the Class and EFTA Subclass, request that the Court enter an Order providing for the following relief:

A.    Certify this case as a class action on behalf of the Class and EFTA Subclass defined above, appoint Plaintiffs as representatives of the Class and Plaintiff ▮▮▮ as representative of the EFTA Subclass, and appoint their counsel as Class Counsel;

B.    Declare that Defendants' actions, as set out above, violate 15 U.S.C. § 1693e, and constitute fraud in the inducement, fraud by omission, and breach of contract;

29

      C.      Award injunctive relief and other relief as is necessary to protect the interests of the Class, including, *inter alia*, an order: (i) prohibiting Defendants from engaging in the wrongful and unlawful acts described herein, and (ii) requiring Defendants to disclose and admit the wrongful and unlawful acts described herein;

      D.      Award Plaintiffs and the Class their reasonable litigation expenses and attorneys' fees;

      E.      Award Plaintiffs and the Class pre- and post-judgment interest, to the extent allowable; and

      F.      Award such other and further relief as equity and justice may require.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury for all issues so triable.

Respectfully submitted,

███████ and ████████
individually and on behalf of all others
similarly situated,

Dated: September 24, 2014      By: _____
              One of Plaintiffs' Attorneys

          Steven L. Woodrow #43140
          swoodrow@edelson.com
          EDELSON PC
          999 West 18th Street, Suite 3000
          Denver, Colorado 80202
          Tel: 303.357.4877
          Fax: 303.446.9111

PX17 Attachment A-30

**Danielle Foss**

| | |
|---|---|
| **From:** | Danielle Foss <danielle@bluerocketbrands.com> |
| **Sent:** | Tuesday, November 08, 2016 11:12 AM |
| **To:** | 'Jenny Johnson' |
| **Subject:** | Dani Reports in Queue |

Hey Jenny,

Here's what I have queued up right now and I prioritized it. Let me know if you want to move priorities around at all on these. These tasks are getting placed in between my other daily/weekly tasks as they pertain to traffic quality. As of right now and until you tell me otherwise, I am prioritizing traffic quality above all else so if traffic is calling my attention that day or we have a traffic issue, all chargeback related items are getting pushed out.

Also, a lot of what is below requires Ryan. I really need him to improve our reporting so I can do a lot of this stuff without Seth and in a timely manner so we stand a chance of me handling some of this stuff while still having time for traffic.

Let me know if you have questions or want to add anything.

1.) Skincare Chargeback Timetable (Dani)
   a. Report on skincare chargebacks, when they started happening, when we noticed the problem, and how we could have improved that process
2.) Verifi/Mona/Statement CB Discrepancy (Dani/Ryan/Seth)
   a. Already found Mona/Verifi Discrepancy. Now working on statement discrepancy.
      i. Dani to pull updated Mona stats now that Ryan has found VAE file issues.
      ii. Dani to work with Ryan to update/improve process on VAE files being uploaded in the Mona
      iii. I will be getting Seth on this today
3.) Chargeback Report (Dani/Ryan)
   a. You and I only discussed this briefly. But you told me you "didn't feel comfortable leaving something this important in Seth's hands" right at the moment.
      i. First steps on this is getting Ryan to build this report for us in Mona so that it's not so manual and we have a better handle on the data without so many mistake potentials. Then the only thing I'll need Seth to do is get CBs into Mona for the places that are manual. Let me know if you agree on this.
4.) Triangle MID Update (Dani)
   a. Since Jenny gave the go-ahead to increase Triangle MIDs, Dani will send Jenny an update on the MID changes being made to Triangle this week.
5.) Determine MID Sacrifices (Dani & Jenny)
   a. First step: talk to RMS about issues and get feedback from Scott. That will enable us to determine how much we should be favoring RMS
   b. Put together a list of MIDs we are going to "Blow Up" this month
   c. Put together a list of MIDs we are "saving" and agree to move their high risk transactions AWAY to "blow up" MIDs.
6.) Quality Report Integration with FAP for Better Chargeback Forecasting (Dani/Ryan)
   a. First step: Get Ryan to add FAP and other early indicators to Quality Report for easier reporting
   b. Pull last 12 months of Data to try and find early indicators that are there within FAP/EC/Decline Reasons on EOT/etc to that eventually lead to higher than average Chargebacks
   c. This report will be pulled weekly for 2 week old data, with the understanding that data younger than 2 months is too immature to make decisions on, for now.

1

7.) Report: Pull Processor CB Report by Affiliate (Dani)
   a. This report will help us determine what MIDs could potentially have issues
8.) Should we do proactive multiple handle? (Dani/Ryan)
   a. What % of customers call us to cancel one product but then never contact us again to cancel step #2....and then end up charging back?
9.) Bin Reporting Next Steps (Jenny)
   a. Let me know if you need anything from me on this.

Thanks,

Danielle Foss | Blue Rocket Brands
p : 720.238.2418 | skype: foss.danielle



2

**Danielle Foss**

**Subject:**                      Radio Ad To-Do List and Questions

1.) Assign a "Fresh" brand that has had no trial traffic
    a.   Whitening Trend?
2.) Determine price points for campaigns
    a.   Check out Jenny's scripts to show what other offers are doing in this type of placement
3.) Should this be trial?
4.) Should this be continuity?
5.) Can we get away with a small buy to start? $20k or less?
    a.   What time slots/days of week could we get for that price?
6.) Call Center setup for phone sales
    a.   Jenny will allocate some dedicated reps to inbound sales calls
7.) Call scripting
    a.   Jenny sent me other scripts to look at and consider
8.) How fast/easily can we optimize cities/time slots?
9.) Setup a really clean website to take online sales and promote the product
10.)Consider new product packaging for this type of customer

Danielle Foss | Blue Rocket Brands
p : 720.238.2418 | skype: foss.danielle

blue rocket
B R A N D S

Summary + todo list to Jenny first.

1

Rebranding Meeting (Blair | Studios | Megan) 5/3
* • BBB complant count per brand
  • pre checked = good (Insur Ship)
  • stats on bundled

Konnective Meeting w/ DevGuard + Ryan   5/3
  • How long will it take Konnective to import
    → Emily to find out
  • Tenative Schedule 18 + 19th

RMA Full

Ms. Reid ,

We recently received your complaint from the Better Business Bureau regarding your Innovation White account. According to our records, we received your order on April 18, 2017 and shipped the package the next day.

*The terms of the offer that you agreed to at the time of your order clearly state that you were to have an 8 day trial period starting from the date of your order processing in which you could cancel your account to avoid further charges. They also indicate that "you must take affirmative action to avoid further charges or you will be charged in the amount of $94.31 eight days from the date of your order processing for the product."*

*These terms were presented to you in multiple places on our website when you ordered our product. Additionally, you were sent an order confirmation email after your order was completed that provided a full written version of the terms you agreed to.*

When you ordered the product you also clicked a button indicating that you agreed to the terms of the offer. When a customer clicks that button we must assume that they have actually read what they are agreeing to. If there was any confusion with the terms you could have called our customer service team and they would have been happy to assist you.

Since we did not hear from you during your trial period, you were charged $94.31 on April 26, 2017.

The first time we heard from you regarding the cancelation of your account was on May 1, 2017 when you canceled your account with a representative. Your account was immediately canceled and you have not received any shipments or charges since then.

We have issued you a returned merchandise authorization number to return your shipment for a refund of the full product price.

Please write the RMA number 59089684c79ec on the outside of the shipping package. Your return must be received by May 26, 2017. You may return your product to:

7350 Eastgate Rd Suite 140
Henderson, NV 89011

If you should need further assistance, please contact our Customer Service Center. We're happy to assist you in any way we can.

Thank you,

Innovation White
855-801-5839

Ongoing Save Sale

Mr. Fantasia,

We recently received your complaint # 90139572 from the Better Business Bureau regarding your Whitening Coach account. According to our records, we received your order on April 4, 2017.

The terms of the offer that you agreed to at the time of your order clearly state that you were to have an 8 day trial period starting from the date of your order processing in which you could cancel your account to avoid further charges.  They also indicate that "you must take affirmative action to avoid further charges or you will be charged in the amount of $94.31 eight days from the date of your order processing for the product."

These terms were presented to you in multiple places on our website when you ordered our product. Additionally, you were sent an order confirmation email after your order was completed that provided a full written version of the terms you agreed to.

When you ordered the product you also clicked a button indicating that you agreed to the terms of the offer. When a customer clicks that button we must assume that they have actually read what they are agreeing to. If there was any confusion with the terms you could have called our customer service team and they would have been happy to assist you.

Since we did not hear from you during your trial period, you were charged $94.31 on April 12, 2017.

According to our records the first contact we had requesting the cancelation of your account was on April 13, 2017 with a representative. We reminded you of the terms of the offer that were agreed to at the time of your order and offered a 60% refund on your charge in lieu of returning the product for a full refund.  You accepted that offer and a refund of $56.59 was issued on April 13, 2017.

Your account remains canceled and you will not receive any further shipments or charges.

 If you should need further assistance, please contact our Customer Service Center. We're happy to assist you in any way we can.

Thank you,

Whitening Coach Customer Service Team
24 hours a day, 7 days a week
877-825-9064 (US Only)



Rebuttal

Ms. Beaver,

We have received your response from the BBB and take your complaint seriously.  In an effort to assist you we have already cancelled your account and you will not receive any further charges. You have been issued a refund of $56.59 as a courtesy, and allowed to keep the product.

We apologize for any confusion, and always do our best to resolve any customer complaint or concern in a timely manner. If there is anything more you need please feel free to call our customer service at 866-711-2831. We're happy to assist you in any way we can.

Sincerely,
Spark Whitening



Ms. Keller,

We recently received your complaint # 90140161 from the Better Business Bureau regarding your Genuine White account. According to our records, we received your order on April 19, 2017 and shipped the package the next day.

*The terms of the offer that you agreed to at the time of your order clearly state that you were to have a 10 day trial period starting from the date of your order processing in which you could cancel your account to avoid further charges. They also indicate that "you must take affirmative action to avoid further charges or you will be charged in the amount of $92.13 ten days from the date of your order processing for the product."*

*These terms were presented to you in multiple places on our website when you ordered our product. Additionally, you were sent an order confirmation email after your order was completed that provided a full written version of the terms you agreed to.*

When you ordered the product you also clicked a button indicating that you agreed to the terms of the offer. When a customer clicks that button we must assume that they have actually read what they are agreeing to. If there was any confusion with the terms you could have called our customer service team and they would have been happy to assist you.

Since we did not hear from you during your trial period, you were charged $92.13 on April 29, 2017.

The first time we heard from you regarding the cancelation of your account was on April 29, 2017 when you canceled with a representative. Your account was immediately canceled and you have not received any shipments or charges since then.

<u>As a courtesy, we have provided you with a full, immediate refund of $92.13 on the full charge.</u>

If you should need further assistance, please contact our Customer Service Center.  We're happy to assist you in any way we can.

Thank you,

Genuine White
877-296-0480

ECS – refund

Ms. Best,

We recently received your complaint # 90139838 from the Better Business Bureau regarding your First Class Whitening account. According to our records, we received your order on April 6, 2017.

*The terms of the offer that you agreed to at the time of your order clearly state that you were to have a 12 day trial period starting from the date of your order processing in which you could cancel your account to avoid further charges.  They also indicate that "you must take affirmative action to avoid further charges or you will be charged in the amount of $94.31 twelve days from the date of your order processing for the product."*

*These terms were presented to you in multiple places on our website when you ordered our product. Additionally, you were sent an order confirmation email after your order was completed that provided a full written version of the terms you agreed to.*

When you ordered the product you also clicked a button indicating that you had read and agreed to the terms of the offer. When a customer clicks that button we must assume that they have actually done what they are stating they did. If there was any confusion with the terms you could have called our customer service team and they would have been happy to assist you.

According to our records the first contact we had requesting the cancelation of your account was on April 7, 2017. At the time you canceled your account, we offered to issue you a return merchandise authorization number so you could return your shipment to avoid any further charges or a special discounted price to keep the product.  You opted to keep the product for a onetime fee of $38.71 to avoid returning our product. We processed that charge the same day and you will not receive any other shipments or charges.

As a courtesy, we have provided you with a full, immediate refund of $38.71.

If you should need further assistance, please contact our Customer Service Center. We're happy to assist you in any way we can.

Thank you,

First Class Whitening Customer Service Team
24 hours a day, 7 days a week
1-877-530-9637 (US Only)

Clean Cancel

Ms. Cruz,

We recently received your complaint from the Better Business Bureau regarding your Genuine White account. According to our records, we received your order on August 11, 2016 and shipped the package the next day.

*The terms of the offer that you agreed to at the time of your order clearly state that you were to have a 10 day trial period starting from the date of your order processing in which you could cancel your account to avoid further charges. They also indicate that "you must take affirmative action to avoid further charges or you will be charged in the amount of $92.13 ten days from the date of your order processing for the product."*

These terms were presented to you in multiple places on our website when you ordered our product. Additionally, you were sent an order confirmation email after your order was completed that provided a full written version of the terms you agreed to.

When you ordered the product you also clicked a button indicating that you agreed to the terms of the offer. When a customer clicks that button we must assume that they have actually read what they are agreeing to. If there was any confusion with the terms you could have called our customer service team and they would have been happy to assist you.

Since we did not hear from you during your trial period, you were charged $92.13 on August 21, 2016 and received one additional shipment at the same cost.

The first time we heard from you regarding the cancelation of your account was on August 29, 2016 when you canceled your account over our automated system.

Your account remains canceled and you will not receive any further shipments or charges.

Thank you,

Genuine White
877-296-0480



ECR

Ms. Morris,

We recently received your complaint from the Better Business Bureau regarding your Genuine White account. According to our records, we received your order on July 13, 2016 and shipped the package the next day.

*The terms of the offer that you agreed to at the time of your order clearly state that you were to have an 8 day trial period starting from the date of your order processing in which you could cancel your account to avoid further charges. They also indicate that "you must take affirmative action to avoid further charges or you will be charged in the amount of $92.13 eight days from the date of your order processing for the product."*

These terms were presented to you in multiple places on our website when you ordered our product. Additionally, you were sent an order confirmation email after your order was completed that provided a full written version of the terms you agreed to.

When you ordered the product you also clicked a button indicating that you agreed to the terms of the offer. When a customer clicks that button we must assume that they have actually read what they are agreeing to. If there was any confusion with the terms you could have called our customer service team and they would have been happy to assist you.

According to our records the first contact we had requesting the cancelation of your account was on August 11, 2016. At the time you canceled your account, we issued you a return merchandise authorization number (both over the phone and through a follow up email) so you could return your shipment to avoid any further charges.  Using this method, you will incur no charges for the product. An email was sent to your email address with full instructions to return your package.

Your package must be received back to our warehouse before 2016-09-09 to avoid being charged $92.13 for the Complete Program.

Please note that we process returns within 72 hours of it arriving to our warehouse.

If you should need further assistance, please contact our Customer Service Center. We're happy to assist you in any way we can.


Thank you,

Genuine White
877-296-0480



Ms. Laurenzi,

We recently received your complaint #10725099 from the Better Business Bureau regarding your Action Pro White Account. We take complaints very seriously and we hope this response will provide you with additional information. According to our records, we received your order on April 24, 2016.

*The terms of the offer that you agreed to at the time of your order clearly state that you were to have a 10 day trial period starting from the date of your order processing in which you could cancel your account to avoid further charges.  They also indicate that "you must take affirmative action to avoid further charges or you will be charged in the amount of $92.13 ten days from the date of your order processing for the product."*

These terms were presented to you in multiple places on our website when you ordered our product. Additionally, you were sent an order confirmation email after your order was completed that provided a full written version of the terms you agreed to.

When you ordered the product you also clicked a button indicating that you agreed to the terms of the offer. When a customer clicks that button we must assume that they have actually read what they are agreeing to. If there was any confusion with the terms you could have called our customer service team and they would have been happy to assist you.

Since we did not hear from you during your trial period, you were charged $92.13 on May 14, 2016 and received two additional shipments at the same cost.

Since the time your account was canceled, you have contacted your credit card company and initiated a chargeback for the full charge. Because of the chargeback, we cannot issue you a credit at this time because you would then end up getting a credit twice for those purchases.

Your account remains canceled and you will not receive any further shipments or charges.

Sincerely,
Action Pro White

# Mint House, LLC

## Ownership Percentage Verification Letter

Date: September 5th, 2013

To Whom It May Concern:

This letter is a confirmation of ownership percentage for Mint House, LLC.

As of today, 9/5/13, Danielle Foss (formally DiSalle) is still a 1.00% owner of Mint House, LLC. Minoxigen, LLC is the other 99.00% owner of Mint House, LLC.  Blair W McNea is the 100% owner of Minoxigen, LLC.

Regards,

Blair W. McNea
99% Owner of Mint House, LLC

Danielle C. Foss
1% Owner of Mint House, LLC

• issue charging customer too many times in a 30 day period.

Recommends 14 day minimum trial

Teeth already has reputation issues so us making trials too short or having pricepoints that are too high. Recommends $89.99 pricepoints

Load Balancing
- similar descriptors but also non-descript.
- LB on CB needs first, then volume next. this is an option is we aren't running mids higher than 60-70%
- Count first then % on CB
- CW adjustments are necessary

Friendly
- 5% of volume on friendly is max. BIN gives away prepaid cards being used.

Key is to, no matter what, do not max mids out. It adds extra risk to not only be maxing mids but also running a high CB% (even if count is below ~~~~~~~~~ threshold.