# PX17

## PX17 Attachment U

Operating Agreement for Spruce River, LLC obtained from office of Lindsey Martinez and Seth Davies

# OPERATING AGREEMENT

## OF
## Spruce River, LLC
A Nevada Limited Liability Company

This Operating Agreement ("*Agreement*") of Spruce River, LLC (the "*Company*") is dated and effective as of February 24, 2011 by and among the persons and entities identified on *Schedule A* attached hereto (individually referred to as a "*Owner*" and collectively referred to as the "*Owners*") and the Company.

## ARTICLE I – COMPANY INFORMATION

1.01  Formation of the Company. The Owners acknowledge that on February 24, 2011, Articles of Organization (the "*Articles*") were filed with the Nevada Secretary of State to form the Company pursuant to the provisions of the Nevada Limited Liability Act (the "*Act*"). A Owner's interest in the Company, including the right to vote on, consent to or otherwise participate in any decision or action of or by the Owners pursuant to this Agreement or the Act, shall be placed into one class of ownership interest (the "*Units*"). Each Owner's "*Percentage Interest*" shall equal a fraction, expressed as a percentage, the number of which is each Owner's total Units and the denominator of which is the total Units in the Company outstanding from time to time.

(a)  Capitalization Structure. The authorized capitalization of the Company shall be 1,000 Units, and may be amended only by a unanimous vote of the Owners.

(b)  Non-Voting Interests. If the interests are transferred pursuant to Article 7, the Manager may convert voting Units into non-voting Units, and may transfer the voting rights previously ascribed to the non-voting Units unto the remaining voting Units on a *pro rata* basis.

1.02  General Provisions.

(a)  Name. The name of the Company shall be Spruce River, LLC. The Company may also conduct business under such trade name(s) as the Manager may determine.

(b)  Purpose. The Company is organized to engage in any lawful business or investment activity.

(c)  Principal Business Office, Registered Office and Registered Agent. The registered office of the Company required by the Act to be maintained in the State of Nevada shall be the office of the initial registered agent named in the Articles or such other office (which need not be a place of business of the Company) as

the Managers may designate from time to time in the manner provided by law. The principal office of the company shall be at such place as the Managers may designate from time to time, which need not be in the State of Nevada, and the Company shall maintain records there. The Company may have such other offices as the Managers may designate from time to time.

(d) Term. The Company shall continue its existence in perpetuity, subject only to dissolution and termination of the Company in the event of:

  i. A unanimous vote of the Owners vote for dissolution;
  ii. Operation of law; or
  iii. The sale, exchange, involuntary conversion or other disposition or transfer of all or substantially all of the assets of the Company.

(e) Admission of Owners. Except as otherwise expressly provided in the Agreement, additional Owners may be admitted to the Company only with a unanimous vote of the Owners.

## ARTICLE II – CAPITAL CONTRIBUTIONS

2.01 Initial Contributions. The Owners initially shall contribute to the Company capital and at the agreed value as described in *Schedule C* attached to this Agreement. No Owner shall be obligated to make any contribution of capital or assets to the Company other than its initial capital contribution.

2.02 Additional Capital Contributions. Except as provided in this Section 2.02, no Owner shall be obligated to make any contribution of capital or assets to the Company other than its initial capital contribution. If the Manager determines that additional capital contributions are necessary, the Manager may allow the Company to accept capital contributions from Owners or the Manager may cause the Company to borrow such additional capital from any source, including any Owner. If additional capital contributions are allowed by the Manager, the Owners' Percentage Interest will be adjusted based on the total capital contributions and the number of Units issued.

## ARTICLE III – PROFITS, LOSSES AND DISTRIBUTIONS

3.01 Profits and Losses. For financial accounting and tax purposes, the Company's net profits or net losses shall be determined on an annual calendar year basis and shall be allocated to the Owners in proportion to each Owner's Percentage Interest in the Company as set forth in *Schedule A* as amended from time to time, in accordance with Treasury Regulation 1.704-1.

3.02 Distributions. The Owners shall determine and distribute available funds annually or at more frequent intervals as approved by the CEO. Available funds, as referred to

herein, shall mean the net cash of the Company available after appropriate provisions for expenses and liabilities, as determined by the CEO. Distributions in liquidation of the Company or in liquidation of an Owner's interest shall be made in accordance with the positive capital account balances pursuant to Treasury Regulation 1.704-l(b)(2)(ii)(b)(2). To the extent a Owner shall have a negative capital account balance, there shall be a qualified income offset, as set forth in Treasury Regulation 1.704-l(b)(2)(ii)(d).

## ARTICLE IV – Management

4.01  Management of the Business. The name and place of residence of the Manager is attached as *Schedule 1* of this Agreement. The Owners, as set forth in *Schedule 2*, as amended from time to time, shall elect by unanimous vote as many Managers as the Owners determine, but no fewer than one. The elected Manager may either be an Owner or non-Owner. The initial Manager of the Company is Jaime Hayden. A Manager shall hold office until such Manager resigns or is removed pursuant to Section 4.07. The CEO shall be Hollywood Pro Smile until his (her) death or resignation. The CEO shall name and appoint a successor at the first meeting of the Owners and that person shall be affirmed by the Owners at the CEO's death or resignation. Any decisions to be made by Owners or Managers shall be determined by the CEO, and the CEO may veto the decision of a Manager, and may delegate any responsibilities, at his sole discretion, to the Manager; provided, however, any CEO or Manager appointed under this section shall be subject to the provisions of Section 4.04 and 4.05.

4.02  Authority of Owners. No Owner acting alone shall have any power or authority to bind the company unless the Owner has been authorized by the Manager to act as an agent of the Company.

4.03  Limitation on Liability of Owners. No Owner shall have any personal liability for any debts or losses of the Company beyond his or her respective capital contributions, except as provided by law.

4.04  Authority of the Manager. Except as otherwise expressly provided herein, all decisions respecting any matter set forth in this Agreement or otherwise affecting or arising out of conduct of the business of the Company shall be made by the Manager. The Manager shall have the right and authority to manage, conduct and operate the Company business and to make all decisions regarding the operation of the Company business and to perform any and all other acts or activities customary or incident to the management of the Company business. Subject to Section 4.01, the Manager shall be authorized to:

(a) employ such agents, employees, managers, accountants, attorneys, consultants and other persons necessary or appropriate to carry out the business and affairs of the Company and to pay as an expense of the Company such reasonable fees, expenses, salaries, wages and other compensation to such persons;

(b) cause to be paid all amounts due and payable by the Company to any person or entity;

(c) make any and all expenditures or investments of excess funds in obligations which the Manager, deems necessary or appropriate in connection with the management of the affairs of the Company and the carrying out of its obligations and responsibilities under this Agreement;

(d) incur such indebtedness on behalf of the Company as the Manager deem necessary to carry out business and affairs of the Company;

(e) execute on behalf of the Company all instruments and documents;

(f) hold and own any Company real and/or personal properties in the name of the Company;

(g) enter into other agreements on behalf of the Company; and

(h) after obtaining requisite Owner consent, if necessary, pursuant to this Agreement, all other acts as may be necessary or appropriate to the conduct of the Company business.

With respect to all of its obligations, powers and responsibilities under this Agreement, the Manager is authorized to execute and deliver for and on behalf of the Company such deeds, leases, notes, contracts, agreements, assignments, bills of sale, security agreements, deeds to secure debt and other documents in such form and on such terms and conditions as it shall deem proper.

4.05   *Limitations on Authority of Manager.*  The CEO's affirmative decision shall be required in the following circumstances:

(a) The issuance of additional Units or any other action that may result in the dilution of an Owner's Percentage Interest;

(b) Any merger or consolidation involving the Company;

(c) Authorize Company expenditures or indebtedness in excess of $500 per transaction;

(d) The sale, lease, transfer or other disposition of all or substantially all of the assets of the Company;

(e) Any voluntary liquidation, dissolution or termination of the Company;

(f) Any amendment to this Agreement or to the certificate of formation of the Company;

(g) The establishment of any joint venture with a third party or the acquisition of all or part of any other business person or entity other than acquisitions in the ordinary course of business or with a *de minimus* value;

(h) The approval of the making of any investment or capital expenditures or significant operating arrangements, in excess of twenty percent (20%) of such expenses as set forth in the annual budget of the Company during any fiscal year;

(i) The entry by the Company into any contract, agreement or arrangement with a Manager;

(j) The settlement of any litigation by the Company, other than routine collection matters; and

(k) The substitution of new Owners.

4.06 <u>Liability for Certain Acts</u>. The Manager shall perform its duties hereunder in good faith, in a manner it reasonably believes to be in the best interests of the Company and with such care as an ordinarily prudent person in a like position would use under similar circumstances. The Manager, if it so performs, shall not have any liability by reason of its management of the Company. The Manager does not, in any way, guarantee the return of any Owner's capital contributions or a profit for the Owners from the operations of the Company. The Manager shall not be liable to the Company or to any Owner by reason of any act, omission, or alleged act or omission arising out of any of his or her activities or alleged activities on behalf of the Company or in furtherance of the interests of the Company; provided, however, that this Section 4.06 shall have no force or effect if the act, omission, or alleged act or omission upon which such actual or threatened action, proceeding or claim is based was performed or omitted as a result of gross negligence or willful misconduct or a knowing and material breach of this Agreement by the Manager.

4.07 <u>Appointment, Substitution and Removal of Manager</u>. Within ten (10) days of any event resulting in the withdrawal of any Manager, the Owners shall appoint a new Manager, and the person so selected shall become a substitute Manager upon the execution and delivery of a written acceptance and adoption of this Agreement, as the same may have been amended, together with such other documents, if any, as counsel for the Company may require. Any Manager may be removed by a majority vote of the voting Units or at the discretion of the CEO.

4.08 <u>Indemnification of Managers, Owners, Officers, Employees and Agents</u>. The Company shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative by reason of the fact that it is or was a Manager, Owner, or officer of the Company, or is or was serving at the request of the Company as a Manager, Owner, officer, employee, or agent of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise, against expenses (including attorneys' fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred by him or her in connection with such action, suit, or proceeding if he or she acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his or her conduct was unlawful.

Page 6 of 14

PX17 Attachment U-6

The Company may advance expenses to any Manager, Owner, officer employee, or agent if the Manager (other than the Manager who is to receive any such advance; or, in the case of an advance to a Manager who, at such time, is the sole Owner of the Managers, then the Owners holding a majority of the voting Units other than the voting Units held by such Manager) reasonably determines that such person would be entitled to indemnification of those expenses pursuant to this Section 4.08.

4.09   Meetings. The Manager shall hold regular annual meetings at times and places to be selected by the Manager. The Manager shall keep minutes of all meetings of the Owners. The minutes shall be placed in the records of the Company.

4.10   Action Without Meeting. Any action required by the Act or by this Agreement to be taken by the Owners may be taken without a meeting if one or more written consents setting forth the action so taken shall be signed by all Owners entitled to vote, and such consents shall have the same force and effect as an unanimous vote of the Owners entitled to vote.

## ARTICLE V – COMPENSATION

5.01   Management Fee. Any Manager rendering services to the Company shall be entitled to reasonable compensation commensurate with the value of such services. Any compensation provided to a Manager must be approved by written consent of the CEO.

5.02   Reimbursement. The Company shall reimburse the Manager, CEO or Owners for all direct out of pocket expenses incurred by them in managing the Company.

## ARTICLE VI – BOOKKEEPING and RECORDS

6.01   Books. The Manager shall maintain complete and accurate books of account of the Company's affairs at the Company's principal place of business. Such books shall be kept on the cash basis method of accounting. The Company's accounting period shall be the calendar year.

6.02   Owners' Accounts. The Manager shall maintain separate capital and distribution accounts for each Owner. Each Owner's capital account shall be determined and maintained in the manner set forth in Treasury Regulation 1.704-l(b)(2)(iv) and shall consist of their initial capital contribution increased by: (a) Any additional capital contribution made by them, (b) Credit balances transferred from their distribution account to their capital account; and decreased by: (y) Distributions to them in reduction of Company capital; and (z) the Owner's share of Company losses if charged to their capital account.

6.03   Reports. The Manager shall be responsible for closing the books of account after the close of each calendar year, and shall prepare and send to each Owner a statement of such Owner's distributive share of income and expense for income tax reporting purposes.

6.04 <u>Company Information</u>. Upon request, the Managers shall supply to any Owner information regarding the Company or its activities. Each Owner or its authorized representative shall have access to and may inspect and copy all books, records and materials in the Manager's possession regarding the Company or its activities.

6.05 <u>Records</u>. The Manager shall cause the Company to keep at its principal place of business the following: (a) A current list in alphabetical order of the full name and the last known street address of each Owner; (b) A copy of the Articles of Organization and the Company Operating Agreement and all amendments; (c) Copies of the Company's federal, state and local income tax returns and reports, if any, for the three most recent years; and (d) Copies of any financial statements of the Company for the three most recent years.

6.06 <u>Tax Matters</u>. Jaime Hayden is designated as the Tax Matters Owner (the "***Tax Matters Owner***") for the Company. Upon his resignation or death, the Tax Matters Owner shall be designated by the Manager. The Tax Matters Owner shall be designated the "tax matters partner" within the meaning of IRC § 6231. The Tax Matters Owner shall cause all federal, state, and local reports for the Company to be prepared and to be timely filed with the appropriate authorities, including without limitation all reports required by licenses and permits, sales and use tax reports, income tax withholding reports, FICA tax reports, unemployment compensation reports, information reports, and similar reports, and shall cause all payments required thereunder to be made by the Company from the Company's funds. The Tax Matters Owner shall make such tax elections and other tax determinations on behalf of the Company as the Tax Matters Owner deems appropriate.

## ARTICLE VII – TRANSFERS

7.01 <u>Assignment</u>. There shall be no assignment, sale, conveyance, transfer, bequest encumber or pledge of all or any part of an Owner's interest in the Company ("***Transfer***") whether or not for value, without the written consent of the CEO. Any attempt to sell, convey, transfer, pledge or assign a Owner's interest in violation of this Agreement, shall be void *ab initio* and of no effect. Any new or additional Unit holders must become party to this Agreement to be deemed Owners.

7.02 <u>Ownership Interest Transfers Are Generally Restricted</u>. The parties agree that Jaime Hayden shall not pledge, hypothecate, or otherwise secure any type of debt or obligation with Units, whether incurred voluntarily or involuntarily, and in any manner whatsoever ("***Encumber***"), Transfer, or permit to be Encumbered or Transferred all or any portion of its Units, whether now or hereafter acquired, except in accordance with the terms of this Agreement. Any attempted Encumbrance or Transfer of any Units not in accordance with the terms of this Agreement shall not be valid and shall not be reflected on the Company's books.

7.03 <u>Redemption</u>. Company may, at any time, redeem some or all of Jaime Hayden's Units at any time at the Agreed Price (defined below) and on the Agreed Terms (defined below).

7.04 <u>Involuntary Transfers</u>. If Jaime Hayden has any information that would reasonably lead it expect that an ***Involuntary Lifetime Transfer*** (any Transfer made on account of a court order or otherwise by operation of law, including any Transfer incident to any divorce or marital property settlement or any Transfer pursuant to applicable community property, quasi-community property or similar state law) is foreseeable, it must promptly send a notice to Hollywood Pro Smile and the Company and thus it shall be deemed to have offered to sell first to Hollywood Pro Smile and then to the Company its Units otherwise to be Transferred, at the Agreement Price and on the Agreement Terms. Such notice shall include a statement of the type of proposed Transfer, the name, address (both home and office), and business or occupation of the person to whom such Units would be Transferred, and any other facts that are or would reasonably be deemed material to the proposed Transfer.

(a) Hollywood Pro Smile shall have sixty (60) days from such notice in which to elect to buy none, some or all of the Units that are deemed to have been offered for sale to Hollywood Pro Smile, pursuant to this Agreement ("***Offered Units***").

(b) If Hollywood Pro Smile does not elect to buy all of the Offered Units within the option period, then the Company shall have sixty (60) days from the expiration of the option period in which to elect to buy none, some or all of the Offered Units that Hollywood Pro Smile did not elect to buy.

(c) If Hollywood Pro Smile and the Company do not, in the aggregate, agree to buy all of the Offered Units within the option periods, such Involuntary Lifetime Transfer may be completed. If an Involuntary Lifetime Transfer is not consummated within thirty (30) days after the expiration of the option period, the provisions of this Agreement shall again apply to such Offered Units as if no such Involuntary Lifetime Transfer had been contemplated and no notice had been given. An Involuntary Lifetime Transfer is consummated when the Company has been given notice that legal title to the Offered Units have been Transferred, subject to recordation on its books.

7.05 <u>Transfer on Death</u>. On the death of Jaime Hayden, his legal representative shall immediately be deemed to have offered to sell to Hollywood Pro Smile first and then secondly to the Company all of Jaime Hayden's Units at the Agreement Price and on the Agreement Terms.

(a) Hollywood Pro Smile shall have sixty (60) days from such notice in which to elect to buy none, some or all of the Offered Units.

(b) If Hollywood Pro Smile does not elect to buy all of the Units within the option period, the Company shall have sixty (60) days from the expiration of the option period in which to elect to buy none, some or all of the Offered Units that Hollywood Pro Smile did not elect to buy.

7.06    If Hollywood Pro Smile and the Company do not, in the aggregate, agree to buy all of the Offered Units within the option periods, the legal representative of Jaime Hayden may distribute such Offered Units to the person or persons entitled to receive such portion of Jaime Hayden's estate, under applicable state law. Such person or persons shall receive such Units subject to the terms of this Agreement, and only if such person or persons agree in writing to be parties to this Agreement.

7.07    Disability. For purposes of this Agreement, the terms "disabled" and "disability" shall mean with respect to a Manager or CEO, the inability of such person to perform his customary duties as a Manager or CEO of the Company either for a period of ninety (90) consecutive or more days or for a period of one-hundred (120) or more days in any consecutive six-calendar month period. If the parties cannot agree within thirty (30) days as to the existence of a disability, the determination shall be made by two physicians, one designated by such person and the other by the Company, as applicable. If these two physicians cannot agree, they shall appoint a third physician and the determination of the majority shall be conclusive and binding on the Company and the Owners. All costs so incurred shall be borne equally by the Company and such Manager or CEO. The start date of the disability for purposes of measuring such disability shall be the date upon which the disabled person and the Company agree or the date upon which the physicians determine, whichever may apply.

(a)    In the event that any Manager or CEO becomes disabled, the Company shall, within thirty (30) days of the start date of the disability, purchase and such Manager or CEO (or a legal representative) shall sell, all of such person's Units to the Company on the terms set forth below.

7.08    Transfer of Minority Ownership Interest. At any time, the minority Unit-holder may Transfer any or all of its Percentage Interest either to the Company, to another Owner or to a third-party.

7.09    The Closing. The purchase of the Offered Units pursuant to this Agreement shall take place at a closing, held at 1:00 p.m. on the thirtieth (30th) day after the date on which the last option to buy has expired or been executed, or on which the last buyer becomes obligated to buy the Offered Units, at the offices of Berg Hill Greenleaf and Ruscitti, 1712 Pearl Street, Boulder, Colorado 80302, or at any other place to which the parties agree.

(a)    At the closing, the buyer shall pay for the Offered Units and Jaime Hayden shall deliver documents representing the transfer all of the Offered Units (if any), duly executed, free and clear of all Encumbrances.

(b)    Jaime Hayden appoints the Company as its agent and attorney-in-fact to execute and deliver all documents needed to convey Jaime Hayden's Units, if an authorized representative from Jaime Hayden is not present at the closing. This power of attorney is coupled with an interest and does not terminate on the Jaime Hayden's disability or death, and continues for as long as this Agreement is in effect.

## ARTICLE VIII – GENERAL TERMS

8.01 Governing Law and Dispute Resolution. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Nevada, without regard to its conflict of law provisions. Except as provided below, any and all disputes arising under or related to this Agreement which cannot be resolved through negotiations between the parties shall be submitted to binding arbitration. If the parties fail to reach a settlement of their dispute within thirty (30) days after the earliest date upon which one of the parties notifies the other(s) in writing of the existence of and its desire to attempt to resolve the dispute, then the dispute shall be promptly submitted to arbitration by a single arbitrator through the Judicial Arbiter Group of Denver, Nevada, any successor of the Judicial Arbiter Group, or any similar arbitration provider who can provide a former judge to conduct the arbitration if the Judicial Arbiter Group is no longer in existence ("JAG"). The arbitrator shall be selected by JAG, if possible, on the basis of his or her expertise in the subject matter(s) of the dispute. The decision of the arbitrator shall be final, non-appealable and binding upon the parties, and it may be entered in any court of competent jurisdiction; provided, however, that any party to the arbitration proceeding may seek a court order vacating the decision of the arbitrator in accordance with the provisions of and on the grounds set forth in C.R.S. § 13-22-214 and/or a modification or correction of the arbitrator's award in accordance with the provisions of C.R.S. §§ 13-22-211 or 13-22-215, and may take an appeal from court orders related to the arbitration proceeding or award as provided in C.R.S. § 13-22-221.

The arbitration shall take place in Nevada. The arbitrator shall be bound by the laws of the State of Nevada applicable to the issues involved in the arbitration and all Nevada rules relating to the admissibility of evidence, including, without limitation, all relevant privileges and the attorney work product doctrine. Discovery shall be permitted and shall be completed in accordance with the time limitations prescribed in the Nevada Rules of Civil Procedure, unless extensions of such time limitations are approved by all parties to the arbitration or are ordered by the arbitrator on the basis of strict necessity adequately demonstrated by the party requesting an extension of time. The arbitrator shall have the power to grant equitable relief where available under Nevada law, and shall not be entitled to make an award of punitive damages. The arbitrator shall issue a written opinion setting forth his or her decision and the reasons therefor within thirty (30) days after the arbitration proceeding is concluded. The obligation of the parties to submit any dispute arising under or related to this Agreement to arbitration as provided in this section shall survive the expiration or earlier termination of this agreement. Notwithstanding the foregoing, any party to this Agreement may seek to obtain, in aid of the arbitration, an injunction or other appropriate relief from a court to preserve or protect trademarks, trade names, copyrights, patents, trade secrets or other intellectual property or proprietary information or to preserve the status quo with respect to any matter pending conclusion of the arbitration proceeding, but no such application to a court shall in any way be permitted to stay or otherwise impede the progress of the arbitration proceeding.

In the event of any arbitration or litigation being filed or instituted between the parties concerning this Agreement, the prevailing party will be entitled to receive from the other party or parties its attorneys' fees, witness fees, costs and expenses, court costs and other reasonable expenses, whether or not such controversy, claim or action is prosecuted to judgment or other of

relief. The "prevailing party" is that party which is awarded judgment or other legal or equitable relief as a result of trial or arbitration, or who receives a payment of money from the other party in settlement of claims asserted by such party. If both parties receive a judgment, settlement payment or other award or relief, the court or the arbitrator shall determine which party is the prevailing party, taking into consideration the merits of the claims asserted by each party, the relative values of the judgments, settlements or other forms of relief received by each party, and the relative equities between the parties.

8.02 After Acquired Units. The Owners acknowledge and agree that the terms and conditions of this Agreement shall apply to any additional Units of the Company acquired by the Owners after the date of this Agreement.

8.03 No Waiver. No provision of this Agreement may be waived except by an agreement in writing signed by the waiving party. A waiver of any term or provision shall not be construed as a waiver of any other term or provision.

8.04 Conflicts. The parties all acknowledge that the Company's counsel, Berg, Hill, Greenleaf & Ruscitti LLP ("**BHGR**"), prepared this Agreement on behalf of and in the course of BHGR's representation of the Company, and that:

(a) THE PARTIES HAVE BEEN ADVISED BY BHGR THAT A CONFLICT EXISTS AMONG THEIR INDIVIDUAL INTERESTS; AND

(b) THE PARTIES HAVE BEEN ADVISED BY BHGR TO SEEK THE ADVICE OF INDEPENDENT COUNSEL; AND

(c) THE PARTIES HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT COUNSEL; AND

(d) THE PARTIES HAVE RECEIVED NO REPRESENTATIONS FROM BHGR ABOUT THE TAX CONSEQUENCES OF THIS AGREEMENT; AND

(e) THE PARTIES HAVE BEEN ADVISED BY BHGR THAT THIS AGREEMENT MAY HAVE TAX CONSEQUENCES; AND

(f) THE PARTIES HAVE BEEN ADVISED BY BHGR TO SEEK THE ADVICE OF INDEPENDENT TAX COUNSEL; AND

(g) THE PARTIES HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT TAX COUNSEL.

8.05 Binding Effect. This Agreement shall be binding upon the parties, their heirs, legal representatives, successors or assigns. This Agreement embodies the entire agreement and understanding between the parties with regard to the subject matter of this Agreement. The parties agree to do any and all things necessary to effectuate the purposes of this Agreement.

8.06 Construction. Throughout this Agreement, the singular shall include the plural; the plural shall include the singular; and the masculine and neuter shall include the feminine, wherever the context so requires.

8.07 Text to Control. The headings of articles and sections are included solely for convenience of reference. If any conflict between any heading and the text of this Agreement exists, the text shall control.

8.08 Severability. If any provision of this Agreement is declared by any court of competent jurisdiction to be invalid for any reason, such invalidity shall not affect the remaining provisions. Such remaining provisions shall be fully severable, and this Agreement shall be construed and enforced as if such invalid provisions never had been inserted in the Agreement.

8.09 Amendment. This Agreement may be amended, altered or revoked at any time, in whole or in part, by filing with this Agreement a written instrument setting forth such changes, signed by the Company and all of the Owners.

8.10 Notices. All notices required to be given by this Agreement shall be made in writing either by: (a) Personal delivery to the party requiring notice (and securing a written receipt) at the address of the party on the books and records of the Company, or (b) Mailing notice through the U.S.P.S. to the party requiring notice, by certified mail, return receipt requested, at the address of the party on the books and records of the Company. The effective date of the notice shall be the date of the written delivery receipt or the date of the return receipt.

8.11 Counterparts. This Agreement may be executed in several counterparts, each of which shall be an original but all of which together shall constitute one and the same instrument.

This Agreement is entered into and shall be effective as of February 24, 2011 by and among the Company and the persons executing the Agreement as Owners. It is the Owners' express intention to create a limited liability company in accordance with applicable law, as currently written or subsequently amended or redrafted.

The undersigned hereby agree, acknowledge, and certify that the foregoing Agreement is approved by each Owner, and the document consisting of 14 pages, constitutes, together with Schedules 1, 2 and 3, and Exhibits A and B (which are incorporated by this reference), the Operating Agreement of Spruce River, LLC, and adopted by the Owners as of February 24, 2011.

**Owners:**

_____  Percent Interest: 99%
Signature – Hollywood Pro Smile


_____  Percent Interest: 1%
Signature – Jaime Hayden