# EXHIBIT O



Colorado Secretary of State
Date and Time: 02/17/2010 02:11 PM
ID Number: 20101097555

Document must be filed electronically.
Paper documents will not be accepted.
  Document processing fee
Fees & forms/cover sheets
  are subject to change.
To access other information or print
  copies of filed documents,
  visit www.sos.state.co.us and
  select Business Center.

$50.00

Document number: 20101097555
Amount Paid: $50.00

ABOVE SPACE FOR OFFICE USE ONLY

## Articles of Organization
filed pursuant to § 7-80-203 and § 7-80-204 of the Colorado Revised Statutes (C.R.S.)

1. The domestic entity name of the limited liability company is

RevGuard, LLC .

*(The name of a limited liability company  must contain the term or abbreviation
"limited liability company",  "ltd. liability company", "limited liability co.", "ltd.
liability co.", "limited", "l.l.c.", "llc", or "ltd.". See §7-90-601, C.R.S.)*

**(Caution:** *The use of certain terms or abbreviations are restricted by law.  Read instructions for more information.)*

2. The principal office address of the limited liability company's initial principal office is

Street address

6260 Lookout Road
*(Street number and name)*

Boulder                          CO   80301
*(City)*                         *(State)*   *(ZIP/Postal Code)*
                            United States
*(Province – if applicable)*     *(Country)*

Mailing address
**(leave blank** if same as street address)
*(Street number and name or Post Office Box information)*

*(City)*            *(State)*      *(ZIP/Postal Code)*

*(Province – if applicable)*     *(Country)*

3. The registered agent name and registered agent address of the limited liability company's initial registered
   agent are

Name
(if an individual)
*(Last)*          *(First)*         *(Middle)*       *(Suffix)*

**OR**

(if an entity)

Berg Hill Greenleaf & Ruscitti LLP

**(Caution:**  *Do not provide both an individual and an entity name.)*

Street address

1712 Pearl Street
*(Street number and name)*

Boulder                          CO   80302
*(City)*                         *(State)*   *(ZIP Code)*

Mailing address
(**leave blank** if same as street address)

_____
*(Street number and name or Post Office Box information)*

_____

_____  CO  _____.
*(City)*              *(State)*        *(ZIP Code)*

*(The following statement is adopted by marking the box.)*

☑ The person appointed as registered agent has consented to being so appointed.

4. The true name and mailing address of the person forming the limited liability company are

Name
(if an individual)

_____ _____ _____ _____
*(Last)*          *(First)*          *(Middle)*      *(Suffix)*

**OR**

(if an entity)

Berg Hill Greenleaf & Ruscitti LLP
_____
*(**Caution:** Do not provide both an individual and an entity name.)*

Mailing address

1712 Pearl Street
_____
*(Street number and name or Post Office Box information)*

_____

Boulder                    CO    80302
_____  ____  _____
*(City)*              *(State)*        *(ZIP/Postal Code)*

United States
_____  _____.
*(Province – if applicable)*      *(Country)*

*(If the following statement applies, adopt the statement by marking the box and include an attachment.)*

☐ The limited liability company has one or more additional persons forming the limited liability company and the name and mailing address of each such person are stated in an attachment.

5. The management of the limited liability company is vested in
*(Mark the applicable box.)*

☑ one or more managers.

**OR**

☐ the members.

6. *(The following statement is adopted by marking the box.)*

☑ There is at least one member of the limited liability company.

7. *(If the following statement applies, adopt the statement by marking the box and include an attachment.)*

☐ This document contains additional information as provided by law.

8. *(**Caution:** Leave blank if the document does not have a delayed effective date. Stating a delayed effective date has significant legal consequences. Read instructions before entering a date.)*

*(If the following statement applies, adopt the statement by entering a date and, if applicable, time using the required format.)*

The delayed effective date and, if applicable, time of this document is/are _____.
*(mm/dd/yyyy hour:minute am/pm)*

**Notice:**

Causing this document to be delivered to the Secretary of State for filing shall constitute the affirmation or acknowledgment of each individual causing such delivery, under penalties of perjury, that the document is the individual's act and deed, or that the individual in good faith believes the document is the act and deed of the person on whose behalf the individual is causing the document to be delivered for filing, taken in conformity with the requirements of part 3 of article 90 of title 7, C.R.S., the constituent documents, and the organic statutes, and that the individual in good faith believes the facts stated in the document are true and the document complies with the requirements of that Part, the constituent documents, and the organic statutes.

This perjury notice applies to each individual who causes this document to be delivered to the Secretary of State, whether or not such individual is named in the document as one who has caused it to be delivered.

9. The true name and mailing address of the individual causing the document to be delivered for filing are

| Johnson | Angela | | |
|---------|--------|--------|--------|
| *(Last)* | *(First)* | *(Middle)* | *(Suffix)* |

Berg Hill Greenleaf & Ruscitti LLp
*(Street number and name or Post Office Box information)*

1712 Pearl Street

| Boulder | CO | 80302 |
|---------|-----|-------|
| *(City)* | *(State)* | *(ZIP/Postal Code)* |

| | United States. | |
|---|---|---|
| *(Province – if applicable)* | *(Country)* | |

*(If the following statement applies, adopt the statement by marking the box and include an attachment.)*

☐ This document contains the true name and mailing address of one or more additional individuals causing the document to be delivered for filing.

**Disclaimer:**

This form/cover sheet, and any related instructions, are not intended to provide legal, business or tax advice, and are furnished without representation or warranty. While this form/cover sheet is believed to satisfy minimum legal requirements as of its revision date, compliance with applicable law, as the same may be amended from time to time, remains the responsibility of the user of this form/cover sheet. Questions should be addressed to the user's legal, business or tax advisor(s).

**THIRD**

**AMENDED AND RESTATED**

**OPERATING AGREEMENT**

**OF**

**REVGUARD, LLC**

This Amended and Restated Operating Agreement ("Agreement") of RevGuard, LLC (the "Company"), entered into and effective as of the 1st day of April, 2014, by and among the persons and entities identified on Schedule A attached hereto (individually referred to herein as a "Member" and collectively referred to as the "Members"), hereby amends and restates in its entirety, the Company's original Operating Agreement dated effective February 17, 2010 and amended August 1, 2011 and January 1, 2014.

In consideration of the covenants and mutual agreements hereinafter set forth, the Members agree as follows:

## ARTICLE I

### GENERAL

1.01   <u>Certificate Of Formation Of the Company</u>.  The Members acknowledge that on February 17, 2010, Articles of Organization (the "Articles") were filed with the Colorado Secretary of State to form the Company pursuant to the provisions of the Colorado Limited Liability Company Act ("Act").

1.02   <u>General Provisions</u>.

(a)  <u>Name</u>.  The name of the Company shall be RevGuard, LLC.  The Company may also conduct business under such trade name(s) as the Managers may determine.

(b)  <u>Purpose</u>.  The Company is organized to engage in any lawful business or investment activity.

(c)  <u>Principal office</u>.  The principal office and place of business of the Company shall be 6260 Lookout Road, Boulder, Colorado 80301, or such place as the Managers may from time to time determine.

(d)  <u>Term</u>.  The Company shall continue its existence in perpetuity, subject only to dissolution and termination of the Company in accordance with the provisions of Article VII of this Agreement.

1

## **ARTICLE II**

## **MEMBERS; CAPITAL ACCOUNTS, CAPITAL CONTRIBUTIONS**

2.01     Membership Classes and Percentage Interests.

(a)     The interests in the Company of each Member, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members pursuant to this Agreement or the Act, shall initially be placed into two classes of units of ownership interest (the "Units"): Class A Units and Class B Units.  Class A Units shall be issued to (i) the initial Members of the Company (the "Founders") or (ii) as otherwise permitted herein.  Class B Units will be granted to key employees, advisors and consultants on such terms and conditions as the Managers reasonably deem advisable on behalf of the Company; including the issuance of Profits Interests (the "Class B Members").  The Manager, subject to confirmation by a Majority Vote (as that term is defined below) of the Members holding Class A Units (the "Class A Members"), may issue Class B Units, in return for past or promised future services to the Company, which consist only of a profits interest in the Company, and/or as to which the percent of income initially allocable to the profits interest of the Class B Units is different from the per cent of total capital accounts represented by the capital account attributable to the Class B Units. A "profits interest," in general, means an interest only in the income and appreciation in value of the Company arising subsequent to the date of issuance of the Units, and does not include any interest in the value of the Company as of the date of issuance.  Class B Units which consist only of a profits interest will not initially have a capital account, since no capital will be contributed in return for their issuance.  (It is hoped that a capital account for such Units will be generated out of allocations of income pursuant to this Operating Agreement, but there can be no assurance of such generation.)  Losses will be allocated to such Units only in accordance with this Operating Agreement.  Class B Units may include both a profits interest and an interest in the value of the Company at the date of issuance, under such terms and conditions, which may include a required capital contribution, as the Class A Unit Holders may determine.

More particularly, in addition to the right to share in Operating Profits pursuant to the terms of the Operating Agreement, a Profits Interest shall consist of the right to share in Liquidating Gain (as elsewhere defined) to the extent that Liquidating Gain exceeds that which would arise from the sale or other transfer or disposition of all or substantially all of the assets of the Company for the "Agreed Value."  The "Agreed Value" means a value of the Company agreed upon between the Class A Unit Holders and the holder of the Profits Interest as part of the agreement for issuance of the Profits Interest.  The Agreed Value shall not be less than fair market value as of date of issuance of the Profits Interest, as reasonably agreed upon between those parties, but may be more than such fair market value.  The Class A Unit Holders may reasonably allocate the Agreed Value among the various assets of the Company, if such allocation is needed. Subject to the foregoing provisions, Class B Units may include such terms and conditions, and be issued pursuant to such agreements, as the Class A Unit Holders may reasonably determine.

The Class A Unit Holders may also grant options to purchase Class B Units, in return for past or promised future services to the Company, under such terms and conditions and be issued pursuant to such agreements as the Class A Unit Holders may reasonably determine.

2

(b) Capitalization Structure.

The *authorized* capitalization of the Company shall be as follows:

| | |
|---|---|
| Class A Units | 1,000,000 |
| Class B Units | 400,000 |
| Total Units | 1,400,000 |

(c) Subject to subparagraphs (e) and (f) below, the capitalization structure will be amended only by vote of Class A Members holding fifty-one percent (55%) of the voting Percentage Interests, as defined below, of the Company ("Clear Majority Vote"). A "Majority Vote" shall be defined as a vote of Class A Members holding fifty-one percent (51%) of the voting Percentage Interests of the Company.

(d) Each Class A Member shall have the right to vote on matters presented to the Members for approval, in accordance with their "Percentage Interests" in the Company. Each Class A Member's Percentage Interest shall equal a fraction, expressed as a percentage, the numerator of which is each Member's total Units and the denominator of which is the total Class A Units of the Company outstanding from time to time. Class B Members shall not be entitled to vote and shall be considered non-voting members.

(e) The Members, their respective Unit class and their initial Percentage Interest shall be as set forth on the Schedule of Members, Capital and Percentage Interest attached hereto as Schedule A, as is amended from time to time. The Managers may, but are not required to, issue certificates of ownership to the holders of the Units in such form as they may consider appropriate, with applicable legends indicating restricted transferability.

(f) Interest on Capital Contributions.   No interest shall be paid on any contribution to the capital of the Company.

2.02   Capital Accounts.

(a) In General.  There shall be established and maintained on the books of the Company a separate capital account (a "Capital Account") for each Member. Each Member's Capital Account shall be credited with the amount of money and the fair market value of other property contributed to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under § 752 of the Internal Revenue Code of 1986, as amended (the "IRC")). Each Member's allocated share of Company items of Capital Account Income and Capital Account Deduction shall be credited or debited to its Capital Account. All Company distributions to a Member of cash or property (which shall be valued at its fair market value net of liabilities secured by such distributed property that the Member is considered to assume or take subject to IRC § 752) shall be debited to such Member's Capital Account. Notwithstanding any other provision hereof, the Members' Capital Accounts shall be maintained in accordance with Treasury Regulations under IRC § 704(b).  Upon consummation of any transfer of Company Units, the existing Capital Accounts of any Member or other holder of Company Units who is a party to such transfer shall be adjusted in accordance

3

with such Treasury Regulations, and a Capital Account shall be established with respect to any assignee which prior to such transfer was not a holder of Company Units, to give effect to such transfer.

(b) <u>Restatement of Capital Accounts</u>.  Upon any event described in Treas. Reg. § 1.704-1(b)(2)(iv)(f)(5), the Capital Accounts shall be restated to reflect a revaluation of the assets of the Company in order to reflect the manner in which the unrealized income, gain, loss, or deduction inherent in such assets (that has not been reflected in the Capital Accounts previously) would be allocated among the Members if there were a taxable sale of such assets for their fair market value as determined by the Managers, in accordance with the Treas. Reg. § 1.704-1(b)(2)(iv)(g) and (h).  Provided, however, that the Managers may forego any such restatement, in their reasonable discretion, if it appears from advice of counsel that no material realization of taxable income will result if the restatement is foregone.

(c) <u>Determination of Capital Account Income and Deduction</u>.  Items of Capital Account Deduction and Capital Account Income shall consist of items of income, gain, loss and deduction as calculated for purposes of determining the taxable income of the Company under IRC § 703 except that (a) income exempt from taxation shall be treated as an item of Capital Account Income, (b) items described in IRC § 709(a)(2)(B) or treated as so described in Treasury Regulations under IRC § 704(b) shall be treated as items of Capital Account Deduction, (c) with respect to property reflected in the Capital Accounts at a book value different from its adjusted basis, the Members' Capital Accounts shall be debited or credited with their allocable Units of items of depreciation, amortization and gain or loss computed in the same manner as such items are computed for federal income tax purposes, except that the computation shall be made with reference to such property's fair market value at the time of the contribution or revaluation instead of at the adjusted tax basis, in accordance with the Treasury Regulations under Code Section 704(b), and (d) any gain or loss treated as recognized upon a restatement of the Capital Accounts under Section 2.02(b) shall be treated as an item of Capital Account Income or Capital Account Deduction, respectively .

(d) <u>Initial Capital Account Balances</u>.  The Members agree that the Initial Capital Account balances of the Members holding each Class of Company Units shall be as set forth on Schedule A, which reflects the cash contributions and contributions in kind of the Members.

(e) <u>Allocations of Capital Account Items</u>.  Items of Capital Account Income and Capital Account Deduction for a taxable year of the Company shall, for purposes of maintaining the Capital Accounts, be allocated according to this Section 2.02(e).

(i) <u>Allocations of Operating Profit</u>.  If the Company realizes Operating Profit in a taxable year, such Operating Profit shall be allocated in the following order and priority:

a.  First, in the reverse order and priority in which Operating Losses were allocated in prior taxable years of the Company in accordance with paragraphs b. and c. of Section 2.02(e)(ii) until the total amount of Operating Profit allocated under this paragraph a. of Section 2.02(e)(i) for such taxable year and all prior taxable years equals the total amount of Operating Losses so allocated in all prior taxable years.

4

           b.    Second, any remaining Operating Profits shall be allocated among the Members in proportion to the respective numbers of outstanding Units.

         (ii)    <u>Allocations of Operating Loss</u>.  If the Company recognizes Operating Loss in a taxable year, such Operating Loss shall be allocated in the following order and priority:

           a.    First, any Operating Loss shall be allocated among the Members in proportion to the Members' positive Cash Capital Accounts until the Cash Capital Accounts have all been reduced to zero.  A Member's "Cash Capital Account" shall equal the Member's Capital Account reduced by the total amount of any noncash contributions to the Company which were credited thereto;

           b.    Second, any remaining Operating Loss shall be allocated among the Members in proportion to the total amount of any non-cash contributions which were credited thereto.

           c.    Third, any remaining Operating Loss shall be allocated among the Members in proportion to their respective numbers of outstanding Units.

         (iii)    <u>Allocations of Liquidating Gain</u>.  Any Liquidating Gain for a taxable year of the Company shall be allocated among the Members in accordance with their respective numbers of outstanding Units or as otherwise provided herein.

         (iv)    <u>Allocations of Liquidating Loss</u>.  Any Liquidating Loss for a taxable year of the Company shall be allocated among the Members in accordance with their respective Capital Account Balances (after taking into account allocations of Liquidating Loss and all other Capital Account items for the year prior to liquidating distributions) or as otherwise provided herein.

         (v)    <u>Determination of Operating Profits and Losses and Liquidating Gain and Loss</u>.

           a.    Operating Profit and Operating Loss for a taxable year of the Company shall be determined by taking into account all items of Capital Account Deduction and Capital Account Income for the year, but excluding any such item which arises upon the sale or deemed sale of all or substantially all assets of the Company; if the amount so determined is a positive amount, it shall be designated "Operating Profit," and it shall otherwise be designated "Operating Loss."

           b.    Liquidating Gain and Liquidating Loss for a taxable year of the Company shall be determined by taking into account all items of Capital Account Deduction and Capital Account Income for the year which arise upon the sale or other transfer or disposition of all or substantially all assets of the Company; if the amount so determined is a positive amount, it shall be designated "Liquidating Gain," and it shall otherwise be designated "Liquidating Loss."

         (vi)    <u>Allocations Required by Treasury Regulations</u>.

5

a.      Notwithstanding any provision in this Agreement, if any Member unexpectedly receives any adjustments, allocations, or distributions described in Treas. Reg. Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), which reduce such Member's Adjusted Capital Account balance to below zero, gross income shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account deficit of such Member as quickly as possible. For purposes of this paragraph a. and paragraph c. below, a Member's Adjusted Capital Account balance shall be the same as the Member's Capital Account balance increased by the sum of (i) the amount, if any, which the Member is unconditionally obligated to contribute to the Company and (ii) the amount, if any, which the Member is deemed to be obligated to contribute to the Company under Treasury Regulations under IRC Section 704(b).

b.      "Minimum gain chargeback," and "partner nonrecourse debt minimum gain chargeback" provisions, as defined in Treasury Regulations under IRC Section 704(b), shall be incorporated herein by reference and given effect notwithstanding other provisions to the contrary in this Section 2.02. Deductions attributable to partner nonrecourse liabilities (within the meaning of Treas. Reg. Section 1.704-2(i)(2)) shall be allocable to the Member or Members who bear the risk of loss with respect to the nonrecourse liability.

c.      If any Member would be allocated an item of deduction or loss which would reduce its Adjusted Capital Account balance to below zero, the Member shall be allocated only the amount of such item which would reduce its Adjusted Capital Account balance to zero, and any remaining amount of such item shall be allocated to the other Members.

d.      Any allocations made pursuant to paragraphs a., b., and c. above, shall be taken into account in determining allocations among the Members in subsequent periods, so that the net amount reflected in each Member's Capital Account will be the same as if such paragraphs were not taken into account. The Managers shall have the discretion to administer this paragraph d. in any reasonable manner which eliminates, to the extent reasonably feasible, any character discrepancy between the amounts allocated under paragraphs a., b., and c. and the corresponding amounts allocated under this paragraph d.

(vii)   Allocations for Tax Purposes. For federal income tax purposes, except as otherwise provided in this Section 2.02(e)(vii), items of income, gain, loss and deduction shall be allocated in accordance with the allocation of the corresponding item for purposes of maintaining Capital Accounts under the preceding provisions of Section 2.02.

a.      Recapture of tax deductions arising out of a disposition of property shall, to the extent consistent with the allocations for tax purposes of the gain or amount realized giving rise to such recapture, be allocated to the Members in the same proportions as the recaptured deduction was originally allocated.

b.      In accordance with IRC § 704(c) and Treasury Regulations thereunder, solely for federal and applicable state and local income tax purposes, income, gain, loss, and deduction with respect to property contributed by a Member shall be allocated so as to take into account any variation between the adjusted basis of such property to the Member for federal income tax purposes and its fair market value at the time of contribution. Following a

6

restatement of the Capital Accounts pursuant to Section 2.02(b), solely for income tax purposes, income, gain, loss, and deduction with respect to the assets of the Company as of the time of such restatement shall be allocated in accordance with the principles of IRC § 704(c). The preceding two sentences shall be administered pursuant to any method of allocation permitted by § 704(c) and Treasury Regulations thereunder as determined by the Managers.

2.04 <u>Additional Capital Contributions; Creation of Additional Interests or Units</u>.

(a) <u>Additional Capital Contributions</u>. Except as provided in this Section 2.04, no Member shall be obligated to make any contribution of capital or assets to the Company other than its initial capital contribution. If the Class A Members determine by Clear Majority Vote that additional capital contributions are necessary, the Managers shall first attempt to raise such additional capital from existing Members. In the event a Member fails to make a required capital contribution, such Member's Percentage Interest shall be subject to dilution and reduced accordingly and proportionately.

(b) <u>Creation of Additional Units</u>. In the event the Class A Members approve, by Clear Majority Vote, the issuance of additional Units, the Company shall, unless otherwise approved by Clear Majority Vote: (i) prepare an offering memorandum describing the units to be issued and the offering price; (ii) provide existing Class A Members the opportunity to participate in the offering; and (iii) offer any remaining unsubscribed units to third-parties, in accordance with this Section 2.04(b):

(i) Each Class A Member shall have the right, exercisable upon written notice to the Managers, within fifteen (15) business days after receipt of the offering memorandum, to participate in such sale of Units on the same terms and conditions as set forth in the offering memorandum. To the extent one or more of the Members exercise such right of participation in accordance with the terms and conditions set forth below, the number of Units that the Company may sell to third-parties in the transaction shall be correspondingly reduced.

(c) Each Member participating in an offering pursuant to this Section 2.04 (a "Participant") shall promptly notify the Company of the number of Units which such Participant elects to purchase. The Company will determine the number of Units the Participant will be entitled to purchase, and will so notify the Participant, based upon the Participant's pro rata ownership of Class A Units in the Company.

(d) The Participant will execute such documentation as is necessary to consummate the purchase of Units pursuant to the terms and conditions specified in the offering.

(e) If none of the Members elect to participate in the offering or if Units remain unsubscribed, the Company shall make the offering available to third-parties.

2.05 <u>Authority of Members</u>. No Member acting alone shall have any power or authority to bind the Company unless the Member has been authorized by the Managers to act as an agent of the Company.

7

2.06   <u>Limitation on Liability</u>.  No Member shall have any personal liability for any debts or losses of the Company beyond his respective capital contributions, except as provided by law.

2.07   <u>Actions by Managers with Respect to Sales of Units</u>.  The Managers shall, with respect to any sale of Units to new Members or additional units to existing Members, (i) make a notation in the appropriate records of the Company with respect to such sale, and (ii) obtain a written representation from each purchaser of Units as to his or her investment intent.

2.08   <u>No Right to Withdraw Capital</u>.  No interest shall accrue on any contribution to the capital of the Company, and no Member shall have the right to withdraw from the Company or be repaid any contribution of capital except as otherwise specifically provided herein.

2.09   <u>Loans by Managers or Members</u>.  Any Manager or Member may, but is not obligated to, loan to the Company such sums as the Manager determines appropriate from time to time for the conduct of Company business.  Any such loans must be approved by a Majority Vote of Class A Members and upon such terms and conditions as such Members determine to be commercially reasonable.  All loans made by a Manager or Member shall be repaid in full before any distributions are made to the Members.

2.10   <u>Section 754 Election</u>.  The Managers may, in their sole discretion, make a Section 754 Election under IRC § 754.

## <u>ARTICLE III</u>

## <u>TRANSFER; SALE OF UNITS; TAG-ALONG RIGHTS</u>

3.01   <u>Transfer Restrictions</u>. (a)   No Member may sell, convey, transfer, pledge or assign, voluntarily or involuntarily (including by operation of law or otherwise), its Units except in accordance with the provisions of this Article III; provided, however, the Class A Members may, by Majority Vote, consent to the transfer of all or a portion of an individual Member's Units to a third-party without otherwise complying with the provisions of this Article III.  Any attempt to sell, convey, transfer, pledge or assign such Units in violation of this Agreement or without the consent of the Class A Members by Majority Vote shall be void and of no effect.

(b)   Notwithstanding the foregoing general restriction, but in addition to transfers of Members' Units approved by a Majority Vote of Members pursuant to Section 3.01(a), the Managers may, in their discretion, grant or withhold approval of the transfer of all or a portion of an individual Member's Units by gift or devise to, or to a trust for the primary benefit of, a member or members of such Member's immediate or extended family, or to an Affiliate, as defined below, of such Member or the Member's family or friends of the Member; provided, however, that the transferring Member retains all voting rights and remains responsible for all obligations relating to the transferred interest.  The Manager's approval shall be in writing and may be subject to any conditions or restrictions which the Managers deem necessary or advisable.  An approved transfer under this Section 3.01(b) does not have to comply with Sections 3.03, 3.04 and 3.05.  However, the person or entity to whom such transfer is to be made shall agree to be subject to and bound by the terms of this Agreement.  For purposes of this

8

Agreement, "Affiliate" means, with respect to any person, any other person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such person. For the purposes of this definition, the term "controls," "is controlled by" or "under common control with" means (i) the direct or indirect ownership of more than fifty percent (50%) of the equity interests (or interests convertible into or otherwise exchangeable for equity interests) in a person, or (ii) possession of the direct or indirect right to vote in excess of fifty percent (50%) of the voting securities or elect in excess of fifty percent (50%) of the Directors or other governing body of a person (whether by securities, ownership, contract or otherwise).

    3.02    Units are Restricted Securities.  The Units have not been registered under the Securities Act of 1933 as amended ("Securities Act") or under the securities laws of any state, and may not be offered, sold, pledged, hypothecated or otherwise transferred unless and until registered under the Securities Act or, in the opinion of counsel in form and substance satisfactory to the Company, such offer, sale, pledge, hypothecation or transfer is in compliance therewith.

    3.03    Tag-Along and Drag-Along Rights. (a)    Except as otherwise provided in Section 3.01(b), if a Member proposes to sell or otherwise transfer any Unit (a "Selling Member"), then the Selling Member shall (i) first, afford the other Members the right of first refusal to purchase such shares arising under Section 3.04, below, and then (ii) second, afford the Members the opportunity to participate in such transfer in accordance with this Section 3.03.

        (b)    If the Units are not acquired in accordance with Section 3.04, then such Selling Member shall promptly give written notice (the "Notice") to the Company and the Members at least thirty (30) days prior to the closing of such sale or transfer notifying the Members that they may exercise their Tag-Along Rights pursuant to this Section 3.03.

        (c)    Each Member shall have the right, exercisable upon written notice to such Selling Member within fifteen (15) days after receipt of the Notice, to participate in such sale of Units on the same terms and conditions as set forth in the Notice.  To the extent one or more of the Members exercise such right of participation in accordance with the terms and conditions set forth below, the number of Units that the Selling Member may sell in the transaction shall be correspondingly reduced.

        (d)    Each Member participating in a Selling Member's sale pursuant to this Section 3.03 (a "Participant") shall promptly notify the Selling Member of the number of Units which such Participant elects to sell.  The Company will determine the number of Units the Participant will be entitled to sell, and will so notify the Participant, based upon the product of (i) the aggregate number of Units covered by the Notice and (ii) a fraction the numerator of which is the number of Units the Participant wishes to sell and the denominator of which is the total number of Units the Selling Member and all the Participants wish to sell.

        (e)    The Participant will execute such documentation as is necessary to consummate the sale of Units pursuant to the terms and conditions specified in the Notice, and the Selling Member shall concurrently therewith remit to such Participant that portion of the sale proceeds to which the Participant is entitled by reason of its participation in such sale.  To the

extent that any Purchaser prohibits such assignment or otherwise refuses to purchase shares or other securities from a Participant exercising its rights of co-sale hereunder, the Selling Member shall not sell to such Purchaser any Units unless and until, simultaneously with such sale, the Selling Member shall purchase such shares or other securities from such Participant.

(f) The exercise or non-exercise of the rights of the Participants hereunder to participate in one or more sales of Units made by the Selling Member shall not adversely affect their rights to participate in subsequent sales of Units.

(g) If none of the Members elect to participate in the sale of the Units subject to the Notice, the Selling Member may, not later than sixty (60) days following delivery to the Company of the Notice, enter into an agreement providing for the closing of the sale or transfer of the Units covered by the Notice within thirty (30) days of such agreement on terms and conditions not more materially favorable to the Selling Member or the buyer than those described in the Notice. Any proposed sale or transfer on terms and conditions materially more favorable to the seller or buyer than those described in the Notice or made after the 60-day period, as well as any subsequent proposed sale or transfer of any of the Units by a Member, shall again be subject to the co-sale rights of the Members and shall require compliance by a Member with the procedures described in this Section 3.03 and Section 3.04.

(h) If the holders of a majority of the Class A Units vote to sell or otherwise transfer all of the outstanding units of the Company, then the holders of all of the outstanding units, including Class B Members, shall be obligated to sell or otherwise transfer all of their units on the same terms and conditions as those accepted by the holders of a majority of the Class A Units, and shall be afforded the opportunity to make such a sale or transfer.

Transfers pursuant to this paragraph 3.03(h) shall not be subject to the requirements of any of the restrictions on transfer elsewhere set forth in Article III.

3.04   <u>Right of First Refusal on Sale of Units</u>.  Except as otherwise provided in Section 3.01(b), any Selling Member desiring to sell all or less than all of his Units ("Offered Units") to a person or entity other than one of the other Members for any reason shall first notify the Company and the other Members in writing, at least sixty (60) days prior to sale, of his or her intention to sell, stating the name and address of the proposed purchaser, the number of Units proposed to be sold, the consideration proposed to be received therefore, and the proposed terms of sale ("Offer Notice"). Upon receipt of the Offer Notice, first the Company and then the Members shall have the right to purchase all of the Offered Units at the price and terms set forth in the Offer Notice. Within twenty (20) days after receipt of the Offer Notice, each Member shall provide the Selling Member with written notice of his or her intention to participate in the offering, should the Company not exercise its priority right of first refusal (each such member, an "Electing Member"). The Electing Member's notice shall specify the total number of Units such Electing Member desires to purchase (the "Elected Units"). This initial twenty-day period ("Member Election Period") coincides with the period during which the Company may elect to exercise its right to purchase the Offered Units ("20-Day Option Period"). If the Company declines to purchase the Offered Units, the Company shall notify each Electing Member of the

10

amount of Units each such Member can purchase, which shall be equal to the product of (x) the Offered Units and (y) a fraction, the numerator of which is each Electing Member's Elected Units and the denominator of which is the sum of all the Electing Members' Elected Units. The Electing Members shall be given a consecutive 10-Day Option period to exercise their option to purchase.

Upon exercise of the option to purchase, the Electing Members or the Company, as the case may be, shall purchase all of the Offered Units within sixty (60) days after notification to the Selling Member of the exercise of the option. If no option to purchase is exercised within the consecutive Option Periods described above or if the option is not exercised as to all of the Offered Units and the Selling Member does not desire to sell less than all of the Offered Units, the Selling Member shall be required to comply with Section 3.03.

3.05   Consent Required for Substitution of New Member. Subject to Sections 3.01(b), an assignee of any Units may become a Member only upon (i) execution and delivery by the assignee of a written acceptance and adoption of this Agreement, as the same may be amended, together with such other documents, if any, as the Managers may require; (ii) the payment to the Company by the Member selling his or her Units of all reasonable expenses incurred by the Company in connection with such assignment; and (iii) with a Clear Majority Vote of the Class A Members. Upon such vote, when applicable, but not otherwise, the assignee shall, with respect to the Units assigned, be admitted to the Company and become a substituted Member therein. This Section 3.05 shall not apply to initial admission of Members pursuant to Article II of this Agreement, to transfers of Units between existing Members of the Company pursuant to Section 3.01(b).

## ARTICLE IV

## DISTRIBUTIONS

4.01   Sharing of Operating Distributions. All distributions made by the Company shall be shared in accordance with the allocations of Operating Profit and Liquidating Gain (or Loss) elsewhere provided for.

4.02   Time of Distribution; Tax Distributions. The Managers may, from time to time, make distributions from Company operations to the Members in amounts that it determines are not needed and may not reasonably be expected to be needed for Company purposes and repayment of Company obligations (including expenses and loans) or establishing reasonable reserves therefor. Subject to the limitations set forth in Section 4.04, the Company shall make reasonable efforts to distribute to the Members at least annually amounts which are sufficient to cover federal and state income taxes payable by the Members on the profits of the Company allocated to the Members pursuant to Section 2.02(a) of this Agreement ("Tax Distributions"). For purposes of such distributions, each Member shall be deemed to incur federal and state income taxes with respect to taxable income of the Company at the maximum applicable rate for individuals resident in the State of Colorado based on the assumption that net losses of the Company will be carried forward by the Members to whom they are allocated, and applied against future Company income, and based on the assumption that Company expenses may be

11

offset against Company income without regard to the limitations imposed by the Internal Revenue Code which could theoretically apply to fewer than all the Members. The Managers shall have the authority to apply the preceding two sentences in any reasonable manner, upon the advice of the Company's counsel or tax accountants. This Section 4.02 shall not be construed as altering the operating of Section 4.03.

4.03    Liquidating Distributions.  In the event of a distribution of proceeds from the sale of all or substantially all the assets of the Company, the amount distributed shall be shared by the Members in accordance with their positive Capital Account balances (as adjusted for all Capital Account items properly recognized through the date of liquidation other than any debit to the Capital Accounts made pursuant to the fourth sentence of Section 2.02(a) as a result of distributions pursuant to this Section 4.03).

4.04    Limits on Distributions.  As provided in Section 7-80-606 of the Act, a Member may not receive a distribution from the Company to the extent that, after giving effect to the distribution, all of the liabilities of the Company, other than liabilities to Members on account of their Company Units, would exceed the fair value of the assets of the Company.

4.05    Withholding.  All amounts withheld pursuant to the Code or any provision of any state or local tax law with respect to any payment or distribution to a Member shall be treated as amounts distributed to such Member.

## ARTICLE V

## MANAGEMENT

5.01    Appointment of Managers.  Blair William McNea is appointed Manager of the Company, and shall serve until his resignation, removal or until his successor has been appointed and has undertaken his or her duties.  The Members by Majority Vote of the Class A Members may appoint additional Managers at their discretion in the future.

5.02    Authority of the Manager or Managers.  Except as otherwise expressly provided herein, all decisions respecting any matter set forth in this Agreement or otherwise affecting or arising out of conduct of the business of the Company shall be made by the Managers.  The Managers shall have the right and authority to manage, conduct and operate the Company business and to make all decisions regarding the operation of the Company business and to perform any and all other acts or activities customary or incident to the management of the Company business.  Subject to Section 5.04, the Managers shall be authorized to:

(a)    employ such agents, employees, managers, accountants, attorneys, consultants, Board of Advisor members and other persons necessary or appropriate to carry out the business and affairs of the Company and to pay as an expense of the Company such reasonable fees, expenses, salaries, wages and other compensation to such persons as Class A Member Turtle Mountains, LLC shall determine; *provided, however*, that any compensation, bonus, salary, or wage paid to Turtle Mountains, LLC shall be determined by the Class A Unit Holders;

12

(b)    cause to be paid all amounts due and payable by the Company to any person or entity;

(c)    make any and all expenditures or investments of excess funds in obligations which the Managers, in their sole discretion, deem necessary or appropriate in connection with the management of the affairs of the company and the carrying out of its obligations and responsibilities under this Agreement;

(d)    lease Company property on such terms and conditions as the Managers shall determine to be in the best interest of the Company;

(e)    incur such indebtedness on behalf of the Company as the Managers deem necessary to carry out business and affairs of the Company;

(f)    purchase insurance insuring the Managers and/or employees of the Company from personal liability for actions taken in good faith on behalf of the Company;

(g)    execute on behalf of the Company all instruments and documents;

(h)    hold and own any Company real and/or personal properties in the name of the Company;

(i)    enter into other agreements on behalf of the Company; and

(j)    after obtaining requisite Member consent, if necessary, pursuant to this Agreement, all other acts as may be necessary or appropriate to the conduct of the Company business.

With respect to all of their obligations, powers and responsibilities under this Agreement, the Managers are authorized to execute and deliver for and on behalf of the Company such deeds, leases, notes, contracts, agreements, assignments, bills of sale, security agreements, deeds to secure debt and other documents in such form and on such terms and conditions as they shall deem proper.

5.03    Liability for Certain Acts.

(a)    The Managers shall perform their duties hereunder in good faith, in a manner they reasonably believe to be in the best interests of the Company and with such care as an ordinarily prudent person in a like position would use under similar circumstances.   The Managers, if they so perform, shall not have any liability by reason of their management of the Company.   The Managers do not, in any way, guarantee the return of any Member's capital contributions or a profit for the Members from the operations of the Company. The Managers shall not be liable to the Company or to any Member by reason of any act, omission, or alleged act or omission arising out of any of their activities or alleged activities on behalf of the Company or in furtherance of the interests of the Company; provided, however, that this Section 5.03 shall have no force or effect if the act, omission, or alleged act or omission upon which such actual or threatened action, proceeding or claim is based was performed or omitted as a result of

13

gross negligence or willful misconduct or a knowing and material breach of this Agreement by the Manager.

    (b)  Indemnification of Managers, Members, Officers, Employees and Agents.

        (i)    The Company shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative by reason of the fact that he or she is or was a Manager, Member, or officer of the Company, or is or was serving at the request of the Company as a Manager, Member, officer, employee, or agent of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise, against expenses (including attorneys' fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred by him or her in connection with such action, suit, or proceeding if he or she acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his or her conduct was unlawful.

        (ii)    The Company shall have power to purchase and maintain insurance on behalf of any person who is or was a Manager, Member, officer, employee, or agent of the Company, or is or was serving at the request of the Company as a Manager, Member, officer, employee, or agent of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise against any liability asserted against him or her and incurred by him or her in any such capacity, or arising out of his or her status as such, whether or not the Company would have the power to indemnify him or her against such liability.

        (iii)    The Company may indemnify any person who is or was an employee or agent of the Company (other than a Manager or officer) to the same extent that it is required to indemnity a Manager or officer under the preceding provisions of this Section 5.03.

        (iv)    The Company may advance expenses to any Manager, Member, officer employee, or agent if the Managers (other than the Manager who is to receive any such advance or, in the case of an advance to a Manager who, at such time, is the sole member of the Managers, the Members holding a majority of the Voting Units other than the Voting Units held by such Manager) reasonably determines that such person would be entitled to indemnification of those expenses pursuant to this Section 5.03.

    5.04   <u>Limitations on Authority of Managers</u>.   Subject to Section 2.01(e), but notwithstanding any other provision of this Agreement to the contrary, a Majority Vote of the Class A Members shall be required in the following circumstances:

    (a)    The issuance of Class B Units;

    (b)    Any merger or consolidation involving the Company;

(c)     The sale, lease, transfer or other disposition of all or substantially all of the assets of the Company;

(d)     Any voluntary liquidation, dissolution or termination of the Company;

(e)     Any amendment to this Agreement or to the certificate of formation of the Company, except as otherwise provided in Section 2.01(c);

(f)     The establishment of any joint venture with a third party or the acquisition of all or part of any other business person or entity other than acquisitions in the ordinary course of business or with a *de minimus* value;

(g)     The approval of the making of any investment or capital expenditures or significant operating arrangements, in excess of twenty percent (20%) of such expenses as set forth in the annual budget of the Company during any fiscal year;

(h)     The entry by the Company into any contract, agreement or arrangement with a Manager;

(i)     The settlement of any litigation by the Company, other than routine collection matters; and

(j)     The substitution of new members pursuant to Section 3.05

Notwithstanding any other provisions of this Agreement to the contrary, a Clear Majority Vote of the Class A Members shall be required in any of the following circumstances:

(a)     Any registered public offering of any equity interests of the Company;

(b)     The issuance of new Units;

(c)     The decision to request additional Capital Contributions from Members; and

(d)     Any other action that may result in the dilution of a Class A Member's Percentage Interest.

5.05    Removal of Managers.  The Members may remove any Manager upon Clear Majority Vote of the Class A Members (excluding the Percentage Interest of the Managing Member subject to removal) at a special meeting of Members called expressly for such purpose.

5.06    Action by Managers.  The Managers shall act jointly on all matters, except that any Manager may separately authorize Company expenditures or indebtedness not to exceed $10,000 per transaction or a greater amount as determined by a majority vote of the Class A Unit Holders.

5.07    Appointment and Substitution of New Manager.  Within ten (10) days of any event resulting in the withdrawal of any Managers, by affirmative vote of at least eighty percent (80%) of the members of the Class A Unit Holders, the Class A Unit Holders shall appoint a new

15

Manager, and the person so elected shall become a substitute Manager upon the execution and delivery of a written acceptance and adoption of this Agreement, as the same may have been amended, together with such other documents, if any, as counsel for the Company may require.

## ARTICLE VI

### CLASS A UNIT HOLDERS.

6.01    Number, Qualification and Initial Advisors.

The Company shall have a Board of Advisors (the "Board") comprised of up to even members ("Advisors"). Advisors need not be Members and shall be appointed from time to time to the Board by a Majority Vote of the Class A Members. Blair McNea and Walter are appointed as the current Board of Advisors as the date of this Amendment.

6.02    Powers.

The Board shall have no binding powers and shall not perform, or be obligaed to perform, any fiduciary activities or responsibilities.

6.03    Term and Vacancies.

Each Advisor shall serve until his or her successor is duly elected and qualified or until his or her death, resignation or removal. No decrease in the number of Advisors constituting the Board shall shorten the term of any incumbent Advisor. Any vacancies on the Board shall be filled by a Majority Vote of the Class A Members.

6.04    Resignation and Removal.

Any Advisor may resign at any time by delivering his or her written resignation to any Manager or two or more Members. The Board, or any individual Advisor, may be removed from office at any time by Majority Vote of the Class A Members.

6.05    Meetings.

The Board shall hold regular meetings, no less often than once annually, at times and places to be selected by the Advisors. Special meetings of the Board may be held at any time and place whenever called by the Members, the Managers or any three Advisors.

6.06    Notice of Meetings.

Notice of the time and place of all regular and special meetings of the Board shall be orally or in writing, by telephone, facsimile, e-mail or other electronic transmission, telegraph or telex, at least two (2) days before the meeting, or sent in writing to each director by first class mail, charges prepaid, at least three (3) days before the date of the meeting. Notice of any

16

meeting may be waived in writing at any time before or after the meeting and will be waived by any director by attendance thereat, except when the director attends the meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

## ARTICLE VII

### BOOKS, RECORDS, TAXES AND MEETINGS.

7.01     Records.  The Company shall keep at the principal office of the Company, (a) true and full information regarding the status of the business and financial condition of the Company; (b) a current list of the full name and last known business, residence or mailing address of each Member and each Manager; (c) a copy of this Agreement and Articles of Organization and all amendments thereto and restatements thereof, together with executed copies of any written powers of attorney pursuant to which this Agreement and any certificate and all amendments thereto and restatements thereof have been executed; (d) copies of the Company's federal, state and local income tax returns and reports, if any; (e) true and full information regarding the amount of cash and a description and statement of the agreed value of any property or services contributed by each Member and which each Member has agreed to contribute in the future, and the date on which each became a Member; and (f) any other information regarding the affairs of the Company as is just and reasonable.  Such records are subject to inspection and copying at the reasonable request, and at the expense, of any Member during ordinary business hours.

7.02     Tax Returns and Accounting.

(a)     Blair McNea is designated as the initial Tax Matters Member (the "Tax Matters Member") for the Company.  Upon his resignation or death, the Tax Matters Member shall be designated by the Managers.  The Tax Matters Members shall be designated the "tax matters partner" within the meaning of IRC § 6231.  The Tax Matters Member shall cause all federal, state, and local reports for the Company to be prepared and to be timely filed with the appropriate authorities, including without limitation all reports required by licenses and permits, sales and use tax reports, income tax withholding reports, FICA tax reports, unemployment compensation reports, information reports, and similar reports, and shall cause all payments required thereunder to be made by the Company from the Company's funds.  The Tax Matters Member shall make such tax elections and other tax determinations on behalf of the Company as the Tax Matters Member deems appropriate.  All costs incurred in performing such duties shall be charged to and treated as expenses of the Company.  The Tax Matters Member may be changed by a vote of the Managers, subject to applicable Treasury Regulations.

(b)     Each item of taxable income, gain, loss, deduction, or tax credit will be allocated among the Members in accordance with Section 2.02(e).  The allocable share of any party who is a Member for less than an entire tax year or whose interest in the Company varies in the tax year shall be adjusted in any reasonable manner chosen by the Tax Matters Member to take its varying interest or lack thereof into account.

(c)     The Tax Matters Member shall cause to be provided to each Member information concerning the Company's taxable income or loss and each item of income, gain,

loss, deduction, or credit which is relevant to reporting a Member's share of Company income, gain, loss, deduction, or credit for purposes of federal or state income tax. Information required for the preparation of a Member's income tax returns shall be furnished to the Members as soon as possible after the close of the Company's fiscal year. The Tax Matters member shall forward to each Member copies of any correspondence received from a taxing authority in its capacity as a Tax Matters Member within ten (10) business days of receipt. The Tax Matters Member shall keep the Members informed of the progress of any tax proceeding in connection with the Company. The Tax Matters Member shall not extend a statute of limitations with respect to the Company or a Member without a Majority Vote.

(d)     The fiscal year of the Company shall be the calendar year.

7.03   Meetings.  The Managers shall hold regular annual meetings at times and places to be selected by the Managers. In addition, the Members holding a total of thirty five percent (35%) of the Percentage Interests in the Company may call a special meeting to be held at the principal place of business of the Company at any time after the giving of five (5) business days prior notice to all of the Members. Any Member may waive notice of or attendance at any meeting of the Members, and may attend by proxy, telephone or any other electronic communication device or may execute a signed written consent. At such meeting, the Members shall transact such business as may properly be brought before the meeting. The Managers shall keep minutes of all meetings of the Members. The minutes shall be placed in the company records of the Company.

7.04   Action Without Meeting.  Any action required by the Act or by this Agreement to be taken by the Members may be taken without a meeting if one or more written consents setting forth the action so taken shall be signed by all Members entitled to vote, and such consents shall have the same force and effect as an unanimous vote of the Members entitled to vote.

## ARTICLE VIII

## DISSOLUTION AND TERMINATION.

8.01   Events of Dissolution.  The Company shall continue for the period provided in the Articles of Organization, or until dissolved by one or more of the following Events of Dissolution:

(i)    operation of law;

(ii)   Majority Vote of the Class A Members; or

(iii)  the sale, exchange, involuntary conversion, or other disposition or transfer of all or substantially all of the assets of the Company.

18

8.02    No Right to Withdraw or Resign.  No Member shall withdraw or resign from the Company by voluntary action without the prior written consent of all remaining Members, which consent may be given or denied in the absolute discretion of each Member.

8.03    Winding-Up.  Upon the occurrence of an Event of Dissolution, the Company's affairs shall be wound up by the Managers, in accordance with the procedures set forth in this Section.

(a)       A statement of the assets and liabilities of the Company as of the date of dissolution shall be prepared.

(b)       The assets and properties of the Company shall be liquidated or valued at their fair market value by the Managers or an appraiser selected by the Managers as promptly as possible, and receivables collected, all in an orderly and businesslike manner so as not to involve undue sacrifice.

(c)       The assets of the Company, including the proceeds of liquidation, shall be applied and distributed in the following order of priority:

(i)       To creditors, including Members and Managers who are creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof) other than liabilities for which reasonable provision for payment has been made and liabilities for distributions to Members pursuant to this Agreement; and

(ii)      To the Member in accordance with Section 4.03.

(d)       Provisions for Contingencies.   The Company shall make reasonable provision to pay all claims and obligations, including all contingent, conditional or unmatured claims and obligations, known to the Company and all claims and obligations which are known to the Company but for which the identity of the claimant is unknown.  If there are sufficient assets, such claims and obligations shall be paid in full and any such provision for payment made shall be made in full.  If there are insufficient assets, such claims and obligations shall be paid or provided for according to their priority and, among claims and obligations of equal priority, ratably to the extent of assets available.  Any liquidating trustee (including a Manager or Member acting as a liquidating trustee) winding up the Company's affairs who has complied with this Agreement shall not be personally liable to the claimants of the dissolved Company by reason of such person's actions in winding up the Company.

(e)       Distributions in Kind.  A Member has no right to demand and receive any distribution from the Company in any form other than cash.  A Member may not be compelled to accept a distribution of any asset in kind from the Company to the extent that the percentage of the asset distributed to him or her exceeds a percentage of that asset which is equal to the percentage in which he or she shares in distributions from the Company.  Any distribution in kind shall be treated as though the assets distributed had been sold at fair market value and any

19

deemed gain or loss will be reflected in the Capital Accounts as though the property had actually been sold. Such fair market value shall be determined by Majority Vote of the Class A Members or, absent such agreement, by an appraiser selected by the Managers.

     (f)  <u>Termination</u>. In connection with the dissolution and winding up of the Company, the Managers shall cause to be filed a statement of intent to dissolve and articles of dissolution in accordance with Part 8 of the Act.

   8.04 <u>No Recourse</u>. Upon dissolution, each Member shall look solely to the assets of the Company for the return of his or her investment, and if the property remaining after payment or discharge of the debts and liabilities of the Company is insufficient to return the capital contributions of any Member, such Member shall have no recourse against any other Member or any Managers.

   8.05 <u>Termination</u>. Upon the dissolution and the completion of winding up of the Company, the Manager shall file a certificate of cancellation with the Office of the Secretary of State of Colorado in accordance with the Act to accomplish the cancellation of the certificate of formation.

**<u>ARTICLE IX</u>**

**MISCELLANEOUS**

   9.01 <u>Notices</u>. Any demand, notice or other communication to be given in connection with this Agreement shall be given in writing and shall be given by personal delivery, by registered mail or by electronic means of communication to the recipient at the address set forth on Schedule A. Any notice delivered to the party to whom it is addressed shall be deemed to have been given and received on the day it is so delivered at such address, provided that if such day is not a business day, then the notice shall be deemed to have been given and received on the business day next following such day. Any notice mailed by registered or certified mail, return receipt requested, shall be deemed to have been given and received when mailed. Any notice sent by ordinary mail shall be deemed to have been given and received on the fifth (5th) business day next following the date of its mailing provided no postal strike is then in effect or comes into effect within three business days after such mailing. Any notice transmitted by telecopier or other form of electronic communication shall be deemed given and received, if confirmed, on the day of its transmission if such day is a business day and if not, on the next following business day.

   9.02 <u>Successors and Assigns</u>. Subject to the restrictions on transfers set forth herein, this Agreement and each and every provision hereof shall be binding upon and shall inure to the benefit of the Members, their respective successors, successors in title, heirs and assigns, and each and every successor in interest to any Member, whether such successor acquires such an interest by way of gift, purchase, foreclosure or by any other method, shall hold such interest subject to all the terms and provisions of this Agreement.

   9.03 <u>Amendments</u>. Amendments to this Agreement or to the Company's certificate of formation may be proposed by any Member. A proposed amendment shall be adopted and be

20

effective as an amendment hereto or to the certificate of formation if it receives Clear Majority Vote, subject, however, to the provisions of Sections 2.01(c) and 2.01(e).

9.04    Applicable Law.  This Agreement and the rights of the parties hereunder shall be governed by the laws of the State of Colorado.

9.05    Counterparts.  This Agreement may be executed in any number of counterparts, all of which taken together shall be deemed one original instrument notwithstanding that all parties are not signatory to the same counterpart.

9.06    Entire Agreement.  This Agreement contains the entire agreement among the Members with respect to the subject matter hereof.

9.07    Captions and Pronouns.   The captions in this Agreement and the particular pronouns used herein, whether masculine, feminine, or neuter, are inserted for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.  Where the content demands, the singular shall include the plural and the plural shall mean the singular.

9.08    Investment Representation and Indemnity Agreement.  Each of the Members (and its assignees and transferees) by execution of this Agreement or an agreement to be bound by the terms of this Agreement represents to each of the other Members, to the Managers and to the Company that it is acquiring the interest in the Company for the purpose of investment and not with a view to, or for resale in connection with, any distribution of said interest.

9.09    Other Ventures.  Any of the Members may engage in or possess an interest in other business ventures of every nature and description, independently or with others, including, but not limited to, the ownership, financing, leasing, operation, management, syndication, brokerage, and development of real property; and neither the Company nor the Members shall have any right by virtue of this Agreement in and to such independent ventures or to the income or profits derived therefrom.

9.10    Income Tax Elections.  All elections required or permitted to be made by the Company under the Code shall be made by the Managers as determined in their sole discretion.

9.11    Severability

If any provision of this Operating Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Operating Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

9.12    Arbitration  Any dispute or controversy arising under or in connection with this Agreement shall be settled exclusively by arbitration in Colorado, in accordance with the Rules of the American Arbitration Association then in effect (except to the extent that the procedures outlined below differ from such rules).  Within thirty (30) days after written notice by either party has been given that a dispute exists and that arbitration is required, each party must select an arbitrator and those two arbitrators shall promptly, but in no event later than thirty (30) days

21

after their selection, select a third arbitrator.  The parties agree to act as expeditiously as possible to select arbitrators and conclude the dispute.  The selected arbitrators must render their decision in writing.  Each party shall bear the costs and expenses of the arbitration and of enforcement of any award in any court.  If advances are required, each party will advance one-half of the estimated fees and expenses of the arbitrators.  Judgment may be entered on the arbitrators' award in any court having jurisdiction.  The Members and the Company consent to jurisdiction and venue in any federal district court in the State of Colorado, and any state court, or Boulder County, Colorado.

[signature page follows]

22

**IN WITNESS WHEREOF**, this Agreement has been executed by each of the Members as of the day and year first above written.

**CLASS A MEMBERS:**

| Turtle Mountains, LLC | Anasazi Management Partners, LLC |
|---|---|
| By: | By: |
| Its: *Managing Member* *Manager* | Its: *Managing Member* *Manager* |

23

**SCHEDULE A**

**SCHEDULE OF UNIT A MEMBERS, CAPITAL AND PERCENTAGE INTEREST**

As of April 1, 2014, 2013

| NAME AND ADDRESS | CAPITAL CONTRIBUTIONS | NUMBER OF UNITS | PERCENTAGE INTEREST |
|---|---|---|---|
| **CLASS A MEMBERS** | | | |
| **Turtle Mountains, LLC** | $1,097,250 Knowledge and Services | 997,500 | 99.75% |
| 4743 Kincross Court Boulder, Colorado 80301 | | | |
| **Anasazi Management Partners, LLC** | $2,750 Knowledge and Services | 2,500 | .25% |
| 4743 Kincross Court Boulder, Colorado 80301 | | | |
| **Totals** | **$1,100,000** | **1,000,000** | **100%** |

**SCHEDULE B**

**SCHEDULE OF UNIT A and UNIT B MEMBERS, PRICE BASIS AND PERCENTAGE INTEREST**

As of April 1, 2014

| Unit A Holders | Units | Ownership Table 04/01/2014 | Percent A Ownership | Percent Total Ownership (Potential) | Cost Basis | Effective Price Basis |
|---|---|---|---|---|---|---|
| Turtle Mountains, LLC | 997,500 | | 99.75% | 74.2% | $  0.86 | |
| Anasazi Management Partners, LLC | 2,500 | | 0.25% | 0.2% | $  0.86 | |
| Total A Units | 1,000,000 | | 100.00% | 74.4% | $  0.86 | |

| Unit B Holders | Potential Units | Units Vested As of 04/1/2014 | Percent B Ownership | Percent Total Ownership (Potential) | Cost Basis | Effective Price Basis |
|---|---|---|---|---|---|---|
| Autumn Leaf, LLC | 250,000 | 137,500 | 80.52% | 18.600% | | $  0.86 |
| Seigle Family Trust | 13,440 | 4,435 | 2.60% | 1.000% | | $  0.86 |
| John Martin | 13,440 | 4,435 | 2.60% | 1.000% | | $  0.86 |
| Ryan Reichenbach | 13,440 | 4,435 | 2.60% | 1.000% | | $  0.86 |
| Jonatahn Bischoff | 13,440 | 4,435 | 2.60% | 1.000% | | $  0.86 |
| Allison and C. Finnegan ("Finn") Faldi | 40,320 | 13,306 | 7.79% | 3.000% | | $  0.86 |
| Robert Seaman | 6,720 | 2,218 | 1.30% | 0.500% | | $  0.86 |
| Total B Units | 344,080 | 170,764 | 100% | 25.600% | | |
| Total Units A & B | 1,344,080 | | | | | |

2