# EXHIBIT P



Colorado Secretary of State
Date and Time: 08/28/2013 10:08 AM
ID Number: 20131500079

Document number: 20131500079
Amount Paid: $50.00

Document must be filed electronically.
Paper documents are not accepted.
Fees & forms are subject to change.
For more information or to print copies
of filed documents, visit www.sos.state.co.us.

ABOVE SPACE FOR OFFICE USE ONLY

## Articles of Organization
filed pursuant to § 7-80-203 and § 7-80-204 of the Colorado Revised Statutes (C.R.S.)

1. The domestic entity name of the limited liability company is

RevLive! LLC

*(The name of a limited liability company  must contain the term or abbreviation "limited liability company", "ltd. liability company", "limited liability co.", "ltd. liability co.", "limited", "l.l.c.", "llc", or "ltd." See §7-90-601, C.R.S.)*

*(Caution: The use of certain terms or abbreviations are restricted by law.  Read instructions for more information.)*

2. The principal office address of the limited liability company's initial principal office is

Street address      6260 Lookout Road
*(Street number and name)*

Boulder                              CO      80301
*(City)*                          *(State)*      *(ZIP/Postal Code)*

United States
*(Province – if applicable)*        *(Country)*

Mailing address
(leave blank if same as street address)
*(Street number and name or Post Office Box information)*

*(City)*          *(State)*      *(ZIP/Postal Code)*

*(Province – if applicable)*        *(Country)*

3. The registered agent name and registered agent address of the limited liability company's initial registered agent are

Name
(if an individual)
*(Last)*          *(First)*          *(Middle)*      *(Suffix)*

or

(if an entity)      Boulder Black Diamond, LLC
*(Caution:  Do not provide both an individual and an entity name.)*

Street address      4743 Kincross Court
*(Street number and name)*

BOULDER                          CO      80301
*(City)*                      *(State)*      *(ZIP Code)*

Mailing address
(leave blank if same as street address)      4743 Kincross Court
*(Street number and name or Post Office Box information)*

| BOULDER | CO | 80301 | . |
|---------|-----|-------|---|
| *(City)* | *(State)* | *(ZIP Code)* | |

*(The following statement is adopted by marking the box.)*

☑ The person appointed as registered agent has consented to being so appointed.

4. The true name and mailing address of the person forming the limited liability company are

Name
    (if an individual)

| _____ | _____ | _____ | ____ |
|-------------|-----------|-----------|------|
| *(Last)* | *(First)* | *(Middle)* | *(Suffix)* |

    or

    (if an entity)      **Boulder Black Diamond, LLC**

*(Caution: Do not provide both an individual and an entity name.)*

Mailing address      **4743 Kincross Court**

                        *(Street number and name or Post Office Box information)*

| BOULDER | CO | 80301 | |
|---------|-----|-------|---|
| *(City)* | *(State)* | *(ZIP/Postal Code)* | |
| | United States | | |
| *(Province – if applicable)* | *(Country)* | | |

*(If the following statement applies, adopt the statement by marking the box and include an attachment.)*

☐ The limited liability company has one or more additional persons forming the limited liability company and the name and mailing address of each such person are stated in an attachment.

5. The management of the limited liability company is vested in
*(Mark the applicable box.)*

☑ one or more managers.

or

☐ the members.

6. *(The following statement is adopted by marking the box.)*

☑ There is at least one member of the limited liability company.

7. *(If the following statement applies, adopt the statement by marking the box and include an attachment.)*

☐ This document contains additional information as provided by law.

8. *(Caution: Leave blank if the document does not have a delayed effective date. Stating a delayed effective date has significant legal consequences. Read instructions before entering a date.)*

*(If the following statement applies, adopt the statement by entering a date and, if applicable, time using the required format.)*

The delayed effective date and, if applicable, time of this document is/are _____.

                                           *(mm/dd/yyyy hour:minute am/pm)*

Notice:

Causing this document to be delivered to the Secretary of State for filing shall constitute the affirmation or acknowledgment of each individual causing such delivery, under penalties of perjury, that the document is the individual's act and deed, or that the individual in good faith believes the document is the act and deed of the person on whose behalf the individual is causing the document to be delivered for filing, taken in conformity with the requirements of part 3 of article 90 of title 7, C.R.S., the constituent documents, and the organic statutes, and that the individual in good faith believes the facts stated in the document are true and the document complies with the requirements of that Part, the constituent documents, and the organic statutes.

This perjury notice applies to each individual who causes this document to be delivered to the Secretary of State, whether or not such individual is named in the document as one who has caused it to be delivered.

9. The true name and mailing address of the individual causing the document to be delivered for filing are

| McNea | Blair | | |
|---|---|---|---|
| *(Last)* | *(First)* | *(Middle)* | *(Suffix)* |

4743 Kincross Court
*(Street number and name or Post Office Box information)*

| BOULDER | CO | 80301 | |
|---|---|---|---|
| *(City)* | *(State)* | *(ZIP/Postal Code)* | |

United States.
| *(Province – if applicable)* | *(Country)* |

*(If the following statement applies, adopt the statement by marking the box and include an attachment.)*

☐  This document contains the true name and mailing address of one or more additional individuals causing the document to be delivered for filing.

Disclaimer:
This form/cover sheet, and any related instructions, are not intended to provide legal, business or tax advice, and are furnished without representation or warranty.  While this form/cover sheet is believed to satisfy minimum legal requirements as of its revision date, compliance with applicable law, as the same may be amended from time to time, remains the responsibility of the user of this form/cover sheet.  Questions should be addressed to the user's legal, business or tax advisor(s).

**RevLive!  LLC**

A Colorado Limited Liability Company

LIMITED LIABILITY COMPANY
OPERATING AGREEMENT

ESTABLISHED AS OF January 1, 2014

**Berg Hill Greenleaf & Ruscitti LLP**
**1712 Pearl Street**
**Boulder, Colorado  80302**
**Tel:  (303) 402-1600**

TABLE OF CONTENTS

ARTICLE I

DEFINITIONS ............................................................................................................... 1

ARTICLE II
FORMATION OF LIMITED LIABILITY COMPANY

2.1.  Formation and Tax Classification ..................................................................... 5
2.2.  Company Name ................................................................................................. 5
2.3.  Articles of Organization, Etc. ........................................................................... 5
2.4.  Principal Business Office, Registered Office and Registered Agent ................ 5
2.5.  Term of the Company ........................................................................................ 6
2.6.  Purposes and Powers ........................................................................................ 6
2.7.  Merger ............................................................................................................... 7
2.8.  Foreign Qualification ........................................................................................ 7

ARTICLE III
CAPITALIZATION AND SHARES

3.1  Capital Contributions ........................................................................................ 7
3.2  Loans by Members ............................................................................................ 8
3.3  Shares ................................................................................................................ 8
3.4  Establishment and Determination of Capital Account ...................................... 8
3.5  Negative Capital Accounts ............................................................................... 9
3.6  Company Capital ............................................................................................... 9
3.7  Legend ............................................................................................................... 9

ARTICLE IV
DISTRIBUTIONS; ALLOCATIONS OF PROFITS AND LOSSES

4.1  Distributions and Payments Generally .............................................................. 9
4.2  Redemption of Member's Shares ...................................................................... 10
4.3  Limitation on Distributions ............................................................................... 10
4.4  Tax Deductions ................................................................................................. 10
4.5  Allocation of Profits and Losses ....................................................................... 10
4.6  Regulatory and Special Allocations .................................................................. 11
4.7  Tax Allocations: Code Section 704(c) ............................................................. 13

ARTICLE V
MEMBERS

5.1  Number .............................................................................................................. 13
5.2  Annual Members' Meeting ................................................................................ 13
5.3  Special Members' Meetings .............................................................................. 14
5.4  Place of Member's Meetings ............................................................................. 14
5.5  Notice of Members' Meeting ............................................................................ 14
5.6  Members' Waiver of Notice .............................................................................. 14
5.7  Proxies ............................................................................................................... 14
5.8  Members' Voting Rights ................................................................................... 14
5.9  Quorum and Required Vote ............................................................................... 14
5.10  Action by Written Consent. ............................................................................. 15
5.11  Telephonic Meetings ....................................................................................... 15
5.12  Withdrawal; Resignation; Redemption ........................................................... 15
5.13  Transfer of Shares ........................................................................................... 15
5.14  Substituted Member ........................................................................................ 17
5.15  Issuance of Additional Shares; Admission of New Members .......................... 17
5.16  Exit Transactions. ............................................................................................ 18
5.17  Prospective Transferees ................................................................................... 19

iii

5.18    Transfer Fees and Expenses. ................................................................................ 19
5.19    Other Limitations ................................................................................................ 19
5.20    Effective Date. .................................................................................................... 19
5.21    Effect of Incapacity. ........................................................................................... 19
5.22    Representations and Warranties of Members ..................................................... 19
5.23    Valuation due to Withdrawal, Transfer, etc. ...................................................... 20

**ARTICLE VI**
**MANAGEMENT OF THE COMPANY**

6.1    Managers. ............................................................................................................ 20
6.2    Number, Qualifications and Term of Office of Managers ................................. 21
6.3    Vacancies. .......................................................................................................... 21
6.4    Resignation ......................................................................................................... 21
6.5    Removal .............................................................................................................. 21
6.6    Compensation ..................................................................................................... 21
6.7    Exculpation of Managers ................................................................................... 21

**ARTICLE VII**
**LIABILITY; INDEMNIFICATION; INSURANCE**

7.1    Limited Liability ................................................................................................ 21
7.2    Indemnification .................................................................................................. 22
7.3    Insurance ............................................................................................................ 23
7.4    Competing Activities ......................................................................................... 23
7.5    Reimbursement of Tax Withholding .................................................................. 24
7.6    Savings Clause ................................................................................................... 24

**ARTICLE XIII**
**BOOKS; ACCOUNTING; TAX ELECTIONS; REPORTS**

8.1    Maintenance and Availability of Records ......................................................... 24
8.2    Accounting.......................................................................................................... 25
8.3    Filing of Returns and Other Writings; "Tax Matters Partner"........................... 25
8.4    Intentionally Left Blank. .................................................................................... 26
8.5    Company Funds................................................................................................... 26
8.6    Intentionally Left Blank. .................................................................................... 26
8.7    Section 754 Election ........................................................................................... 26

**ARTICLE IX**
**DISSOLUTION; TERMINATION**

9.1    Events of Dissolution ......................................................................................... 26
9.2    Liquidation and Termination .............................................................................. 26
9.3    Articles of Dissolution ....................................................................................... 27

**ARTICLE X**
**MISCELLANEOUS**

10.1    Notices................................................................................................................ 27
10.2    Word Meanings; Construction............................................................................ 28
10.3    Binding Provisions ............................................................................................. 28
10.4    Applicable Law .................................................................................................. 28
10.5    Arbitration .......................................................................................................... 28
10.6    Separability of Provisions .................................................................................. 29
10.7    Section Titles...................................................................................................... 30
10.8    Further Assurances ............................................................................................. 30
10.9    Directly or Indirectly.......................................................................................... 30
10.10    Counterparts........................................................................................................ 30
10.11    Effect of Waiver and Consent............................................................................. 30

iii

10.12  Waiver of Certain Rights..................................................................................................30
10.13  Notice to Members of Provisions.......................................................................................30
10.14  Entire Agreement .............................................................................................................30
10.15  Amendments....................................................................................................................30

iii

## REVLIVE!, LLC

## OPERATING AGREEMENT

THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "Agreement") of RevLive! LLC (the "Company"), dated and effective as of January 1, 2014, is hereby agreed to by and among Turtle Mountains and Autumn Leaf LLC a Colorado limited liability company ("Turtle Mountains and Autumn Leaf LLC") and each other person who becomes a member in accordance with the terms of this Agreement (collectively, the "Members"). Any reference in this Agreement to a Member shall include such Member's successors to the extent such successors have become Substituted Members in accordance with the provisions of this Agreement.

### RECITALS

WHEREAS, the Members have agreed to form the Company as a limited liability company pursuant to the Colorado Limited Liability Company Act (the "Act").

NOW, THEREFORE, in consideration of the mutual covenants herein contained and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Members agree as follows:

### ARTICLE I

### DEFINITIONS

As used in this Agreement, the following terms have the following meanings:

"Act" means the Colorado Limited Liability Company Act, and any successor statute, as amended from time to time.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Taxable Year, after giving effect to the following adjustments:

Credit to the Capital Account any amount which such Member is obligate to restore or is deemed obligated to restore pursuant to Treasury Regulations Sections 1.704-1(b)(2)(ii)(*c*), 1.704-2(g)(1) and 1.704-2(i); and

Debit to such Capital Account the items described in Treasury Regulation Section 1.704-1(b)(2)(i)(*d*)(4), (5) and (6).

"Affiliate" of, or a Person "Affiliated" with, a specified Person means a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person specified.

- 1 -

"<u>Agreement</u>" means this Limited Liability Company Operating Agreement, as executed and as may be amended, modified, supplemented or restated from time to time, as the context requires.

"<u>Articles</u>" has the meaning given to that term in Section 2.3.

"<u>Book Value</u>" means, with respect to any Company property, the Company's adjusted basis for federal income tax purposes, adjusted from time to time to reflect the adjustments required or permitted by Treasury Regulation Section 1.704-1(b)(2)(iv)($d$) – ($g$).

"<u>Capital Account</u>" has the meaning given that term in Section 3.4.

"<u>Capital Contribution</u>" means the aggregate contributions made (or deemed to be made) by a Member to the Company pursuant to Article III as of the date in question, as shown opposite such Member's name on <u>Schedule A</u>, as the same may be amended from time to time.

"<u>Chief Executive Officer (CEO)</u>" shall mean the person specifically named under Section 6.2.

"<u>Code</u>" means the Internal Revenue code of 1986 and any successor statute, as amended from time to time.

"<u>Company</u>" means the Colorado Limited Liability Company formed pursuant to the Certificate and the Original Agreement and continued hereby.

"<u>Company Minimum Gain</u>" has the meaning set forth for "partnership minimum gain" in Treasury Regulation Section 1.704-2(d).

"<u>Economic Interest</u>" means a Member's or Economic Owner's share of the Company's net profits, net losses and distributions pursuant to this Agreement and the Act, but shall not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Members, or any right to receive information concerning the business and affairs of the Company, in each case except as expressly otherwise provided in this Agreement or required by the Act.

"<u>Economic Owner</u>" means any owner of an Economic Interest who is not a Member. No owner of an Economic Interest which is not a Member shall be deemed a "member" (as that term is used in the Act) of the Company.

"<u>Exit Transaction</u>" has the meaning given to that term in Section 5.16.

"<u>Fiscal Year</u>" of the Company means the calendar year.

- 2 -

"Incapacity" or "Incapacitated" means (a) with respect to a natural person, the bankruptcy, death, incompetency or insanity of such individual and (b) with respect to any other Person, the bankruptcy, liquidation, dissolution or termination of such Person.

"Indemnifying Member" has the meaning given that the term in Section 8.5.

"Member" means Turtle Mountains and Autumn Leaf LLC and each other Person who is hereby or hereafter admitted as a Member in accordance with the terms of this Agreement and the Act. The Members shall constitute the "members" (as that term is defined in the Act) of the Company. Notwithstanding any provision of this Agreement to the contrary, the Members shall constitute a single class or group of members of the Company for all purposes of the Act and this Agreement.

"Member Minimum Gain" has the meaning set forth "partner nonrecourse debt minimum gain" in Treasury Regulation Section 1.704-2(i).

"Member Nonrecourse Deductions" has the meaning set forth for "partner nonrecourse deductions" in Treasury Regulations Section 1.704-2(i).

"Membership Interest" means a Member's interest in the Company, including such Member's Economic Interest and the right, if any to participate in the management of the business and affairs of the company, the right, if any, to vote on, consent to or otherwise participate in any decision or action of or by the Members and the right to receive information concerning the business and affairs of the Company, in each case to the extent expressly provided in this Agreement or required by the Act.

"Net Profit" and "Net Loss" means, for each Taxable Year or other period, an amount equal to the Company's taxable income or loss for such Taxable Year or other period, determined in accordance with Section 703(a) of the Code, which for this purpose shall include all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code, with the following adjustments:

(i) Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profit or Net Loss pursuant to this definition shall be added to such taxable income or subcontracted from such taxable loss;

(ii) Any expenditures of the Company described in Section 705(a)(2(B) of the Code or treated as Section 705(a)(2)(B) expenditures pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(*i*) (other than expenses in respect of which an election is properly made under Section 709 of the Code), and not otherwise taken into account in computing Net Profit or Net Loss pursuant to this definition, shall be subtracted from such taxable income or added to such taxable loss;

(iii) If the Book Value of any Company property is adjusted pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(*e*)(in connection with a distribution of such property) or (*f*) (in connection with a revaluation of Capital Accounts), the amount of

- 3 -

such adjustment shall be taken into account as gain or loss from the disposition of such property for purposes of computing Net Profit or Net Loss;

(iv) Gain or loss resulting from the disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of such property, notwithstanding that the adjusted tax basis of such Company property may differ from its Book Value; and

(v) With respect to Company property having a Book Value that differs from its adjusted basis for tax purposes, in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there shall be taken into account depreciation, amortization and cost recovery deductions computed by reference to the property's Book Value in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g).

"Nonrecourse Deductions" has the meaning set forth in Treasury Regulation Section 1.704-2(b)(1). The amount of nonrecourse Deductions for any Taxable Year shall be computed as set forth in Treasury Regulation Section 1.704-2(c).

"Percentage Interest" means, at any time with respect to a Member, a percentage equal to a fraction, (a) the numerator of which is the number of Shares held by such Member at such time (b) the denominator of which is the aggregate number of Shares held by all Members at such time, in each case as reflected in the books and records of the Company.

"Person" means a natural person, partnership (whether general or limited), limited liability company, trust, estate, association, corporation, custodian, nominee or any other individual or entity in its own or any representative capacity.

"Proceeding" has the meaning given that term in Section 7.2.

"Restricted Securities" means (a) the Membership Interest or any other interest in the Company held by ay Member or its Affiliates and (b) any securities issued with respect to, or in exchange for, the securities referred to in clause (a) above in connection with a conversion, combination of shares, recapitalization, merger, consolidation or other reorganization. As to any particular Restricted Securities, such securities shall cease to be Restricted Securities when they have (i) been distributed to the public pursuant to a offering registered under the Securities Act or (ii) sold to the public through a broker, dealer or market maker in compliance with Rule 144 (or any similar provision then in force) promulgated by the SEC under the Securities Act. For purposes of this Agreement, a Person shall be deemed to be in existence, whenever such Person has the right to acquire directly or indirectly such Restricted Securities (upon conversion or exercise in connection with a transfer of securities or otherwise, but disregarding any restrictions or limitations upon the exercise of such right), whether or not such acquisition has actually been effected, and such Person shall be entitled to exercise the rights of, and be subject to the obligations of, a holder of Restricted Securities hereunder.

- 4 -

"SEC" means the Securities and Exchange Commission or any successor agency hereto that administers the Securities Act and the Securities Exchange Act of 1934.

"Securities Act" means the Securities Action of 1933, as amended from time to time.

"Share" has the meaning given to such term in Section 3.3.

"Tax Distribution" means, with respect to any Member, a distribution to such Member pursuant to Section 4.4 hereof.

"Taxable Year" means the Company's taxable year ending December 31 (or party thereof, in the case of the Company's last taxable year), or such other year as is (i) required by Section 706 of the code or (ii) designated by the Managing Member.

"Transfer" has the meaning given that term in Section 5.13.

Other terms defined in this Agreement have the meanings so given them.

## ARTICLE II

## FORMATION OF LIMITED LIABILITY COMPANY

**2.1.    Formation and Tax Classification.**  The Company has been formed as a limited liability company under and pursuant to the Act. Each Member represents and warrants that such Member is duly authorized to join this Agreement and that the person executing this Agreement on its behalf is duly authorized to do so.   The Members intend that the Company will be classified as a partnership for federal, state, and local income and franchise tax purposes and each Member of the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment.   The Members intend that the Company shall not be a partnership (including, without limitation, a limited partnership) for any other purpose.

**2.2.    Company Name.**  The name of the company is RevLive! LLC.  The business of the Company shall be conducted under such name or such other names as the Members may from time to time determine.

**2.3.    Articles of Organization, Etc.**  Articles of Organization for the Company (the "Articles") have heretofore been filed with the Secretary of State of the State of Colorado.   The Members hereby agree to execute, file and record all such other certificates and documents, including amendments to the Articles, and to do such other acts as may be appropriate to comply with all requirements for the formation, continuation and operation of a limited liability company, the ownership of property, and the conduct of business under the laws of the State of Colorado and any other jurisdiction in which the Company may own property or conduct business.

- 5 -

**2.4.    Principal Business Office, Registered Office and Registered Agent.**    The registered office of the Company required by the Act to be maintained in the State of Colorado shall be the office of the initial registered agent named in the Articles or such other office (which need not be a place of business of the Company) as the Managers may designate from time to time in the manner provided by law. The principal office of the company shall be at such place as the Managers may designate from time to time, which need not bee in the State of Colorado, and the Company shall maintain records there.  The Company may have such other offices as the Managers may designate from time to time.

**2.5.    Term of the Company.**  The term of the Company shall commence on the date of the initial filing of the Articles with the office of the Secretary of State of the State of Colorado and shall continue until dissolved or otherwise terminated pursuant to this Agreement or the law of the State of Colorado.

**2.6.    Purposes and Powers.**  The Company may exchange in any lawful business or activity.  By way of example only and not limitation, and subject to all of the provisions of this Agreement, the Company has the power to:

a)    conduct its business, carry on its operations and have and exercise the powers granted to a limited liability company by the Act in any state, territory, district or possession of the United States, or in any foreign country that may be necessary, convenient or incidental to the accomplishment of the purpose of the Company;

b)    enter into, perform and carry out contracts of any kind (including contracts with any Member or any Affiliate thereof, or any agent of the Company) necessary to, in connection with, or incidental to, the accomplishment of the purposes of the Company;

c)    acquire by purchase, lease, contribution of the property or otherwise own, hold, operate, maintain, finance, refinance, improver, lease, sell, convey, mortgage, transfer, demolish or dispose of any real or personal property that may be necessary, convenient or incidental to the accomplishment of the Company's purpose;

d)    establish reserves for capital expenditures, working capital, debt service, taxes and assessments;

e)    purchase, take, receive, subscribe for or otherwise acquire, own, hold use, vote, employ, sell, mortgage, lend, pledge or otherwise dispose of, and otherwise use and deal in and with, shares or other interests in or obligations of domestic or foreign corporations, associations, general or limited partnerships (including the power to admitted as a partner thereof and to exercise the rights and perform the duties created thereby), trusts, limited liability companies (including the power to be admitted as a member or appointed as a manager thereof and to exercise the rights and perform the duties created thereby) or individuals or direct or indirect obligations of the Untied States or of any government, state, territory, governmental district or municipality or of any instrumentality of any of them;

- 6 -

      f)     lend money for any proper purpose, to invest and reinvest its funds and to take hold real and personal property for the payment of funds so loaned or invested;

      g)     borrow money and issue evidence of indebtedness and guaranty indebtedness (whether f the Company or any subsidiary thereof), and to secure the same by a mortgage, pledge or other line on the assets of the Company;

      h)     employ or otherwise engage employees, managers, contractors, agents, advisors and consultants and pay reasonable compensation for the services rendered by any of the foregoing;

      i)     sue and be sued, complain and defend, and participate in administrative or other proceedings, in its name;

      j)     pay, collect, compromise, litigate, arbitrate or otherwise adjust or settle any and all other claims or demands of or against the Company or to hold proceeds against the payment of contingent liabilities;

      k)     indemnify any person in accordance with the Act and obtain any and all types of insurance;

      l)     make, execute, acknowledge and file any and all documents or instruments necessary, convenient or incidental to the accomplishment of the purpose of the company; and

      m)     do such other things and engage in such other activities related to the foregoing as may be necessary, convenient or advisable with respect to the conduct of the business or activities of the Company.

    **2.7.**    **Merger.**  Subject to the provisions of the Agreement, the Company may, with approval of Members holding a majority of the outstanding Shares, merge with, or consolidate into, another limited liability company (organized under the laws of Colorado or any other state), a corporation (organized under the laws of Colorado or any other state) or other business entity, regardless of whether the Company is the survivor of such merger or consolidation.

    **2.8.**    **Foreign Qualification.**  Prior to the Company's conduct of business in any jurisdiction other than Colorado, the Manager shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Manager, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. At the request of the Manager, each Member shall execute, acknowledge, swear to and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue and terminate the company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

## ARTICLE III

## CAPITALIZATION AND SHARES

- 7 -

**3.1   Capital Contributions**.  Each member shall initially contribute the amount of cash or property with the value set forth next to such Member's name on Schedule A attached hereto.

Additional capital contributions shall be required ("Required Additional Contributions") only if the Manger(s) requires such Required Additional Contributions.  If a Member (a "Defaulting Member") fails to make any Required Additional Contribution, the defaulting Member's Shares shall be decreased by that number of Shares which is equal to the product of (a) the total shares outstanding prior to the Required Additional Defaulting Member's Required Additional Contribution which the Defaulting Member fails to contribute and (b) the denominator of which is the sum obtained by adding (i) the total capital contributions made by all Members prior to such Required Additional Contributions and (ii) the amount of such Required Additional Contributions (including the Defaulting Member's portion thereof). Any Member or combination of Members ("Contributing Member(s)") who are not Defaulting Members may contribute any amount of the uncontributed portion of the Defaulting Member's Required Additional Contribution and each Contributing Member's Shares shall be increased by that number of Shares which is equal to (x) the total Shares outstanding prior to the Required Additional Contributions, multiplied by (y) a fraction, the numerator of which is equal to the amount of the Defaulting Member's Required Additional Contribution which such Contributing member contributes and the denominator of which is the Company Fair Value immediately prior to and disregarding the total Required Additional Contributions at such time.

**3.2   Loans by Members**.  No Member, as such, shall be required to lend any funds to the Company.  Any Member may, with the approval of the Manager, make loans to the Company, and any loan by a Member to the Company shall not be considered to be a Capital Contribution.

**3.3   Shares**.  A Member's interest in the Net Profit and Net Loss of the Company and rights to receive distributions of Company cash and property shall be represented by shares (the "Shares").  The number of Shares assigned to each Member shall be listed opposite such Member's name on Schedule A. Except as otherwise provided herein, each Share shall represent an equivalent economic interest in the Company, and – if (and only if) held by a Member (including any person who becomes a Substituted Member) – shall be entitled to one vote on each matter to be voted on (at a Member's meeting or in any other manner) hereunder.  Shares may not represent a particular Member's entire Membership Interest, which, to the extent specified in this Agreement, may also include an interest in capital or other rights and privileges. Any Shares issued after the date of this Agreement shall have such designations, preferences or special rights as determined by the Manager, which may differ from those of the Shares issued as of the date of this Agreement.

**3.4   Establishment and Determination of Capital Account**.  A capital account ("Capital Account") shall be established for each Member on the books of the Company initially reflecting an amount equal to such Member's initial Capital Contribution pursuant to Section 3.1(a).  Each Member's Capital Account shall be (a) increased by any additional Capital Contributions made by such Member pursuant to the terms of this Agreement and such

- 8 -

Member's share of items of Net Profit allocated to such Member pursuant to Article IV, (b) decreased by such member's share of Net Loss allocated to such Member pursuant to Article IV and the amount of any cash and the fair market value of any other property (net of liabilities assumed by such Member and liabilities to which such property is subject) distributed to such member and (c) adjusted as otherwise required by the Code and the regulations thereunder, including but not limited to, the rules of Treasury Regulation Section 1.704-1(b)(2)(iv). Any references in this Agreement to the Capital Account of a Member shall be deemed to refer to such Capital Account as the same may be increased or decreased from time to time as set forth above.

**3.5     Negative Capital Accounts**.  Except as otherwise provided by law, no Member shall be required to pay to the company or any other member any deficit or negative balance which may exist from time to time in such Member's Capital Account.

**3.6     Company Capital**.  No Member shall be paid interest on any Capital Contribution to the Company or on such Member's Capital Account, and no Member shall have any right (a) to demand the return of such Member's Capital Contribution or any other distribution from the Company (whether upon resignation, withdrawal or otherwise), except upon Dissolution of the Company pursuant to Article X hereof or (b) to cause a partition of the Company's assets.

**3.7     Legend**.  In the event that certificates representing Shares or other interests in the Company are issued, such certificates will bear the following legend:

> THE INTEREST REPRESENTED BY THIS CERTIFICATE WAS ORIGINALLY ISSUED AS OF February 8, 2011 HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION THEREUNDER.   THE TRANSFER OF THE INTEREST REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE CONDITIONS SPECIFIED IN A LIMITED LIABILITY COMPANY OPERATING AGREEMENT, AS AMENDED, GOVERNING THE ISSUER (THE "COMPANY"), BY AND AMONG CERTAIN INVESTORS.  A COPY OF SUCH CONDITIONS SHALL BE FURNISHED BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST AND WITHOUT CHARGE.

## ARTICLE IV

### DISTRIBUTIONS; ALLOCATIONS OF PROFITS AND LOSSES

**4.1     Distributions and Payments Generally**.  Subject to Section 4.3, the amount and timing of distributions to Members shall be subject to the approval of Members holding a majority of the shares, in each case subject to the retention and establishment of reserves of, or payment to third parties of, such funds as the Members deem necessary with respect to the reasonable business needs of the Company which shall include the payment or the making of provision for the payment when due of the Company's obligations, including the payment of any

-9-

management or administrative fees and expenses or any other obligations, <u>provided</u> <u>however</u>, that, except as otherwise provided in Section 9.2, any distributions shall be made to the Members in proportion to their Percentage Interests.

**4.2     Redemption of Member's Shares.**  No redemption of Shares (other than in connection with a Dissolution) shall be permitted.   Any Member withdrawing prior to Dissolution of the Company shall be entitled to receive only those distributions which such Member would have been entitled to receive in the absence of such withdrawal.

**4.3     Limitation on Distributions.**  Notwithstanding any other provisions of this Agreement, no distribution (including distributions in redemption of Shares or upon Dissolution a Liquidating Sale) shall be made to a Member to the extent that, after giving effect to the distribution, all liabilities of the company (other than liabilities to Members on account of their Shares) would exceed the fair value of the Company's assets.

**4.4     Tax Deductions.**  Notwithstanding any other provision of this Agreement (other than Section 4.3), and so long as the Manager(s) has determined that such distribution would not be prohibited or create a default under any financing agreement to which the Company is subject, at least ten (10) business days before each date prescribed by the Internal Revenue Code for individuals and/or calendar year businesses to pay quarterly installments of estimated tax, the Company shall distribute to each member available cash (as determined by the Manager(s)) an amount not to exceed the Company Estimated Tax for such quarter multiplied by a fraction, the numerator of which is the number of shares owned by such Member and the denominator of which is the total number of Shares outstanding at such time. "<u>Company Estimated Tax</u>" for any quarter of a taxable year is an amount equal to the estimated tax liability for the current taxable year as will be reported on Form 1065, multiplied by  0.1115.

**4.5     Allocation of Profits and Losses.**

a)       **Net Profit.**  Subject to the provisions of Sections 4.6, and after all Capital Contributions and distributions for the Taxable Year have been reflected in the Member's Capital Accounts, the Net Profit, if any, for each Taxable Year shall be credited to the Member's Capital Accounts in the following manner and priority:

i.       <u>First</u>, to the Members in proportion to and to the extent of the amount by which (a) the cumulative Net Losses previously allocated to each Member pursuant to Section 4.5(b)(iii) exceeds (b) the cumulative Net Profits previously allocated to such Member pursuant to this Section 4.5(a)(i) for all Taxable Years;

ii.       <u>Second</u>, to the Members in proportion to and to the extent of the excess of (a) the Net Losses previously allocated to them pursuant to Section 4.5(b)(ii) for all Taxable Years over (b) the Net Profits previously allocated to them pursuant to this Section 4.5(a)(ii) for all Taxable Years; and

iii.       <u>Third</u>, to the Members in proportion to their Percentage Interests.

- 10 -

b)      **Net Loss.**  Subject to the provisions of Sections 4.6, and after all Capital Contributions and distributions for the Taxable Year have been reflected in the Member's Capital Accounts, the Net Loss, if any, for each Taxable Year shall be debited to the Member's Capital Accounts in the following manner and priority:

i.      First, to the Members in proportion to and, to the extent of the amount by which (a) the cumulative Net Profits previously allocated to each such Member pursuant to Section 4.5(a)(iii) for all Taxable Years exceeds (b) the cumulative Net Losses previously allocated to such Member pursuant to this Section 4.5(b)(i);

ii.     Second, to the Members in proportion to and to the extent of their positive Capital Account balances (giving effect to the adjustments contained in the definition of Adjusted Capital Account Deficit); and

iii.    Third, to the Members in proportion to their Percentage Interests.

**4.6     Regulatory and Special Allocations.**  Notwithstanding the provisions of Section 4.5:

a)      **Allocations Resulting From Elective Basis Adjustments.**  To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or 743(b) is required to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated, as provided in Treasury Regulation Section 1.704-1(b)(2)(iv)(*m*), as an item of Net Profit (if the adjustment increases the basis of the asset) or Net Loss (if the adjustment decreases such basis) and such Net Profit or Net Loss shall be specifically allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Treasury Regulations.

b)      **Minimum Gain Chargeback.**  If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulation Section 1.704-2(d)(1)) during any Taxable Year, each Member shall be specially allocated items of taxable income or gain for such Taxable Year and, if necessary, subsequent Taxable Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulation Section 1.704-2(g).  The items to be so allocated shall be determined in accordance with Treasury Regulation Sections 1.704-2(f)(6) and 1.704-2(j)(2).  This paragraph is intended to comply with the minimum gain chargeback requirement in Treasury Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

c)      **Member Minimum Gain Chargeback.**  Except as otherwise provided in Treasury Regulation Section 1.704-2(i)(4), if there is a net decrease in Member Minimum Gain during any Taxable Year, each Member that has a share of such Member Minimum Gain shall be specially allocated items of taxable income or gain for such Taxable Year (and, if necessary, subsequent Taxable Years) in an amount equal to that Member's share of the net decrease in accordance with Treasury Regulation Sections 1.704-2(i)(4) and 1.704-2(j)(2).  This paragraph is

- 11 -

intended to comply with the minimum gain chargeback requirements in the Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

      d)    **Qualified Income Offset.**  If any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(*d*)(*4*), (*5*) or (*6*), items of taxable income and gain shall be specially allocated to such Member in an amount and matter sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustments, allocations or distributions as quickly as possible. This paragraph is intended to comply with the qualified income offset requirement in Treasury Regulation Section 1.704-1(b)(2)(ii)(*d*) and shall be interpreted consistently therewith.

      e)    **Gross Income Allocation.**  In the event any Member has a deficit Capital Account at the end of any Taxable Year which is in excess of the amount such Member is deemed obligated to restore pursuant to the penultimate sentences of Treasury Regulations 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 4.6(e) shall be made only if and to the extent that such member would have a deficit Capital Account in excess of such amount after all other allocations provided for in this Section 4 have been made as if Section 4.6(d) and this Section 4.6(e) were not in the Agreement.

      f)    **Loss Limitation.**  Losses allocated pursuant to Section 4.5 hereof shall not exceed the maximum amount of Losses that can be allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any operations period. The allocation of Nonrecourse Deductions to a Member will not create an Adjusted Capital Account Deficit for such Member because, pursuant to the definition of Adjusted Capital Account Deficit herein and Treasury Regulation Section 1.704-2(g)(1), Nonrecourse Deductions are credited to a Member's Capital Account in computing a Member's Adjusted Capital Account Deficit. In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 4.5 hereof, the limitation set forth in this Section 4.6(f) shall be applied on a Member by Member basis and Losses not allocated to any Member as a result of such limitation shall be allocated to the other Members in accordance with the positive balances in such Member's Capital Accounts so as to allocate the maximum permissible Losses to each Member under Treasury Regulations Section 1.704(b)(2)(ii)(d).

      g)    **Intent to Maintain Economic Agreement.**  The allocations set forth in paragraphs (a), (b), (c), and (d) above (the "Regulatory Allocations" are intended to comply with certain requirements of the Treasury Regulations under Code Section 704. Notwithstanding any other provisions of this Article IV (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating Profits and Losses among Members so that, to the extent possible, the net amount of such allocations of Profits and Losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.

      h)    **Authority to Adjust Allocations.**  The allocation provisions of Sections 4.5, 4.6, and 9.2 and the related definitions in Section 1.1 (the "Allocations") are intended to

- 12 -

maintain the Capital Amounts of the Members in a manner consistent with the relative economic interests of the Members as reflected in their relative Percentage Interests.

**4.7    Tax Allocations: Code Section 704(c).**

a)      The income, gains, losses, deductions and expenses of the Company shall be allocated, for federal, state and Local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses, deductions and expenses among the Members for computing their Capital Accounts, except that if any such allocation is not permitted by the Code or other applicable law, then to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.

b)      In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, deduction and expense with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time of contribution.

c)      If the Book Value of any Company assets is adjusted pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f) as provided in the definition of Book Value, subsequent allocations of items of taxable income, gain, loss, deduction and expense with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c).

d)      Allocation of tax credits, tax credit recapture, and any items related thereto shall be allocated to the members according to their interests in such items as determined by the Manager taking into account the principles of Treasury Regulation Section 1.704-1(b)(4)(ii).

e)      Any elections or other decisions relating to such allocations shall be made by the Manager in any manner that reasonably reflects the purpose and intent of this Agreement. Allocations pursuant to this Section 4.7 are solely for the purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of profits, losses, other items or distributions pursuant to any provisions of this Agreement.

## ARTICLE V

## MEMBERS

**5.1    Number.**  The Company shall at all times have one or more Members, who shall constitute the "members" of the company for purposes of the Act.

**5.2    Annual Members' Meeting.**  The annual meeting of Members for the election of the Managers and for the transaction of such business as may properly be brought before the meeting shall be held on such date and at such time as determined by the Manager(s).  If no annual meeting is held in accordance with the foregoing provisions, the Manager(s) shall cause

- 13 -

the meeting to be held as soon thereafter as convenient.   If no annual meeting is held in accordance with the forgoing provisions, a special meeting may be held in lieu of the annual meeting, and any action taken at that special meeting shall have the same effect as if it had been taken at the annual meeting, and in such case all references in this Agreement to the annual meeting of Members shall be deemed to refer to such special meeting.

**5.3   Special Members' Meetings.**   Special meetings of the Members may be called for any purpose at any time by the Manager(s) or any Member.   Such written request shall specify the purpose or purposes of, and a proposed date for, the meeting and shall be delivered to the other Members and the Manager.   Upon receipt of such written request, the Manager(s) shall fix a date and time for such meeting, provided, however, that if a date within five (5) business days of the proposed date specified in the written request has not been set, the meeting shall be held at 10:00 a.m. on the fifth business day after such proposed date.

**5.4   Place of Member's Meetings.**   All meetings of Members shall be held at the principal place of business office of the Company, or at such other place as may be designated by the Manager

**5.5   Notice of Members' Meeting.**   Except as otherwise provided in this Agreement or the Act, written notice of any meeting of Members stating the place, date and hour of the meeting and, in the case of a special meeting, the purpose for which the meeting is called, shall be delivered either personally or by mail to each Member not less than five nor more than sixty (60) days before the date of the meeting, by or at the direction of the Manager(s).   If mailed, such notice shall be deemed to be delivered to any Member when deposited in the United States mail addressed to the Member at its address as it appears on the books of the Company, with postage prepaid.   At any adjourned meeting the company may transact any business which might have been transacted at the original meetings.   If the adjournment is for more than thirty (30) days, a notice of the adjourned meeting shall be given to each Member.

**5.6   Members' Waiver of Notice.**   Any Members, either before or after any Members' meeting, may waive in writing notice of the meeting, and its waiver shall be deemed the equivalent of giving notice.   Attendance at a meeting by a Member shall constitute a waiver of notice, except when the Member attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

**5.7   Proxies.**   A Member entitled to vote at a meeting of Members or to express consent or dissent to Company action in writing without a meeting may authorize another person or persons to act for it by proxy.   No proxy shall be voted or acted upon after three (3) years from its date, unless the proxy provides for a longer period.

**5.8   Members' Voting Rights.**   Members shall vote on the annual election of the Managers as provided in Article VI, any removal of a Manager pursuant to Article VI, any matter requiring a decision, agreement, approval or consent of any Member hereunder, and on any other matter submitted to a vote of the Members.

- 14 -

**5.9    Quorum and Required Vote**. No vote on any matter requiring a vote hereunder shall be effective unless a quorum is achieved. Except as otherwise provided by law, the holders of a majority of the Shares entitled to vote at the meeting, present in person or by proxy, shall constitute a quorum for the transaction of business. If a quorum is present, except as otherwise provided in this Agreement, the affirmative vote of a majority of the total Shares of all Members present or represented by proxy at the meeting and entitled to vote on the subject matter shall be the act of the Members.

**5.10    Action by Written Consent**. Except as otherwise provided by law, any action required by the provisions of the Act to be taken, or any action which may be taken at a Members' meeting, may be taken without a meeting without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the Members holding not less than a majority of the Shares or, if greater, such other percentage of Shares necessary to authorize or take such action at a meeting at which all Members entitled to vote thereon were present and voted. Prompt notice of the action so taken without a meeting shall be given to those Members who have not consented in writing. Any action taken pursuant to such written consent of the Members shall have the same force and effect as if taken by the Members at a meeting thereof at which a quorum is present.

**5.11    Telephonic Meetings**. Members may participate in any meeting of Members by means of a conference utilizing telephonic or similar communication equipment by which all persons participating in the meeting can hear each other at the same time. Such participation shall constitute presence in person at the meeting.

**5.12    Withdrawal; Resignation; Redemption.** No Member shall have the right to have such Member's Shares redeemed in whole or in part, without prior written consent of all the Members. The withdrawal or resignation from participation in the affairs of the Company prior to the expiration of this Agreement shall constitute a violation of this Agreement unless such withdrawal or resignation is approved by written consent of all remaining Members. If the Members approve the withdrawal or resignation of a Member pursuant to the preceding sentence, the Members (other than the withdrawing or resigning Member) must elect to redeem all of such withdrawing or resigning Member's Shares. If the Members do not approve such withdrawal or resignation pursuant to this Section, such Member shall (i) not be entitled to vote such Member's Shares, and (ii) have no right to receive distributions except those distributions which such Member would have been entitled to receive in absence of such resignation.

**5.13    Transfer of Shares**.

a)      **Consent Required**. No Member shall sell, assign, transfer, exchange, mortgage, pledge, grant a security interest in, or otherwise dispose of or encumber (whether voluntarily or involuntarily or by operation of law) all or any portion of its Shares or other interest in the Company (each such event, a "Transfer") without the prior written consent of all the Members, which consent may be given or withheld by such Members in their sole and absolute discretion. Any attempt to sell, convey, transfer, pledge or assign such Shares in violation of this Agreement or without the consent of all the Members, shall be void ab initio and of no effect.

b) **Non-Recognition of Certain Transfers**. Notwithstanding any other provision of this Agreement, any Transfer in contravention of any of the provisions of this Article shall be void and ineffective, and shall not bind, or be recognized by, the Company.

c) **Right of First Refusal**.

i. <u>Bona Fide Offer</u>. In the event a Member receives a <u>bona fide</u> offer for cash or indebtedness for all or a portion of his/her or her Shares or other interests in the Company, the Member ("Transferring Member") shall first offer his/her or her Shares or other interest to the other Members, and shall attach to such offer a statement of intention to transfer, the name and address of such prospective purchaser, the portion of the Transferring Member's Shares or other interests involved in the proposed transfer ("<u>Offered Interest</u>"), and the price and terms of such transfer, including a copy of all purchase agreements and other related documents. Any offer in which the purchase price does not consist of cash or indebtedness shall not be considered a <u>bona fide</u> offer and shall not give any Member the right to avail himself of the provisions of this Section 5.13(c).

ii. <u>Option to Purchase</u>. The Members other than the Transferring Member shall have the option to purchase all, but not less than all, of the Transferring Member's Offered Interest for a period of sixty (60) days from the receipt of written notice of a <u>bona fide</u> offer. If more than one Member wishes to purchase the Offered Interest (a "Purchasing Member"), or if the Members wish to purchase more of the membership interest than is available to be purchased, the Transferring Member's Offered Interest shall be acquired in proportion to the percentage of total Shares of the Company owned by Purchasing Members immediately before purchase of the Offered Interest.

iii. <u>Notices</u>. The notice of exercise of the option to purchase shall be delivered by the Company to each of the Members and shall specify the portion of the Shares or other interests to be purchased and a date for the closing of the purchase which shall be not more than sixty (60) days after the date of the giving of such notice of election. The Company shall determine the portion of the membership interest which each Purchasing Member shall be entitled to purchase, and provide notice of same to each Purchasing Member no later than twenty (20) days prior to closing. <u>If the Transferring Member's Offered Interest is sold to such bona fide prospective purchaser, then the restrictions imposed upon such interest hereunder shall be applicable to such interest and all restrictions shall remain in force with respect to the balance of such Member's interest which was not offered for sale</u>. If such transfer is not made within sixty (60) days after the termination of the Members right to purchase as to the provisions of this Section 5.13(c), the Transferring Member cannot transfer any portion of his/her or her membership interest and, then, the provisions of this Section 5.13(c) shall again apply to the proposed transfer.

iv. <u>Purchase Price</u>. In the event that a Purchasing Member exercises the rights under this section, the Purchase Price and terms of sale for the Shares or other interest owned by the Transferring Member shall be equal to the price offered by a <u>bona fide</u> purchaser as set forth by the Transferring Member in the notice given pursuant to Section 5.13(c)(i).

- 16 -

v.   <u>Closing of Purchase</u>.  The closing shall take place at the Company's principal office or at the place otherwise agreed to by the Transferring Member and the Purchasing Members.  The Purchase Price shall be paid on terms no less favorable than the terms offered to the Transferring Member by the <u>bona fide</u> purchaser, as set forth by the Transferring Member in the notice given pursuant to Section 5.13(c)(i).

### 5.14   Substituted Member.

a)   An assignee of any shares or other interests in the Company (or any portion thereof), in accordance with the provisions of Article V, shall become a substituted Member ("<u>Substituted Member</u>") entitled to all the rights of a Member with respect to such assigned interest if and only if (i) the assignor gives the assignee such right, (ii) the assignee has agreed in writing to be bound by the provisions of this Agreement affecting the interest so transferred, and (iii) all of the Members approve the admission of such assignee as a Member.

b)   The Company shall be entitled to treat the record owner of any Shares or other interest in the Company as the absolute owner thereof and shall incur no liability for distributions of cash or other property made in good faith to such owner until such time as a written assignment of such Shares or other interest in the Company is permitted pursuant to the terms and conditions of Section 5.13 and this Section 5.14, has been received and accepted by the Manager and recorded on the books of the Company.

c)   Upon the admission of a Substituted Member, <u>Schedule A</u> attached hereto shall be amended to reflect the name, address and Share and other interests in the Company of such Substituted Member and to eliminate the name and address of and other information relating to the assigning Member with regard to the assigned Shares and other interests in the Company.

d)   **Required Amendments; Continuation.**  If, and to the extent, any Transfer of an interest in the company is permitted hereunder, this Agreement shall be amended to reflect such admission or Transfer and the elimination of the transferor Member.  The admission of any Substitute Member pursuant to this Article V shall be deemed effective immediately prior to the Transfer of an interest in the Company to such Substituted Member.  If the transferor Member has Transferred all of his/her Shares pursuant to this Article V, then, immediately following such Transfer, the transferor member shall cease to be a Member of the Company.

### 5.15   Issuance of Additional Shares; Admission of New Members.

a)   **Issuance of Additional Shares.**  The Manager(s) may, from time to time, issue additional Shares ("<u>Additional Shares</u>"), either to existing Members or to other persons, if such issuance of Additional Shares is approved by the Manager(s).

b)   **Admission of New members; Amendment to Schedule A.**  In order for a person who is not an existing Member to be admitted as a Member of the company with respect

- 17 -

to Additional Shares: (i) such Person shall have delivered to the Manager(s) a written undertaking to be bound by the terms and conditions of this Agreement and shall have delivered such documents and instruments as the Manager(s) determines to be necessary or appropriate in connection with the issuance of such Additional Shares to such Person or to effect such Person's admission as a member; and (ii) the Manager(s) shall amend <u>Schedule A</u>, without the further vote, act or consent of any other Member, to reflect such Person as a Member.  Upon the amendment of <u>Schedule A</u>, such Person shall be admitted as a Member and deemed listed as such on the books and records of the Company and thereupon shall be issued his/her or its Shares and membership interest.  If Additional Shares are issued to an existing Member in accordance with Section 5.15(a), the Manager(s) shall amend <u>Schedule A</u>, without the further vote, act or consent of any other Member, to reflect the issuance of such Additional Shares and, upon the amendment of such Schedule A, such Member shall be issued his/her or its Additional Shares.

### 5.16   Exit Transactions.

A Company sale or an initial public offering (each an "<u>Exit Transaction</u>"), including without limitation the pricing, method and timing of such sale or initial public offering, must be approved by each of the Members.

a)       Upon the consummation of the Exit Transaction, (i) each Member will receive the same form of consideration and the same portion of the aggregate consideration that such Member would have received if such aggregate consideration had been distributed by the Company in complete liquidation pursuant to this Agreement as in effect immediately prior to such Exit Transaction; (ii) if any holders of a class of interest are given an option as to the form and amount of consideration to be received, each Member holding a comparable interest will be given the same option; and (iii) each person who holds then currently exercisable rights to acquire Shares will be given an opportunity to exercise such rights immediately prior to the consummation of the Exit Transaction and participate in such sale as a holder of such Shares.

b)       If the Company or the Members enter into any transaction for which Rule 506 (or any similar rule then in effect) promulgated by the Securities and Exchange Commission ("<u>SEC</u>") may be available with respect to such negotiation or transaction (including a merger, consolidation or other reorganization), the members who are not accredited investors (as such term is defined in Rule 501 promulgated by the SEC) will, at the request of the Company, appoint a purchaser representative (as such term is defined in Rule 501 promulgated by the SEC) reasonably acceptable to the Company.  If any Member appoints a purchaser representative designated by the Company, the Company will pay the fees of such purchaser representative, but if any Member declines to appoint the purchaser representative designated by the Company, the Company will appoint a purchaser representative, and such Member will be responsible for the fees and expenses of the purchaser representative so appointed.

c)       Each Member will bear such Member's pro-rata share (based on such Member's share of the aggregate proceeds paid in such Exit Transaction of the Company) of the costs of any Company sale pursuant to an Exit Transaction to the extent such costs are incurred for the benefit of all Members and are not otherwise paid by the Company or the acquiring party. Costs incurred by Members at their option and on their own behalf and income and other taxes

- 18 -

incurred by a Member as a result of the transactions hereunder will not be considered costs of the transaction hereunder and will be borne by the Member or Members incurring such costs or taxes. Except for the foregoing, no Member shall be obligated to bear any material costs in connection with any Exit Transaction or Reorganization Plan.

**5.17    Prospective Transferees.** Subject to the terms of this Agreement, the Company agrees to cooperate, as may reasonably be requested, in order to provide any information and access to any information to any prospective transferee in connection with a proposed Transfer. Upon request of the Members, the Company shall promptly supply to the Members, or any of their prospective transferees, all information required to be delivered in connection with a Transfer pursuant to rules promulgated by the SEC.

**5.18    Transfer Fees and Expenses.** The transferor and transferee of any Shares or other interests in the Company shall be jointly and severally obligated to reimburse the Company for all reasonable expenses (including attorneys' fees and expenses) incurred by the Company as a result of any Transfer or proposed Transfer of such interest, whether or not consummated.

**5.19    Other Limitations.** In order to permit the Company to qualify for the benefit of a "safe harbor" under Section 7704 of the Internal Revenue Code, notwithstanding anything to the contrary in this Agreement, no Transfer shall be permitted or recognized (within the meaning of Treasury Regulation Section 1.7704-1(d)) by the Company or the Members if and to the extent that such Transfer would cause the Company to have more than 100 partners (within the meaning of Treasury Regulation Section 1.7704-1(h), including the look-through rule in Treasury Regulation Section 1.7704-1(h)(3)).

**5.20    Effective Date.** Any Transfer and any related admission of a Person as a Member in compliance with this Article V shall be deemed effective on such date that the transferee or successor in interest complies with the requirements of this Agreement.

**5.21    Effect of Incapacity.** Except as otherwise provided herein, the incapacity of a Member shall not dissolve or terminate the Company. In the event of such incapacity, the executor, administrator, guardian, trustee or other personal representative of the Incapacitated Member shall be deemed to be the assignee of such Member's Economic Interest and may, subject to the terms and conditions set forth in Section 5.14, become a Substituted Member.

**5.22    Representations and Warranties of Members.** Each Member hereby represents and warrants to and acknowledges to the Company that: (i) such Member has knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed investment decision with respect thereto; (ii) such Member is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time; (iii) such Member is acquiring interests in the Company for investment only and not with a view to, or for resale in connection with, any distribution to the public or public offering thereof; (iv) the interests in the Company have not been registered under the securities laws of any jurisdiction and cannot be disposed of unless they are subsequently registered and/or qualified under applicable securities laws and the provisions of this Agreement have been complied with; (v) the execution, delivery and

- 19 -

performance of this Agreement have been duly authorized by such Member and do not require such Member to obtain any consent or approval that has not been obtained and do not contravene or result in a default under any provision of any law or regulation applicable to such Member or other governing documents or any agreement or instrument to which such Member is a party of by which such Member is bound and (vi) this Agreement is valid, binding and enforceable against such Member in accordance with its terms.

    **5.23**    **Valuation due to Withdrawal, Transfer, etc.**  In the event of a valuation of a Member's interest in the Company because of a withdrawal, resignation or expulsion of a Member (referred to in this Section as a "Exiting Member"), or Transfer of an interest without consent of the Members, the value of the Exiting Member's interest shall be equal to:

    a)    the amount in the Exiting Member's Capital Account, according to the Capital Account records maintained by the Company's regularly engaged independent certified public accountant, adjusted to generally accepted accounting principles (regardless of whether the Company's financial statements and the Member's Capital Accounts are ordinarily kept on a cash basis); minus

    b)    any amounts owed by such Exiting Member to the Company; both determined as of the end of the month in which written notice of the Transfer, withdrawal, resignation or expulsion is received by the Company, or if no such notice is received, as of the last day of the month immediately prior to the month in which the first payment of purchase price or redemption payment is to be made.

## ARTICLE VI

### MANAGEMENT OF THE COMPANY
### MANAGERS

    **6.1**    **Managers**.  Except as otherwise provided in the Act, the business and affairs of the Company shall be managed by or under the direction of managers (the "Managers").  The Managers shall possess all rights and powers as provided in the Act and otherwise by law. Except as otherwise expressly provided herein, the Members hereby consent to the exercise by the Managers of all such powers and rights conferred on them by the Act with respect to the management and control of the Company.  The Managers shall have full, exclusive and complete discretion to manage and control the business and affairs of the Company, to make all decisions affecting the business, operations and affairs of the Company and to take all such actions as it deems necessary or appropriate to accomplish the purpose of the Company as set forth herein. Subject to the provisions of this Agreement, the Managers shall have general and active management of the business and operations of the Company.  Except as otherwise provided herein, no Member (other than a Member who is a Manager), in his/her or its capacity as a Member, shall have any power to act for, sign for or do any act that would bind the Company. Each Member acknowledges and agrees that a Manager shall not be bound to devote all of such Manager's business time to the affairs of the Company, and that a Manager and such Manager's Affiliates do and will continue to engage for such Manager's own account and for the account of others in other business ventures.

- 20 -

**6.2     Number, Qualifications and Term of Office of Managers**.  There shall initially be two (2) Managers.  Jenny Johnson and Blair McNea shall be the initial Managers of the Company.  The Members may, by Majority Vote, appoint additional Managers at their discretion at any time and change the person who is the Chief Executive Officer ("CEO").  Members may hold a vote to change who is CEO at any time and for any reason, with the sole requirement being a notification of members constituting a majority ownership.  Blair McNea shall hold the position of Chairman ("Chairman") and Jenny Johnson shall hold the position of Chief Executive Officer ("CEO").     The CEO shall have the operational decision-making power for the Companyand may delegate any responsibilities, at his/her sole discretion, to other employees or Managers.  Manager or Managers shall reference anyone in this Agreement named as a Manager under this Section 6.2, including the CEO.   However, any reference to the CEO in this Agreement shall be exclusive to the person holding that title.  A Manager shall hold office until such Manager resigns or is removed pursuant to Section 6.5.

**6.3     Vacancies**.  Any vacancy in the position of Manager or CEO shall be filled by a majority vote of the Members.  A Manager elected to fill a vacancy shall be elected for the unexpired term of his/her predecessor in office.

**6.4     Resignation**.  A Manager may resign by delivering to the Company at the Company's principal office his/her written resignation addressed to the Members.   Such resignation shall be effective upon receipt unless it is specified to be effective at some other time or upon the happening of some other event.

**6.5     Removal**.  Except as otherwise provided in the Act, a Manager may be removed without cause by a majority vote of the Members.

**6.6     Compensation**.  Unless approved by the Members, a Manager shall not be paid compensation by the Company for his/her services or for expenses of attendance at meetings or relating to the affairs of the Company.

**6.7     Exculpation of Managers**.  Neither the Managers nor any affiliate of any Manager shall be liable to the Members for any act or failure to act pursuant to this Agreement, except where such act or failure to act constitutes a breach of this Agreement, gross negligence or willful misconduct and has not been expressly authorized by the Members.  The Managers shall be entitled to rely upon the advice of legal counsel, independent public accountants and other experts, including financial advisors, and any act of or failure to act by the Managers in good faith reliance on such advice shall in no event subject the Managers or any such other person to liability to the Company or any Member.

## ARTICLE VII

## LIABILITY; INDEMNIFICATION; INSURANCE

**7.1     Limited Liability**.   Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be

- 21 -

solely the debts, obligations and liabilities of the Company, and the Manager and the Members shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Manager or Member of the Company. The Members and the Manager shall not be required to lend any funds to the Company. Each of the Members shall only be liable to make payment of its respective contributions as and when due hereunder and other payments as expressly provided in this Agreement. If and to the extent a Member's contribution shall be fully paid, such Member shall not, except as required by the express provisions of the Act regarding repayment of sums wrongfully distributed to Members, be required to make any further contributions.

**7.2     Indemnification.**

a)     To the fullest extent permitted by law, the Company shall indemnify any person who was or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative (hereinafter, a "Proceeding") (other than an action, suit or proceeding by or in the right of the Company to procure a judgment in its favor), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he is or was a Member, Manager, officer, employee or agent of the Company, or is or was serving at the request of the Company as a Member, Director, manager, partner, officer, employee or agent of another corporation, partnership, limited liability company, joint venture, trust or other enterprise ("Indemnified Person") against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his/her conduct was unlawful. The termination of any Proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his/her conduct was unlawful.

b)     To the fullest extent permitted by law, the Company shall indemnify any person who was or is a party or is threatened to be made a party to any Proceeding by or in the right of the Company to procure a judgment in its favor by reason of the fact that he is or was an Indemnified Person against expenses (including attorneys' fees) actually and reasonably incurred by him in connection with the defense or settlement of such Proceeding if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Company unless and only to the extent that the court in which such Proceeding was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the court shall deem proper.

c)     To the extent that an Indemnified Person has been successful on the merits or otherwise in defense of any Proceeding (or any portion thereof), he shall, to the fullest extent permitted by law, be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith.

d)     Any indemnification under paragraphs (a) and (b) (unless ordered by a court) shall be made by the Company only as authorized in the specific case upon a determination that indemnification of the Indemnified Person is proper in the circumstances because he has met the applicable standard of conduct set forth in paragraphs (a) and (b). Such determination shall be made (i) by independent legal counsel in a written opinion to the Company, (ii) by any court of competent jurisdiction before whom the matter is brought, or (iii) before any arbitration panel or other binding adjudicatory forum selected by the disinterested Member (if any) and reasonably acceptable to all Members.

e)     Expenses incurred by an Indemnified Person in defending a Proceeding may be paid by the Company in advance of the final disposition of such Proceeding upon receipt of a written undertaking by or on behalf of the Indemnified Person to repay such amount if it shall ultimately be determined that he is not entitled to be indemnified by the Company as authorized in this Section 7.2.

f)     The indemnification and advancement of expenses provided by this Section 7.2 shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any agreement, vote of Members or otherwise, both as to action in his/her official capacity and as to action in another capacity while holding such office, and shall continue as to a person who has ceased to be a Director, Member, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

7.3     **Insurance.** The Company shall have power to purchase and maintain insurance on behalf of any person who is or was an Indemnified Person against any liability asserted against him and incurred by him in any such capacity, or arising out of his/her status as such, whether or not the Company would have the power to indemnify him against such liability under the provisions of Section 8.2.

7.4     **Competing Activities.** Except as may otherwise be agreed in writing and subject to the duties and obligations of officers to the Company: (a) the Members and Manager (and any security holders, partners, members, managers, agents, employees and Affiliates of each of them), may engage or invest in, own and/or manage, independently or with others, any business activity of any type or description, including without limitation those that might be in direct or indirect competition with the Company; (b) neither the Company, nor any Member or Manager shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom; (c) the Members and Manager (and the officers, directors, security holders, partners, members, managers, agents, employees or Affiliates of any of them) shall not be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken advantage of by the Company; and (d) the Members and Manager (and the officers, directors, security holders,

- 23 -

partners, members, managers, agents, employees and Affiliates of each of them) shall have the right to hold any investment opportunity or prospective economic advantage for their own account or to recommend such opportunity to persons other than the Company.

    **7.5    Reimbursement of Tax Withholding**. If the Company is obligated to pay any amount to a governmental agency (or otherwise makes a payment) because of a Member's status or otherwise specifically attributable to a Member (including, without limitation, federal, state or local withholding taxes imposed with respect to any issuance of Shares or other interests to a Member or any payments to a Member, federal withholding taxes with respect to foreign persons, state personal property taxes, state unincorporated business taxes, etc.), then such Member (the "Indemnifying Member") shall indemnify the Company in full for the entire amount paid (including, without limitation, any interest, penalties and expenses associated with such payments). The amount to be indemnified shall at the option of the other Members, either:

        a)    promptly upon notification of an obligation to indemnify the Company, the Indemnifying Member shall make a cash payment to the Company equal to the full amount to be indemnified, or

        b)    the Company shall reduce distributions that would otherwise be made to the Indemnifying Member, until the Company has recovered the amount to be indemnified.(provided that the amount of such reduction shall be deemed to have been distributed for all purposes of this Agreement).

An Indemnifying Member's obligation to make contributions to the Company under this Section 8.5 shall survive the termination, dissolution, liquidation and winding up of the Company and, for purposes of this Section 8.5, the Company shall be treated as continuing in existence. The Company may pursue and enforce all rights and remedies it may have against each Indemnifying Member under this Section 8.5, including instituting an arbitration proceeding to collect such contribution with interest calculated at prime rate plus five percentage points per annum (but not in excess of the highest rate per annum permitted by law).

    **7.6    Savings Clause**. If this Article VIII or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each person indemnified pursuant to this Article VIII as to costs, charges and expenses (including reasonable attorneys' fees), judgments, fines and amounts paid in settlement with respect to any such Proceeding, appeal, inquiry or investigation to the full extent permitted by any applicable portion of this Article VII that shall not have been invalidated and to the fullest extent permitted by applicable law.

## ARTICLE VIII

### BOOKS; ACCOUNTING; TAX ELECTIONS; REPORTS

    **8.1    Maintenance and Availability of Records.**

- 24 -

a)      The Manager(s) shall keep, or cause to be kept, items at the principal business office of the Company:

    i.      A current list of the full name and last known business address of each Member,

    ii.      a copy of the Articles, including all amendments thereto and executed copies of all powers of attorney pursuant to which the Articles or any amendment has been executed,

    iii.      copies of the Company's federal, state and local income tax returns and reports, if any, for the three most recent years,

    iv.      copies of this Agreement,

    v.      copies of any financial statements of the Company for the three most recent years, and

    vi.      all other records required to be maintained pursuant to the Act.

b)      Promptly upon request, the Members shall, at the cost and expense of the Company, furnish, or cause to be furnished, to each Member such information relating to the financial condition and operations of the Company as any Member may from time to time reasonably request.

c)      Each Member shall have the right, at all reasonable times and upon reasonable notice during normal business hours, to audit, examine and make copies of or extracts from the books of account of the Company for any purpose reasonably related to such Member's interest as a Member of the Company. Such right may be exercised through any agent or employee of such Member designated by it or by a certified public accountant designated by such Member. A Member shall bear all expenses incurred in any examination made for such Member's account.

**8.2      Accounting.**

a)      **Financial Accounts**.  Except for Member's Capital Accounts, the books of the Company shall be kept on the accrual basis of accounting, and otherwise in accordance with generally accepted accounting principles consistently applied, and shall at all times be maintained or made available at the principal business office of the Company.

**8.3      Filing of Returns and Other Writings; "Tax Matters Partner".**

a)      The Manager shall cause the preparation and timely filing of all Company tax and information returns and shall, on behalf of the Company, timely file all other writings required by any governmental authority having jurisdiction to require such filing.

- 25 -

b)      Unless and until the Members shall otherwise agree, Turtle Mountains, LLC shall serve as the "tax matters partner" for purposes of Section 6231 of the Internal Revenue Code. Promptly following the written request of the tax matters partner, the Company shall, to the fullest extent permitted by law, reimburse and indemnify the tax matters partner for all reasonable expenses, including reasonable legal and accounting fees, claims, liabilities, losses and damages incurred by the tax matters partner in connection with any administrative or judicial proceeding with respect to the tax liability of the Members.

c)      **Member Tax Information**.  Within ninety (90) days after the end of each taxable year of the Company, the Manager will cause to be delivered to each person who was a Member or Economic Owner at any time during such taxable year a Form K-1 and such other information, if any, with respect to the Company as may be necessary for the preparation of such Member's or Economic Owner's federal, state and local income tax returns, including a statement showing such Member's or Economic Owner's share of income, gain or loss, expense and credits for such Taxable Year for federal income tax purposes.  My deficiency for taxes imposed on any Member or Economic Owner (including penalties, additions to tax. or interest imposed with respect to such taxes) shall be paid by such Member or Economic Owner, and if paid by the Company, shall be recoverable from such Member or Economic Owner.

d)      The provisions of this Section 8.3 shall survive the termination of the Company or the termination of any Member's interest in the Company and shall remain binding on the Members for as long a period of time as is necessary to resolve with the Internal Revenue Service any and all matters regarding the federal income taxation of the Company or the Members.

**8.4      Intentionally Left Blank**

**8.5      Company Funds**.  The Company may not commingle the Company's funds with the funds of any Member or the funds of any Affiliate of any Member.

**8.6      Intentionally Left Blank.**

**8.7      Section 754 Election.**  In the discretion of all the Members the Company may elect, pursuant to Section 754 of the Code, to adjust the basis of Company property as permitted and provided in Sections 734 and 743 of the Internal Revenue Code. Such election shall be effective solely for federal (and, if applicable, state and local) income tax purposes.

## ARTICLE IX

## DISSOLUTION; TERMINATION

**9.1      Events of Dissolution**.  The Company shall exist in perpetuity unless all the Members agree to dissolve (a "Dissolution") the Company.  Dissolution of the Company shall be effective on the day on which the event occurs giving rise to the dissolution, but the Company shall not terminate until the assets of the Company shall have been distributed as provided herein

- 26 -

and articles of dissolution of the Company have been filed with the Secretary of State of the State of Colorado.

**9.2     Liquidation and Termination.**   On Dissolution of the Company, the Manager shall designate a Member or Members to act as liquidator(s). The liquidator(s) shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act. The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidator(s) shall continue to operate the Company properties with all of the power and authority of Manager and Members, subject to the power of the Manager to remove and replace such liquidator(s). The steps to be accomplished by the liquidator(s) are as follows:

a)      As promptly as possible after Dissolution and again after final liquidation, the liquidator(s) shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

b)      The liquidator(s) shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including, without limitation, all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine).

c)      In the final Taxable Year of the Company, Net Profits and Net Losses shall be credited or charged to Capital Accounts of the Members (which Capital Accounts shall be first adjusted to take into account all distributions other than liquidating distributions made during the Taxable Year) in the manner provided in Article W.  If the fair market value (as determined by the Manager the of Company) assets to be distributed in kind pursuant to Section 10.2(d) exceeds ("book gain"), or is less than ("book loss"), the Company's book basis (as determined for Capital Account purposes) for such assets, such book gain or book loss shall be taken into account in the calculation of Net Profit or Net Loss to be allocated under Article IV and this Section 10.2(c).

d)      All remaining assets of the Company shall be distributed to the Members in accordance with their positive Capital Account balances.

**9.3     Articles of Dissolution.**   On completion of the distribution of Company assets as provided herein, the Company is terminated, and shall file articles of dissolution with the Secretary of State of the State of Colorado, cancel any other filings and take such other actions as may be necessary to terminate the Company.

## ARTICLE X

### MISCELLANEOUS

**10.1   Notices.**

- 27 -

a) Any and all notices, consents, offers, elections and other communications required or permitted under this Agreement shall be deemed adequately given only if in writing and the same shall be delivered either in hand or by mail or Federal Express or similar expedited commercial carrier, addressed to the recipient of the notice, postage prepaid and registered or certified with return receipt requested (if by mail), or with all freight charges prepaid (if by Federal Express or similar carrier).

b) All notices, demands, and requests to be sent hereunder shall be deemed to have been given for all purposes of this Agreement upon the date of receipt or refusal.

All such notices, demands and requests shall be addressed as follows:

If to **Turtle Mountains**, to:

Turtle Mountains, LLC
4743 Kincross Court
Boulder, Colorado 80301

If to **Autumn Leaf**, to:

Autumn Leaf, LLC
14285 Inca St.
Westminster, CO 80023

or to such other address as any Member may have designated for itself by written notice to the others in the manner herein prescribed, except that notices of change of address shall be effective only upon receipt.

**10.2   Word Meanings; Construction.**   The words such as "herein", "hereinafter", "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires. Unless otherwise indicated, all references to Articles and Sections refer to articles and sections of this Agreement and all references to Schedules are to schedules attached hereto, each of which is made a part hereof for all purposes.

**10.3   Binding Provisions.**   The covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the heirs, legal representatives, successors and assigns of the respective parties hereto.

**10.4   Applicable Law.**   This Agreement shall be construed and enforced in accordance with the laws of the State of Colorado, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Colorado or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Colorado. In the event

- 28 -

of a conflict between any provision of this Agreement and any non-mandatory provision of the Act, the provision of this Agreement shall control and take precedence.

**10.5    Arbitration**.  Except as provided below, any and all disputes arising under or related to this Agreement which cannot be resolved through negotiations between the parties shall be submitted to binding arbitration. If the parties fail to reach a settlement of their dispute within thirty (30) days after the earliest date upon which one of the parties notifies the other(s) in writing of the existence of and its desire to attempt to resolve the dispute, then the dispute shall be promptly submitted to arbitration by a single arbitrator through the Judicial Arbiter Group of Denver, Colorado, any successor of the Judicial Arbiter Group, or any similar arbitration provider who can provide a former judge to conduct the arbitration if the Judicial Arbiter Group is no longer in existence ("JAG"). The arbitrator shall be selected by JAG, if possible, on the basis of his/her or her expertise in the subject matter(s) of the dispute. The decision of the arbitrator shall be final, non-appealable and binding upon the parties, and it may be entered in any court of competent jurisdiction; provided, however, that any party to the arbitration proceeding may seek a court order vacating the decision of the arbitrator in accordance with the provisions of and on the grounds set forth in C.R.S. § 13-22-214 and/or a modification or correction of the arbitrator's award in accordance with the provisions of C.R.S. §§ 13-22-211 or 13-22-215, and may take an appeal from court orders related to the arbitration proceeding or award as provided in C.R.S. § 13-22-221.

The arbitration shall take place in Boulder, Colorado. The arbitrator shall be bound by the laws of the State of Colorado applicable to the issues involved in the arbitration and all Colorado rules relating to the admissibility of evidence, including, without limitation, all relevant privileges and the attorney work product doctrine. Discovery shall be permitted and shall be completed in accordance with the time limitations prescribed in the Colorado Rules of Civil Procedure, unless extensions of such time limitations are approved by all parties to the arbitration or are ordered by the arbitrator on the basis of strict necessity adequately demonstrated by the party requesting an extension of time. The arbitrator shall have the power to grant equitable relief where available under Colorado law, and shall be entitled to make an award of punitive damages where such an award is permitted by Colorado law. The arbitrator shall issue a written opinion setting forth his/her or her decision and the reasons therefor within thirty (30) days after the arbitration proceeding is concluded. The obligation of the parties to submit any dispute arising under or related to this Agreement to arbitration as provided in this section shall survive the expiration or earlier termination of this agreement. Notwithstanding the foregoing, any party to this Agreement may seek to obtain an injunction or other appropriate relief from a court to preserve the status quo with respect to any matter pending conclusion of the arbitration proceeding, but no such application to a court shall in any way be permitted to stay or otherwise impede the progress of the arbitration proceeding.

In the event of any arbitration or litigation being filed or instituted between the parties concerning this Agreement, the prevailing party will be entitled to receive from the other parry or parties its attorneys' fees, witness fees, costs and expenses, court costs and other reasonable expenses, whether or not such controversy, claim or action is prosecuted to judgment or other of relief The "prevailing party" is that parry which is awarded judgment or other legal or equitable relief as a result of trial or arbitration, or who receives a payment of money from the other party

- 29 -

in settlement of claims asserted by such party. If both parties receive a judgment, settlement payment or other award or relief, the court or the arbitrator shall determine which party is the prevailing party, taking into consideration the merits of the claims asserted by each party, the relative values of the judgments, settlements or other forms of relief received by each party, and the relative equities between the parties.

**10.6   Separability of Provisions.**  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of any other provision of this Agreement in such jurisdiction or affect the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, but this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

**10.7   Section Titles.**  Section titles are for descriptive purposes only and shall not control or alter the meaning of this Agreement as set forth in the text.

**10.8   Further Assurances.**   The Members shall execute and deliver such further instruments and do such further acts and things as may be required to carry out the intent and purposes of this Agreement.

**10.9   Directly or Indirectly.**  Where any provision in this Agreement refers to action to be taken by any person, or which such person is prohibited from taking, such provision shall be applicable whether the action in question is taken directly or indirectly by such person.

**10.10   Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement.

**10.11   Effect of Waiver and Consent.**  A waiver or consent, express or implied, to or of any breach or default by any person in the performance by that person of its obligations hereunder or with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that person of the same or any other obligations of that person hereunder or with respect to the Company. Failure on the part of a person to complain of any act of any person or to declare any person in default hereunder or with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that person of its rights with respect to that default until the applicable statute-of-limitations period has run.

**10.12   Waiver of Certain Rights.**  Each Member irrevocably waives any right it may have to demand any distributions or withdrawal of property from, the Company or to maintain any action for dissolution (except pursuant to Section 7-80-802 of the Act) of the Company or for partition of the property of the Company.

**10.13   Notice to Members of Provisions.**  By executing this Agreement, each Member acknowledges that it has actual notice of (a) all of the provisions hereof (including, without

- 30 -

limitation, the restrictions on the transfer set forth in Article V) and (b) all of the provisions of the Articles.

**10.14  Entire Agreement.**  This Agreement together with the other agreements and instruments entered into in connection herewith constitutes the entire agreement among the parties hereto with respect to the transactions contemplated herein, and supersedes all other prior understandings or agreements among the Members with respect to such transactions.

**10.15  Amendments.**  The Articles and this Agreement may be amended if such amendment is approved by Members holding a majority of the Shares.

\* \* \* \*

IN WITNESS WHEREOF, the Members have executed and delivered this Agreement as of the day and year first above written.

MEMBERS:

Turtle Mountains, LLC

Blair William McNea, Manager

Autumn Leaf, LLC

Walter Long, Manager

- 31 -

## SCHEDULE A

### SCHEDULE OF MEMBERS, CAPITAL AND PERCENTAGE INTEREST
As of January 1, 2014

| NAME AND ADDRESS | CAPITAL CONTRIBUTIONS | NUMBER OF UNITS | PERCENTAGE INTEREST |
|---|---|---|---|
| **CLASS A MEMBERS** | | | |
| **Turtle Mountains, LLC** | $8.800 Capital, Knowledge and Services | 88,000 | 88% |
| 4743 Kincross Court Boulder, CO 80301 | | | |
| **Autumn Leaf, LLC** | $1,200 Capital, Knowledge and Services | 12,000 | 12% |
| 14285 Inca St. Westminster, CO 80023 | | | |
| **TOTAL:** | **$10,000** | **100,000** | **100%** |

- 32 -