# Attachment 1

## Order Denying Release of Legal Fees

*FTC v. Johnson*, No. 2:10-CV-2203 (D. Nev. June 17, 2011)

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No.: 2:10-cv-02203-RLH-GWF |
| Plaintiff, | **O R D E R** |
| vs. | (Emergency Motion for Release of Funds From Receiver for Living Expenses and Cost of Defense–#219) |
| JEREMY JOHNSON, individually, as officer of Defendants I Works, Inc., Cloud Nine, Inc., CPA Upsell, Inc., Elite Debit, Inc., Internet Economy, Inc., Market Funding, Inc., and Success Marketing, Inc.; as a member of Defendant Network Agenda LLC; and as the *de facto* principal of numerous Defendant Shell Companies identified below; | |
| DUANE FIELDING, individually, as an officer of Anthon Holdings, Inc., and as a member of Defendant Network Agenda LLC; | |
| ANDY JOHNSON, individually, as a manager of I Works, Inc., and as titular principal of numerous Defendant Shell Companies identified below; | |
| LOYD JOHNSTON, individually, as a manager of I Works, Inc., and as titular principal of numerous Defendant Shell Companies identified below; | |
| SCOTT LEAVITT, individually, as a manager of I Works, Inc., and as a principal of Defendant Employee Plus, Inc.; | |

1

| | |
|---|---|
| 1 | SCOTT MUIR, individually and as titular principal of numerous Defendant Shell Companies identified below; ) ) ) |
| 2 | |
| 3 | BRYCE PAYNE, individually, as a manager of I Works, Inc., and as titular principal of Defendant JRB Media, Inc., a Shell Company; ) ) ) ) |
| 4 | |
| 5 | KEVIN PILON, individually and as titular principal of numerous Defendant Shell Companies identified below; ) ) ) |
| 6 | |
| 7 | RYAN RIDDLE, individually, as a former manager of I Works, Inc., and as titular principal of Defendant Diamond J Media, Inc., a Shell Company; ) ) ) ) ) |
| 8 | |
| 9 | |
| 10 | TERRASON SPINKS, individually and as principal of Defendant Jet Processing, Inc., a Shell Company; and ) ) ) |
| 11 | |
| 12 | I WORKS, INC., et al., ) ) |
| 13 | Defendants. ) |

Before the Court is Defendants Jeremy D. Johnson; I Works, Inc.; Cloud Nine Marketing, Inc.; CPA Upsell, Inc.; Elite Debit, Inc.; Internet Economy, Inc.; Market Funding Solutions, Inc.; Success Marketing, Inc.; Fitness for Life, Inc.'s (collectively, the "Johnson Defendants") **Emergency Motion for Release of Funds From Receiver for Living Expenses and Cost of Defense** (#219, filed May 20, 2011). The Court has also considered Plaintiff Federal Trade Commission's ("FTC") Opposition (#229, filed May 27, 2011), Receiver Robb Evans of Robb Evans and Associates' ("Receiver") Opposition (#225, filed May 26, 2011), and the Johnson Defendants' Reply (#225, filed May 26, 2011).

## BACKGROUND

As the parties are familiar with the facts of this case, the Court will not recount them further except as necessary for disposition of this motion. This dispute arises from the FTC's investigation of Jeremy Johnson and numerous affiliated individuals and corporations who allegedly defrauded the public via internet scams. On December 21, 2010, the FTC filed its

1  complaint pursuant to the Federal Trade Commission Act ("the Act"), and the Electronic Fund
2  Transfer Act ("EFTA") to obtain permanent injunctive relief, restitution, disgorgement, and other
3  equitable relief. On February 10, 2011, the Court appointed the Receiver and enjoined the sale of
4  any property owned by Johnson or his affiliated entities. (Dkt. #130, Prelim. Inj. Order.)

5        The Johnson Defendants now ask the Court to authorize the Receiver to release
6  funds to pay their legal fees and Johnson's personal living expenses. According to the motion and
7  corresponding affidavit, Johnson incurred $222,958 in attorney fees and $3,374.53 in costs with
8  the Jones Waldo law firm from January to March 2011. (Dkt. #219-2, Mot. Ex. B, Aff. of Fees
9  and Costs by Michael Shaw, May 13, 2011.) Johnson also claims an additional $22,348.67 in
10 costs incurred to gather and maintain documents requested by the FTC during its investigation.
11 Finally, Johnson asks the Court to authorize the Receiver to release approximately $27,000 per
12 month for his living expenses. The Court set an expedited briefing schedule for these requests
13 (Dkt. #221, Min. Order, May 23, 2011), and the parties have now fully briefed these issues. For
14 the reasons discussed below, the Court denies the motion.

15 **DISCUSSION**
16 **I.   The Johnson Defendants' Request for Funds**
17    **A.   Legal Standard**
18       In civil law enforcement cases where a district court has frozen a party's assets, the
19 court has discretion to release funds for the purpose of paying attorney fees or living expenses.
20 *Commodity Futures Trading Comm'n v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 775 (9th Cir. 1995).
21 When reviewing district courts' discretionary decisions to release frozen funds, the Ninth Circuit
22 has "recognized the importance of preserving the integrity of disputed assets to ensure that such
23 assets are not squandered by one party to the potential detriment of another." *FSLIC v. Ferm*, 909
24 F.2d 372, 374 (9th Cir. 1990).
25 ///
26 ///

**B.     Analysis**

In cases such as this, district courts have considered the following factors in determining whether to release frozen funds for legal fees and living expenses: (1) the likelihood that plaintiff will prevail on the merits; (2) whether defense counsel was aware of the possibility that the court might deny or limit attorney fees; (3) the availability of assets for consumer redress; (4) a defendant's access to alternative assets; and (5) the reasonableness of the funds requested for legal fees and living expenses. *See, e.g.*, *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989). This list is not exclusive as the relevant factors may vary from case to case. However, the Court will focus its analysis on these factors as the Johnson Defendants have acknowledged the propriety of these factors. (Dkt. #233, Reply 7:3–4.)

**1.     FTC's Probable Success on the Merits of its Claim**

In exercising its discretion, the Court must take into account the FTC's probable success on the merits of its claim. *World Wide Factors, Ltd.*, 882 F.2d at 346. The Court previously evaluated the merits of this case in its order granting FTC's motion for preliminary injunction. Specifically, the Court found:

> There is good cause to believe that Defendants have engaged and are likely to engage in acts and practices that violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), and Section 205.10(b) of Regulation E, 12 C.F.R.§ 205.10(b), and that the Commission is therefore likely to prevail on the merits of this action.

(Dkt. #130, Prelim. Inj. Order, Findings ¶ 4.) Johnson argues, in contrast, that the Court's observations during the preliminary injunction hearing support his position that the FTC is unlikely to succeed on the merits in this case. In the hearing, the Court expressed doubt to FTC's likelihood of obtaining summary judgment and further recognized the contested factual issues in this case. (Dkt. #233-7, Reply Ex. D, Hr'g Tr. 161:14–22.) However, this doubtful reference does not negate the Court's findings of an ultimate likelihood of success, it simply acknowledged that the FTC may not be able to obtain a favorable judgment through summary judgment. In light of

///

AO 72
(Rev. 8/82)

the Court's findings and without any recent changes, the Court finds that the FTC still shows a probability of success on the merits.

### 2. Defense Counsels' Awareness of the Asset Freeze

A district court may presume that attorneys who are aware of a defendant's asset freeze will also know that the court has discretion to approve or deny a release of frozen assets to pay attorney fees. *FTC v. Sharp*, 1991 WL 214076, at *1 (D. Nev. Jul. 23, 1991); *see also FTC v. Image Sales and Consultants, Inc*., 1997 U.S. Dist. LEXIS 18905, at * 7 (N.D. Ind. Nov. 14, 1997) (noting that "an attorney who knowingly consents to represent a defendant whose assets have been frozen assumes the risk of not being paid").

After the FTC filed its motions for injunctive relief, the Jones Waldo law firm began representing every Defendant in this case. (Dkt. #58, Verified Petition for Permission to Practice Pro Hac Vice, Jan. 25, 2011.) Scott Leavitt and Employee Plus subsequently retained separate counsel. (Dkt. #233-7, Hr'g Tr. 3:16–17.) Johnson represents that he incurred $222,958.00 in attorney fees and $3,374.53 in costs with Jones Waldo from January to March 2011 (Dkt. #219-2, Aff. of Fees and Costs.), and another $22,348.67 in costs to gather and maintain documents for the FTC's investigation. This $248,681.20 in total fees do not include the recent attorney fees incurred with Hutchinson & Steffen, the Johnson Defendants' current counsel. To that end, Johnson states that Hutchinson & Steffen has since been paid $7,500 retainer[1] and "one additional payment from others who expect to be paid back." (Dkt. #233-1, Reply Ex. C., Johnson Supp. Decl. ¶ 5.) The Affidavit of Fees and Costs further indicates that fees were incurred "in defending the Defendants" (Dkt. #219-2, ¶ 2), but does not detail what fees were incurred specifically by Johnson and his related entities.

Here, the Court can easily assume that Jones Waldo was aware of the asset freeze prior to agreeing to represent the Defendants in this case. The Court issued a Temporary

---

[1] Presumably, Johnson paid this $7,500.00 retainer himself, although this is unclear from his Supplemental Declaration.

5

Restraining Order (#44) on January 13, 2011—almost two weeks prior to attorney Michael Shaw filing his Pro Hac Vice Petition (#58) on January 25. The same is true for Hutchinson & Steffen because its attorneys first appeared before this Court two months after the preliminary injunction was put in place. (Dkt. #176, Notice of Change of Attorney, Apr. 12, 2011.) Thus, the Court concludes that the Johnson Defendants' current and former counsel assumed the risk of not getting paid.

As discussed in greater detail below, the Court also notes that the sizeable Jones Waldo bill has already been paid—a fact that was carefully omitted from the Affidavit of Fees and Costs and Johnson's initial Declaration (Dkt. #219-1, Mot. Ex. A). Johnson attempted to explain this omission in this Supplemental Declaration by saying that neither he nor iWorks paid these fees, despite the fact that they are responsible for the bulk of those charges. (Dkt. #233-1, ¶ 5.) Johnson also failed to address whether the $22,348.67 in costs related to the FTC's investigation are paid, although none of the corresponding invoices indicate an unpaid balance and three of the four invoices were issued after the TRO or preliminary injunction was in place. (Dkt. #219-1, Mot. Ex. A-1, Landmark Legal Solutions Invoices.)

### 3.  Availability of Assets for Consumer Redress

When a defendant's frozen assets are insufficient to cover the potential claims, a district court is within its discretion to deny a fee application. *Noble Metals Int'l, Inc.*, 67 F.3d at 775 (affirming the district court's decision to deny attorney fees because the record demonstrated that "the frozen assets fell far short of the amount needed to compensate" aggrieved parties). Furthermore, if the receiver's estate is not large enough to pay all the claims against it, the court must essentially decide whether the alleged victims or defense counsel deserves the money more. *FTC v. Sharp*, 1991 WL 214076, at *1 (D. Nev. Jul. 23, 1991). In a criminal case with similar implications, the Supreme Court has held that a district court may restrain a defendant from using disputed funds to pay for attorney's fees before a final judgment on the merits has been rendered. *United States v. Monsanto*, 491 U.S. 600, 615 (1989).

In this case, the FTC has alleged over $289 million dollars in potential consumer injuries, while the Receiver tells the Court that the cash on hand totals only $736,598. (Dkt. #225, Receiver's Opp'n 14:26.) Although this amount does not take into account Johnson's unliquidated assets, the amount available to satisfy consumer injuries is simply a drop in the bucket when compared to the potential liability. Consumers would likely receive pennies on the dollar for their injuries. Under these circumstances, the Court finds it inappropriate to pay defense counsel's fees at this time. Doing so at this juncture could leave consumers without any assets available for redress—an outcome that runs contrary to the Court's directive "to preserv[e] the integrity of disputed assets to ensure that such assets are not squandered by one party to the potential detriment of another." *Ferm*, 909 F.2d at 374.

### 4. Defendant's Access to Alternative Assets

Another important consideration for a district court in determining whether to release frozen assets is the defendant's availability of alternative assets. *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1032 n.10 (7th Cir. 1988). Here, the record supports a finding that Johnson may have access to alternative assets. Johnson claims that he has subsisted on his wife's savings since the Court entered the preliminary injunction. However, Johnson's recent expenditures would have far exceed his spouse's purported $130,000 savings which Johnson maintains is now depleted. Those expenditures include: (1) living expenses for the four months since the asset freeze; (2) a legal retainer paid to his new counsel; (3) investigation related costs; and (4) international travel expenses for himself, wife, and two children as they traveled back and forth from Utah to Costa Rica. Although $130,000 is no small amount, The Court doubts that Johnson was able to afford these expenses on his wife's savings alone.

Several additional inconsistencies lead the Court to believe that Johnson has access to additional assets. For instance, Johnson's initial Declaration did not mention any rental income which he was owed and had used for personal expenses. Instead Johnson represented to the Court, "I have not had the means to provide for myself and my family." (Dkt. #219-1, ¶ 16.) The $6,600

7

AO 72
(Rev. 8/82)

in rental income on a house in Santa Monica was only disclosed after the Receiver noted this inconsistency. (Dkt. #233-1, Johnson Supp. Decl. ¶ 2.a.) In addition, Johnson provides the Court with no details related to the large payments made to both Jones Waldo and Hutchinson & Steffen—at least $256,000—other than to say Jones Waldo may have "overused" the retainers paid by other Defendants, and Hutchinson & Steffen "has received a $7,500 retainer and one additional payment from others who expect to be paid back." (*Id.* ¶ 5.) The Affidavit of Fees and Costs also fails to provide any reference to payments and the individuals or entities who made those payments—Defendants or others. These vague references give the Court little reason to believe Johnson is without access to alternative funds.

### 5. Reasonableness of the Requested Funds

For a defendant to receive access to frozen funds, a district court must determine that the funds be used solely for fees which are "reasonable." *FSLIC v. Ferm*, 909 F.2d at 374; *see also World Wide Factors, Ltd.*, 882 F.2d at 348. The Court will separately address the reasonableness of the requested attorney fees and living expenses.

#### i. Attorney's Fees

To determine the reasonableness of requested attorney fees, a district court must follow the factors set forth in *Kerr v. Screen Extras Guild*, 526 F.2d 67 (9th Cir. 1975). These factors include: (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases. *Id.* at 70. In calculating attorney fees, the "lodestar" is calculated by multiplying number of hours expended on litigation by a reasonable hourly rate. *Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996).

AO 72
(Rev. 8/82)

1  Although it provides the Court with hourly totals for each Jones Waldo attorney, the Affidavit of Fees and Costs fails to attach the "detailed spreadsheet of all time spent and hourly descriptions" referenced as "Exhibit A." (Dkt. #219-2, ¶ 8.) In addition, Jones Waldo has not made any attempt to inform the Court of what portion of its fees are attributable to the Johnson Defendants rather than the numerous other individual and corporate Defendants. Without this specific information, the Court cannot genuinely examine the reasonableness of the requested fees.

Furthermore, the Court is unsure why Johnson would seek a specific amount of funds to pay Jones Waldo when Jones Waldo's bill has already been satisfied, especially in light of his representation that the bill may have been paid with retainers provided by some of the other individual Defendants. (Dkt. #233-1, Johnson Supp. Decl. ¶ 5.) And because he is unsure as to his portion, Johnson could potentially retain a leftover amount to the detriment of the Receiver's estate. Furthermore, if the Court were to unfreeze the requested fees to repay those retainers, it would essentially amount to refunding the Defendants rather than preserving the disputed funds for potential consumer injuries. With a myriad of unanswered questions remaining, the Court is unwilling to approve Johnson's request for attorney fees.

### ii. Living Expenses

To determine the reasonableness of requested living expenses, a district court must be comfortable that the requested funds involve necessities and would not support luxuries or a lavish lifestyle. *See, e.g., SEC v. Private Equity Mgmt. Group, Inc.*, No. 09-2901, 2009 WL 2058247, * 4 (C.D. Cal. July 9, 2009) (finding that a defendant's requests for living expenses was "facially unreasonable" because he asked for an amount that would fund "a lavish lifestyle" including owning multiple homes and cars); *SEC v. Duclaud Gonzalez de Castilla*, 170 F. Supp. 2d 427, 430 (S.D.N.Y. 2001) (denying defendant's request for living expenses that included money for a nanny, housekeeper, handyman, and nurse).

Johnson asks the Court to release approximately $27,000 per month for his living expenses. The Court finds Johnson's requests unreasonable for several reasons. In particular,

AO 72
(Rev. 8/82)

Johnson asks for funds to support a residence that: (1) is currently worth much less than the mortgage obligation, (2) was mortgaged through a suspicious and possibly fraudulent transaction, (3) he and his family did not actually live in for a period of at least two months since the Court ordered injunctive relief because they were temporarily residing in Costa Rica, (4) has a large yard purportedly necessitating a $2,600 monthly yard care expense, and (5) requires a $16,644 monthly payment—over 62% of his purported living expenses. Under these circumstances alone, the Court cannot justify Johnson's request. Johnson is not entitled to monies that would continue funding a fiscally irresponsible lifestyle, regardless of the injunction's language indicating that the Receiver may not take physical possession of or sell this residence. Therefore, the Court denies the Johnson Defendants' motion.

## CONCLUSION

Accordingly, and for good cause appearing,

IT IS HEREBY ORDERED that the Johnson Defendants' Emergency Motion for Release of Funds From Receiver for Living Expenses and Cost of Defense (#219) is DENIED.

Dated: June 17, 2011.

_____
**ROGER L. HUNT**
**United States District Judge**